# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTIQUENO CORBETT, DAMARIS LUCIANO, and ROB DOBBS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>PHARMACARE U.S., INC., a Delaware Corporation,<br><br>        Defendant. | Civil Action No.: 3:21-cv-00137-GPC-AGS |

## DECLARATION OF KEITH R. UGONE, PH.D.

**April 24, 2023**

CONFIDENTIAL – FOR COUNSEL ONLY

# DECLARATION OF KEITH R. UGONE, PH.D.

## April 24, 2023

I.  OVERVIEW OF ASSIGNMENT ................................................................ 1

II.  SUMMARY OF OPINIONS ...................................................................... 4

III.  QUALIFICATIONS AND EXPERIENCE ............................................... 7

IV.  FACTS, DATA, AND INFORMATION RECEIVED ............................... 9

V.  OVERVIEW OF PARTIES ...................................................................... 10

   A. Named Plaintiffs ................................................................................. 10

   B. PharmaCare U.S., Inc. ("PharmaCare") ............................................. 11

VI.  SUMMARY OF NAMED PLAINTIFFS' EXPERT SUBMISSIONS ...... 11

     1.  Summary of Dennis Report ............................................................ 11

     2.  Summary of the Weir Declaration ................................................. 16

VII.  OVERVIEW OF CHALLENGED PRODUCTS ..................................... 17

VIII.  OVERVIEW OF  CHALLENGED REPRESENTATIONS....................... 19

IX.  DETERMINATION OF CLAIMED ECONOMIC INJURY AND DAMAGES AS
A RESULT OF THE CHALLENGED REPRESENTATIONS REQUIRES
INDIVIDUAL INQUIRY ........................................................................ 20

   A. Challenged Products: Summary Of Forms And Size Packages.................. 21

   B. Challenged Products: Package Sizes And Prices ................................. 23

   C. Challenged Products: Forms And Prices .............................................. 24

   D. Challenged Products: Prices By Retailer ............................................. 26

   E. Challenged Products: Discounted And Expedited Prices ..................... 27

   F. Challenged Products And Challenged Representations.......................... 27

   G. Conclusion: Individual Inquiry (Not Common Proof) Is Required To Evaluate
Claimed Damages ................................................................................ 28

X.  THE CLAIMED PRICE PREMIUM MEASURES MR. WEIR WILL OBTAIN
FROM DR. DENNIS WILL NOT REPRESENT A PRICE PREMIUM.................. 29

   A. Dr. Dennis' Analysis Will Yield A Measure Of Consumer Willingness-To-Pay
Rather Than A Difference In Market Prices ............................................. 30

     1.  Willingness-To-Pay Measures Are Not Differences In Market Prices.............. 31

     2.  Documentary Support That A Conjoint Analysis/Market Simulation
Experiment Does Not Yield A Measure Of A Change In Market Price.............. 32

   B. Measures Of Willingness-to-pay, Such As Those To Be Calculated By Dr. Dennis,
Overstate Differences In Market Prices or Identify Differences Where None May
Exist ....................................................................................................... 34

EX PAGE - 0805

    C.  The Claimed Use Of Real-World Prices Does Not Transform Willingness-To-Pay Measures Into Differences In Market Prices ............................................................... 34

**XI.**      **MR. WEIR'S PROPOSED APPLICATION OF A CLASS-WIDE CLAIMED PRICE PREMIUM PERCENTAGE IGNORES INDIVIDUALIZED FACTORS . 36**

    A.  Different Demands Exist For The Challenged Products............................................. 38

    B.  Some Putative Class Members Purchased The Challenged Products And Were Satisfied With The Products' Performances ............................................................. 40

    C.  Some Putative Class Members Purchased The Challenged Products For Reasons Unrelated To The Challenged Representations ......................................................... 42

    D.  Individual Inquiry Is Required To Determine The Forms Purchased And The Prices Paid For Challenged Products ...................................................................................... 43

    E.  Mr. Weir's Discussion Of Supply-Side Factors Is Incomplete................................... 45

        1.  Mr. Weir Discussed General Claimed "Supply-Side Factors" That Are Insufficient For Determining Market Prices ......................................................... 45

        2.  Mr. Weir's Discussion Of Claimed "Supply-Side Factors" With Dr. Dennis Does Not Cause The Results From Dr. Dennis' Proposed Survey To Represent A Change In Market Price ...................................................................................... 46

    F.  Additional Deficiencies In Mr. Weir's Proposed Analysis: Full Compensatory Model .......................................................................................................................... 48

    G.  Mr. Weir Will Use Dr. Dennis' Current Survey Results For Past Years.................... 49

**XII.**     **CLAIMED INJURY AND/OR CLAIMED DAMAGES IN THIS MATTER CANNOT BE RELIABLY EVALUATED ON A CLASS-WIDE BASIS USING COMMON PROOF ......................................................................................................... 50**

## DECLARATION OF KEITH R. UGONE, PH.D.

### April 24, 2023

I, Keith R. Ugone, make the following declaration under penalty of perjury.

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by counsel for PharmaCare, U.S., Inc. ("Defendant" or "PharmaCare") to offer my opinions regarding various economic and damages-related issues relevant to class certification in the matter of *Montiqueno Corbett, Damaris Luciano, and Rob Dobbs, individually and on behalf of all others similarly situated vs. PharmaCare, U.S., Inc.*

2.    I understand that PharmaCare sells a line of Sambucol brand black elderberry products including: Original Syrup, Advanced Immune Syrup, Sugar Free Syrup, Syrup for Kids, Effervescent Tablets, Chewable Tablets, Pastilles (Throat Lozenges), Daily Immune Drink Powder, Gummies, Gummies for Kids, Advanced Immune Capsules, and Infant Drops (collectively the "Challenged Products").[1]

3.    I understand that Montiqueno Corbett and Rob Dobbs ("Named Plaintiffs" or "Plaintiffs") allege that PharmaCare has "intentionally marketed and sold … illegal … [Challenged] Products using false and misleading labeling and advertising."[2]  Generally, I understand

---

[1] Second Amended Class Action Complaint, *Corbett et al. v. Pharmacare U.S., Inc.*, November 29, 2021 ("Complaint"), ¶ 1. The terms "Challenged Products", "Challenged Representations", "Considered Products", and "Considered Representations" are defined in paragraph 2, paragraph 5, footnote 12, and footnote 12, respectively.

[2] Plaintiffs' Second Amended Class Action Complaint, *Montiqueno Corbett, Damaris Luciano, and Rob Dobbs, on Behalf of Themselves and All Other Similarly Situated, v. PharmaCare U.S., Inc*, Civil Action No. 3:21-cv-00137-GPC-AGS dated November 21, 2021 ("Second Amended Complaint"), ¶ 12. While the Second Amended Complaint includes three named Plaintiffs, I understand that Damaris Luciano is no longer a named Plaintiff. (Deposition of J. Michael Dennis, Ph.D., April 14, 2023 ("Dennis Deposition"), p. 9:18-19; Order Granting in Part and Denying in Part Defendant's Motion to Dismiss the First Amended Complaint, *Corbett et al. v. PharmaCare U.S., Inc.*, October 19, 2021 ("MTD Order"), pp. 3-4.)

EX PAGE - 0807

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

that Plaintiffs assert that the Challenged Products are "illegal to sell"[3] because: (a) the Challenged Products "contain [an] undisclosed NDI[]" or "new dietary ingredient;"[4] (b) PharmaCare made claims about the Challenged Products that, when viewed in their totality, … [were] either explicitly or implicitly claiming to mitigate or prevent disease;"[5] (c) the Challenged Products "labeling fail[ed] to include adequate directions for use;"[6] and (d) PharmaCare improperly "claim[ed] that its [Challenged] Products have 'high antioxidant levels.'"[7]

4.      I also understand that Plaintiffs assert that PharmaCare's "claim that its [Challenged] Products have been 'scientifically tested' is misleading and deceptive" and that the claim "'scientifically tested' improperly suggests that the [Challenged] Products are effective in keeping consumers safe from diseases[,] which is false."[8]  Plaintiffs further assert that they and the putative Class members "would not have purchased the [Challenged] Products or would not have paid as much for the Products had they known the truth about the mislabeled and false advertised [Challenged] Products."[9]

5.      I refer to the representations Challenged in the Second Amended Complaint, including those discussed above, as the "Challenged Representations."

_____

[3] Second Amended Complaint, ¶¶ 8, 93-94, and 100-101.

[4] Second Amended Complaint, ¶¶ 22-37.

[5] Second Amended Complaint, ¶¶ 38-56.

[6] Second Amended Complaint, ¶¶ 57-60.

[7] Second Amended Complaint, ¶¶ 61-69.

[8] MTD Order, p. 4.

[9] Second Amended Complaint, ¶ 79.

CONFIDENTIAL – FOR COUNSEL ONLY

EX PAGE - 0808

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

---

6. I understand that Plaintiffs seek certification of the following putative classes.[10]

   a. National "Class": "During the fullest period allowed by law, all persons in the United States who purchased the [Challenged] Products (the "National Class") for personal use and not for resale."

   b. California State "Subclass": "During the fullest period allowed by law, all persons in the State of California who purchased the [Challenged] Products (the "California Subclass") for personal use and not for resale."

   c. Missouri State "Subclass": "During the fullest period allowed by law, all persons in the State of Missouri who purchased the [Challenged] Products (the "Missouri Subclass") for personal use and not for resale."

7. Relating to claimed damages issues, Plaintiffs have provided two damages-related submissions in support of class certification.

   a. Dennis Report. On March 22, 2023, Dr. J. Michael Dennis submitted a declaration[11] and expert report ("Dennis Report") in support of class certification. Dr. Dennis proposed the use of a choice-based conjoint analysis ("CBC analysis") and market simulation "to isolate any price premium solely attributable" to certain representations.[12] At this stage of the dispute, Dr. Dennis has not performed a conjoint survey and/or associated market simulation to derive a claimed price premium.[13]

---

[10] Second Amended Complaint, ¶ 103.

[11] Declaration and Expert Report of J. Michael Dennis, Ph.D. dated March 22, 2023 and received on April 14, 2023 ("Dennis Report"). I use "Dennis Report" to refer to Dr. Dennis' amended report received on April 14, 2023 and that replaced the Declaration of J. Michael Dennis, dated March 22, 2023, which was received on March 22, 2023.

[12] Dennis Report, ¶ 28. The representations considered by Dr. Dennis are "scientifically tested," "virologist developed," "developed by a world renowned virologist," "support[] immunity," "Supports immune system," and "provides strong immune system support"12. Dennis Report, ¶ 18. Dr. Dennis also considered Plaintiffs' claim that "the products cannot be lawfully sold or labeled as 'Dietary Supplements' because [PharmaCare] allegedly failed to provide the U.S. Food & Drug Administration with the required New Dietary Ingredient ('NDI') information under applicable regulations." Dennis Report, ¶ 19. Dr. Dennis states that he "can test 'Dietary Supplement' as an additional [Considered] Representation, or in the alternative, ... could test the Omission 'This Product cannot legally be sold as a Dietary Supplement.'" Dennis Report ¶ 19. I refer to this alleged omission as the "Omission." I refer to the representations and Omission considered by Dr. Dennis as the "Considered Representations." Additionally, Dr. Dennis appears to have considered only a subset of the Challenged Products. Specifically, he does not appear to consider Gummies, Gummies for Kids, Advanced Immune Capsules, or Infant Drops in his analysis (Dennis Report ¶ 18, footnote 3). I refer to the eight products considered by Dr. Dennis as the "Considered Products."

[13] Dr. Dennis also was asked by counsel for Named Plaintiffs to conduct a "perceptions survey" and a "materiality survey." (Dennis Report, ¶ 21.) While Dr. Dennis has not completed his conjoint analysis and market simulation, he has completed his "perceptions survey" and "materiality survey." I have been asked to review and comment (from an economic and damages quantification perspective) only on Dr. Dennis' conjoint analysis and market simulation.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

b. <u>Weir Declaration</u>.  On March 22, 2023, Mr. Colin B. Weir submitted a declaration ("Weir Declaration") in support of class certification.[14] Mr. Weir proposed to use the results from Dr. Dennis' proposed survey and market simulation "to measure the overpayment for the [Challenged] Products solely attributable to Claims."[15] Mr. Weir also proposed a methodology for mathematically calculating claimed Class-wide damages.  At this stage of the dispute, Mr. Weir has not performed any damages-related calculations.

8.    I have been requested by counsel for PharmaCare to conduct the following analyses.

a. Evaluate from an economic perspective whether standard economic analysis can be used to quantify reliably on a Class-wide basis (using common proof) the economic injury and economic damages being claimed in this matter.

b. Evaluate from an economic perspective whether the proposed common proof methodologies presented in the Dennis Report and Weir Declaration for calculating claimed Class-wide damages would yield reliable results.

## II.    <u>SUMMARY OF OPINIONS</u>[16]

9.    Based upon (a) my economics and damage quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) analysis of sales and pricing data associated with the Challenged Products, and (e) my review of Plaintiffs' experts' submissions, *inter alia*, I have reached the following conclusions.

a. The claimed injury and/or claimed damages alleged to be suffered by putative Class members due to the Challenged Representations cannot be determined reliably using Class-wide (or common) proof.  Individual inquiry is required.

b. From an economic and damages quantification perspective, the methodology proposed by Dr. Dennis and Mr. Weir to calculate a Class-wide monetary recovery using common proof does not provide a reliable or relevant measure of the claimed economic injury (if any) experienced by putative Class members.

_____

[14] Declaration of Colin B. Weir, dated March 22, 2023 ("Weir Declaration").

[15] Weir Declaration, ¶ 6.  (Bracketed text added for clarification.) Weir identified the Considered Representations and the Omission (i.e., "This product cannot legally be sold as a dietary supplement."). (Weir Declaration, at footnote 2.)

[16] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout my declaration (i.e., narrative and associated exhibits).

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

10.    A simple and mechanical "price premium times quantity" or "price premium percentage times dollar sales" type approach (using common proof or a common price premium metric) will not yield a reliable measure of claimed Class-wide damages.  In this matter, there is no common proof measure of a claimed price premium associated with the Challenged Representations and Challenged Products (and Named Plaintiffs' survey and damages experts have not proposed a reliable one).

11.    As explained throughout my declaration, whether and to what extent any individual Class member may have experienced economic harm attributable to the Challenged Representations depends upon (among other things):

   a.  the form of the Challenged Product purchased;

   b.  the package size of the Challenged Product purchased;

   c.  the retailer from whom the Challenged Product is purchased;

   d.  the price paid (including whether a discount was received); and

   e.  the alleged misrepresentation.

12.    Analysis of public pricing data from various retailers, including CVS online, Walgreens online, and Amazon, indicates that there is not a single (i.e., uniform) Challenged Product and associated price that can be used to evaluate claimed damages on a Class-wide basis using a common proof approach.  Rather, Challenged Product data demonstrates that there are wide variations in purchase prices associated with the Challenged Products across their (a) forms, (b) package sizes, and (c) retailers, among other things.  Compounding this complexity is that the Challenged Representations are not the same across Challenged Products.  Some Challenged Products possess all of the Considered Representations while others possess only a limited number of the Considered Representations.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

13.   The aforementioned observations were not considered appropriately by Dr. Dennis when
      he opined that "[m]y price premium statistics will be accurately generalizable to the
      Defendant's Products sold during the proposed class period for the Proposed Classes."[17]
      This especially is true given that it appears Dr. Dennis' conjoint survey/market simulation
      will only be conducted on one size of one Challenged Product.[18] The aforementioned
      observations also were not considered appropriately by Mr. Weir in his proposed common
      proof price premium approach to evaluating claimed Class-wide damages.  Mr. Weir has
      not demonstrated that a single claimed damages measure can account for different market
      conditions under which individual putative Class members purchased the Challenged
      Products or can account for likely different price premiums (in absolute and percentage
      terms), if any.  Mr. Weir has not demonstrated that a single claimed damages measure can
      account for different features and forms that may drive purchase decisions across the
      different products with average sales prices varying significantly.

14.   More specifically, relating to these issues, Mr. Weir does not acknowledge or analyze the
      following considerations in his declaration.

      a.   The presence of different package sizes and prices (aggregate and per unit) indicate
           that there are different demands and cost considerations present for each of the package
           sizes offered of the Challenged Products.

      b.   The presence of different forms and prices indicate that there are different demands and
           cost considerations present for each of the forms offered of the Challenged Products.

      c.   The presence of different locations (and prices) where putative Class members can
           purchase the Challenged Products indicates that there are unique circumstances and

_____

[17] Dennis Report, ¶ 127.

[18] There are eight different forms across 12 different Challenged Products (plus numerous package sizes).  The product proposed to be surveyed by Dr. Dennis (i.e., Sambucol Black Elderberry Original Syrup product (7.8 fl. oz.)) comprises less than 10% of the various forms and varieties of the Challenged Products, as shown in **Exhibit 4** and **Exhibit 5**. I discuss this in more detail in **Section VI.I**.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023
_____

demands associated with where putative Class members purchase the Challenged Products (and their associated willingness-to-pay).

15. Additionally, in his claimed common proof approach to calculating claimed Class-wide damages, Mr. Weir does not properly consider (or consider at all) the following.

   a. A common claimed percentage price premium applied under the aforementioned circumstances will extract value <u>as claimed damages</u> when such value is unrelated to the Challenged Representations and is instead related to form, package size, or retailer. No supporting work has been performed to validate an assumption that survey results obtained for one Challenged Product out of many can be reliably applied to other Challenged Products of different forms, package sizes, and prices.

   b. Deficiencies in Dr. Dennis' analysis (e.g., measuring claimed changes in willingness-to-pay rather than claimed changes in market price) will carry over to Mr. Weir's claimed damages calculations, rendering his analysis unreliable.

   c. Individual inquiry is required to determine the forms of the Challenged Products purchased, the package size purchased, and ultimately, the claimed percentage price premium (if any).

   d. Consumer preferences are influenced by the contemporaneous market environment and socio-economic conditions. A survey yet to be conducted in a different market environment, especially in the current COVID-affected environment, cannot guarantee a result regarding a price premium applicable to a different (i.e., earlier) time period. No supporting work has been performed to validate an assumption that survey results obtained in the future (or today) can be reliably applied to an earlier, pre-COVID time period.

16. For the above reasons, <u>and for additional reasons presented throughout my declaration</u>, Dr. Dennis and Mr. Weir's proposed common proof approaches are not capable of reliably determining whether individual putative Class members experienced economic injury (if any) or the quantum of such economic injury (if such injury were to exist).

## III.   <u>QUALIFICATIONS AND EXPERIENCE</u>

17. I am currently serving as a Senior Advisor at Analysis Group, Inc. ("AG"), having retired from my Managing Principal position. I have been employed by AG since the beginning of 2004.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

18.     AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. AG has 14 offices worldwide (i.e., in Boston, MA; Chicago, IL; Dallas, TX; Denver, CO; Los Angeles, CA; Menlo Park, CA; Montreal, Quebec; New York, NY; San Francisco, CA; Washington, D.C.; Beijing, China; London, the United Kingdom; Brussels, Belgium; and Paris, France). AG consists of over 1,000 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, health care consulting, and strategy consulting.

19.     My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients. Throughout my career I have provided these consulting services in class certification matters, antitrust cases, breach of contract cases, intellectual property cases, fraud-related cases, business tort cases, business interruption cases, and securities-related cases, among others. I have worked on engagements (or submitted reports) relating to class certification issues numerous times, including but not limited to matters relating to beverages and energy drinks (alcoholic and non-alcoholic), fast food, non-stick cooking sprays, cooking oils, gas mileage, hand soap, facial cream, lipstick, foundation, computer tablets, printers, self-cleaning ovens, vehicle tires, windows, jewelry, and probiotics, among others.

20.     I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses. Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity, assessments of profitability, assessments of reasonable royalties, and assessments of the competitive

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023
_____

business environment. I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams. During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models. I have provided expert testimony in deposition and trial settings numerous times.

21.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983. Attached as **Exhibit 1** is a true and correct copy of my current resume. A listing of publications I have authored is contained in my resume. Attached as **Exhibit 2** is my trial and deposition testimony experience. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

22.    AG is being compensated based upon hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being compensated at a rate of $910 per hour for my time. Hourly rates for other staff at AG working on this matter range from $415 to $950 per hour, depending upon the level and experience of the staff involved.

## IV.    FACTS, DATA, AND INFORMATION RECEIVED

23.    The facts, data, and information available to me in forming my opinions are contained in **Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits). Examples of the types of information available to me included the following:

a.    legal documents: (e.g., Second Amended Class Action Complaint; PharmaCare's responses to interrogatories; Order Granting In Part And Denying In Part Defendant's Motion To Dismiss The First Amended Complaint);

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

    b.  <u>deposition transcripts</u>: (i.e., Weir Deposition; Dennis Deposition);

    c.  <u>reports and declarations</u>: (i.e., Declaration of Colin B. Weir, dated March 22, 2023; Declaration and Expert Report of J. Michael Dennis, Ph.D. dated March 22, 2023 and produced on March 22, 2023; Declaration and Expert Report of J. Michael Dennis, Ph.D. dated March 22, 2023 and produced on April 14, 2023);

    d.  <u>documents produced by PharmaCare</u>: (e.g., product labels; wholesale and direct-to-customer sales data relating to the accused products); and

    e.  <u>information independently obtained</u>: (e.g., information from PharmaCare's company website; information from online retailers' websites relating to Challenged Product offerings; economic literature).

24.    In addition, during the preparation of my declaration, I held a discussion with Dr. Ron Wilcox. I understand that Dr. Wilcox will be evaluating Dr. Dennis' conjoint analysis survey and conclusions.

25.    My analyses and opinions are based upon the information available, standard economic theory, and my education and training. The information I am relying upon is information typically relied upon by experts in my field. I reserve the ability to (a) review documents, deposition transcripts, expert reports, or other information (if any) still to be produced by the Parties to this dispute and (b) supplement my opinions based upon that review, if appropriate. I also reserve the ability to use demonstrative exhibits and/or other information at hearings/trial to explain and illustrate my opinions.

## V.    <u>OVERVIEW OF PARTIES</u>

### A.  <u>Named Plaintiffs</u>

26.    I understand that there are two remaining Named Plaintiffs in this litigation.

    a.  <u>Montiqueno Corbett</u>. Mr. Corbett alleged he is a resident of San Diego, California.[19] Mr. Corbett further alleged that between approximately November 2017 and January 2020 he purchased Sambucol Black Elderberry Capsules, Sambucol Black Elderberry

_____

[19] Second Amended Complaint, ¶ 14.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

Syrup Original, and Sambucol Black Elderberry Gummies through both Amazon and a CVS Pharmacy in San Diego, California.[20]

b. <u>Rob Dobbs</u>. Mr. Dobbs alleged he is a resident of Florissant, Missouri.[21] Mr Dobbs further alleged that between August 2019 and April 2020 he purchased Sambucol Black Elderberry Gummies through Amazon.[22]

27. While there are 12 Challenged Products (as described in more detail below and listed in **Table 1**), the Named Plaintiffs alleged that they have made purchases of just three such products (i.e., Sambucol Black Elderberry Capsules, Sambucol Black Elderberry Syrup Original, and Sambucol Black Elderberry Gummies). The Named Plaintiffs allege that they made these purchases at CVS Pharmacy and on Amazon.[23]

## B. **PharmaCare U.S., Inc. ("PharmaCare")**

28. Defendant PharmaCare sells the Sambucol line of black elderberry products at issue in this litigation.[24] In response to Interrogatory No. 7, PharmaCare attached:[25]

a. "a chart of gross sales in units and dollars to all its purchasers nationally by SKU in the United States during each month from 2015 to present at Appendix A"; and

b. "a chart of net sales in units and dollars to all its purchasers nationally by SKU in the United States during each month from 2015 to present at Appendix B."

## VI. **SUMMARY OF NAMED PLAINTIFFS' EXPERT SUBMISSIONS**

### 1. **Summary of Dennis Report**

29. Dr. Dennis states he is a survey research expert retained by Named Plaintiffs. Dr. Dennis was asked by Plaintiffs' counsel:

_____

[20] Second Amended Complaint, ¶ 80.

[21] Second Amended Complaint, ¶ 16.

[22] Second Amended Complaint, ¶ 97.

[23] Second Amended Complaint, ¶¶ 80 and 96.

[24] *See* Second Amended Complaint, ¶ 1.

[25] Defendant PharmaCare U.S., Inc's Further Response to Plaintiffs' First Set of Interrogatories, dated July 22, 2022, Interrogatory No. 7, pp. 14-15.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

(i) to design, conduct, and report on a reliable consumer perception survey to determine whether a reasonable consumer was misled by [PharmaCare's] labeling of the Products using the [Considered] Representations, and (ii) to design, conduct, and report on a reliable materiality survey to determine whether a reasonable consumer was influenced to purchase the Products because of the [Considered] Representations, and (iii) to propose a reliable methodology for measuring any price premium paid by Class Members that is solely attributable to Defendant's use of the [Considered] Representations.[26]

30. With respect to his assignment to propose a reliable methodology for measuring any price premium paid by Class members, Dr. Dennis opined that choice-based conjoint ("CBC") analysis is an appropriate survey design for this assignment.[27] He states that he will "design the conjoint survey or surveys in such a manner to provide a reliable and accurate measurement of the market price premia, if any, solely attributable to the [Considered] Representations used by Defendant on the [Considered] Products, as well as the Challenged representation and/or Omission relating to Defendant unlawfully labeling and selling the [Considered] Products as 'Dietary Supplements'."[28] Dr. Dennis states that he plans to use Sawtooth Software for designing his survey and conducting various analyses using the survey results.[29]

31. Dr. Dennis described the proposed conjoint survey in his report as follows.[30]

In a conjoint survey, survey participants are presented with a "choice exercise" in which they are typically shown a set of 3 or 4 hypothetical products and asked to choose which of the products, if any, they would purchase. The hypothetical products in conjoint surveys are typically comprised of 6 to 8 "attributes" that reflect features that consumers consider

_____

[26] Dennis Report, ¶ 21 (modifications in bracketed text added for clarification).

[27] Dennis Report, ¶ 83.

[28] Dennis Report, ¶ 90. (Bracketed text added for clarification.)

[29] Dennis Report, ¶ 119. Mr. Dennis relies on Dynata, a market research firm, to conduct online surveys. (Dennis Report, ¶ 43).

[30] Dennis Report, ¶¶ 87-88 (internal footnotes omitted).

EX PAGE - 0818

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

in making purchasing decisions. For consumer-packaged goods, attributes that consumers typically consider in their purchasing decisions include things like product brand, packaging claims, product size and, of course, price.

For each product attribute, there are various "levels" of the attribute. For example, if a conjoint was considering golf balls, attributes might be model and brand, performance, and price. The levels of the brand attribute might be "Pro V1, by Titleist," "Eclipse+, by Golfers, Inc.," "Long Shot, by Performance Plus," "RZN by Nike," "High-Flyer, by Smith and Forester." The levels for the performance attribute might be that the ball drives 20 yards farther than the average ball, 15 yards, 10 yards, 5 yards, or 0 yards.

32.   For his CBC analysis, Dr. Dennis proposes to present survey participants with twelve choice exercises (or "choice tasks"), where each choice set contains three different product profiles.[31]   These product profiles are comprised of three features with the following attributes and proposed attribute levels.[32]

a.   <u>Brand</u>.[33]   Dr. Dennis describes the brand attribute to be included in the conjoint analysis as follows.

I will select a representative sample of four or more different branded Elderberry products from the Defendant's competitors. The branded product list will be derived from leading products that compete with the [Considered] Products, plus the at-issue Product. As an initial matter, Defendant's market research indicates that among "immune support" products that contain Black Elderberry, consumers are most aware of these Sambucol competitors: Nature's Way, Nature Made, and Nature's Bounty. I will also consider Zarbee's Naturals for inclusion in the brand attribute.[34]

_____

[31] Dennis Report, ¶ 95.

[32] Mr. Dennis notes that while the proposed attribute levels are broadly defined, the price points and distractor claims have not been precisely defined (Dennis Report, ¶ 94).

[33] Dennis Report, ¶¶ 97-98 (internal footnote omitted).

[34] There is no indication in the Dennis Report that Dr. Dennis has conducted any additional investigation into these competitive products (including the claims made on the labeling of these competitive products).

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

---

    b. <u>Label Claims</u>.[35]  Dr. Dennis describes the label claims to be included in the conjoint analysis as follows.[36]

        i.   "Scientifically Tested";

        ii.  "Virologist Developed";

        iii. "Developed by a World Renowned Virologist";

        iv. "Support Immunity";

        v.  "Dietary Supplement"; and

        vi. "Eight or more unidentified 'distractor claims'".

    c. <u>Price</u>.  Dr. Dennis describes the price attribute to be included in the conjoint analysis as follows.[37]

        One price from 4 to 6 price points,[38] "based on the lowest and highest prices observed through actual sales transactions for the [Considered] Products and competing products."[39]

33.    For each of the choice sets, the survey respondent will choose one of the three product profiles[40] and indicate whether they actually would be willing to buy the product.[41] Dr.

---

[35] Dennis Report, ¶¶ 99-100.

[36] There is no indication in the Dennis Report that Dr. Dennis has conducted any additional investigation into other labeling claims that may influence a putative Class member's purchase decision. PharmaCare has provided wholesale and direct-to-customer sales data for 27 different stock keeping units (i.e., SKUs) over the FY2015 to FY2022 time period.  These SKUs covered different forms, different package sizes, age groups (i.e., infants, kids, and adults), strength (e.g., advanced immune), and sugar content (e.g., sugar free).

[37] There is no indication in the Dennis Report that Dr. Dennis has conducted any additional investigation into the prices associated with the Challenged Products. The prices of the Challenged Products vary by form, package size, retailer, and other attributes.  It appears Dr. Dennis intends to perform his conjoint survey/market simulation analysis using the Sambucol Black Elderberry Original Syrup product (7.8 fl. oz.).  This product comprises less than 10% of the various forms and varieties of the Challenged Products, as shown in **Exhibit 4** and **Exhibit 5**. Dr. Dennis has not investigated or stated in his report the prices associated with the product he proposes to use in his analysis (or as compared with the other Challenged Products provided by PharmaCare).  As discussed elsewhere in my report, there are significant price differences associated with the different Challenged Products.  Dr. Dennis has not reconciled his statement that he will use the lowest and highest prices observed through actual sales transactions for the surveyed product with the range of prices associated with other Challenge Products.

[38] Dennis Report, ¶ 95.

[39] Dennis Report, ¶ 103 (modification in bracketed text added for clarification).

[40] Dennis Report, ¶ 95.

[41] Dennis Report, ¶¶ 87 and 105.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

Dennis plans to communicate to respondents "to assume that the products do not differ in any way except for the differences in the attributes shown in the survey."[42]

34.    Dr. Dennis proposes to combine the results of his conjoint survey with a "market-simulation" analysis to "estimate reliably what the prices of the [Considered] Products would have been 'but-for' the harmful act (that is, Defendant's use of the [Considered] Representations) and then comparing those 'but-for' prices to the actual prices paid by class members."[43] Dr. Dennis proposes to do this employing Sawtooth Software using Hierarchical Bayesian models.[44] Dr. Dennis claims that "[m]arket simulation will provide a statistically robust estimate of the price premium that reasonable consumers paid, if any, as a result of each of the [Considered] Representations as well as the Challenged Representation ["Dietary Supplement"] and/or Omission relating to Defendant unlawfully labeling and selling the [Considered] Products as 'Dietary Supplements'."[45]

35.    Finally, Dr. Dennis proposes to provide the results of the CBC and market-simulation analysis to Mr. Weir for use in his proposed damages calculations.

> I [Dr. Dennis] understand that my price premium survey, *if conducted*, will be a source of data for Mr. Colin Weir, Plaintiffs' expert in economics, who I understand will be responsible for calculating economic damages. Mr. Weir would calculate the amount of any economic damages suffered by class members that is specifically attributable to the [Considered] Representations.[46]

_____

[42] Dennis Report, ¶ 95.

[43] Dennis Report, ¶ 28.

[44] Dennis Report, ¶ 123.

[45] Dennis Report, ¶ 123 (bracketed text added for clarification).

[46] Dennis Report, ¶ 22. (*Italics* added; modification in bracketed text added for clarification.) See also Dennis Report, ¶ 31: "Below I describe the sample design that I used in conducting the consumer perception and materiality surveys. I will use the same sample design approach *if asked* by Plaintiff's Counsel to conduct the proposed choice-based conjoint survey." (*Italics* added.)

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

### 2. <u>Summary of the Weir Declaration</u>

36.    Mr. Weir was retained by Named Plaintiffs to work with Dr. Dennis. Mr. Weir identifies

his assignment as the following.

> . . . to ascertain whether it would be possible to determine damages on a
> class-wide basis using common evidence, and if so, to provide a framework
> for the calculation of damages suffered by the proposed class of consumers
> as a result of the allegedly false and misleading Claims.[47]

37.    Mr. Weir further states that he has "been asked to work with Dr. Michael Dennis to help

design (from an economic perspective), and to evaluate the economic suitability of a

conjoint survey (to be designed, implemented, and analyzed by Dr. Dennis) to measure the

overpayment for the [Challenged] Products solely attributable to" the Considered

Representations and Omission.[48]

38.    According to Mr. Weir, he consulted with Dr. Dennis during the preparation of Dr. Dennis'

proposed conjoint survey design.[49] Mr. Weir intends to rely upon Dr. Dennis' estimated

price premium in order to estimate Class-wide damages.[50] Mr. Weir asserts that no

individualized inquiry is required[51] and that "[v]ariations in purchase price do not prevent

the calculation of class-wide damages."[52] Mr. Weir also asserts that Class-wide

overpayment damages can be calculated according to the following formula:[53]

$$\% \textit{ Price Premium Factor}: \textit{Claim} \times \$\textit{Units Sold} = \textit{Damages}.$$

_____

[47] Weir Declaration, ¶ 5.

[48] Weir Declaration, ¶ 6 (bracketed text added for clarification).

[49] Weir Declaration, ¶ 34.

[50] Weir Declaration, ¶¶ 39-40.

[51] Weir Declaration, § IX.

[52] Weir Declaration, ¶ 69.

[53] Weir Declaration, ¶ 63.

CONFIDENTIAL – FOR COUNSEL ONLY

EX PAGE - 0822

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

___

39.    Separately, Mr. Weir describes a "Full Compensatory Damages" framework that he claims

would be appropriate "[i]f the Plaintiffs prove that they are due a full recovery as a matter

of law."[54] Mr. Weir states that these damages "can be calculated using the sales data that

have been obtained, or are in the process of being obtained, by Plaintiffs' counsel."[55] Under

this methodology, claimed Class-wide damages would be calculated as:[56]

$$Units\ Sold\ \times Average\ Retail\ Price = Full\ Compensatory\ Damages.$$

## VII.    OVERVIEW OF CHALLENGED PRODUCTS

40.    During the putative Class period as defined by the Named Plaintiffs (i.e., during "the fullest

period allowed by law"[57]), PharmaCare sold a variety of Sambucol products that are the

subject of Plaintiffs' allegations in the Second Amended Complaint.[58] The Challenged

Products[59] are identified in the following table.

**Table 1**

| Challenged Products | |
|---|---|
| Sambucol Black Elderberry Original Syrup | Sambucol Black Elderberry Advanced Immune Capsules |
| Sambucol Black Elderberry Advanced Immune Syrup | Sambucol Black Elderberry Effervescent Tablets |
| Sambucol Black Elderberry Sugar Free Syrup | Sambucol Black Elderberry Chewable Tablets |
| Sambucol Black Elderberry Syrup for Kids | Sambucol Black Elderberry Pastilles (Throat Lozenges) |
| Sambucol Black Elderberry Gummies | Sambucol Black Elderberry Daily Immune Drink Powder |
| Sambucol Black Elderberry Gummies for Kids | Sambucol Black Elderberry Infant Drops |

___

[54] Weir Declaration, ¶ 65.

[55] Weir Declaration, ¶ 68.

[56] Weir Declaration, ¶ 67.

[57] Second Amended Complaint, ¶ 103.

[58] Second Amended Complaint, ¶ 11.

[59] Second Amended Complaint, ¶ 1.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

41.  Elderberry refers to the fruit of the flowering plants of the genus *Sambucus*.[60] Dietary supplements containing elderberry have become increasingly popular in recent years, which the American Botanical Council suggests is driven by a growing "focus on immune support" by dietary supplement consumers.[61]

42.  PharmaCare produces a variety of Sambucol products for consumers who wish to purchase an elderberry supplement. In addition to the varying "forms"— such as syrup, gummies, tablets, lozenges, and powders— exhibited in the table above, these Sambucol products are available in various unit counts. As will be discussed in more detail below, review of Amazon, Walgreens, CVS and PharmaCare's websites reveals the following about the Challenged Products.

   a.  Sambucol Black Elderberry Original Syrup is an elderberry syrup that is sold in 4oz, 7.8oz, or 16.9oz bottles.

   b.  Sambucol Black Elderberry Sugar Free Syrup is a version of Sambucol Black Elderberry Original Syrup containing no additional sugar that is sold in 4oz bottles.

   c.  Sambucol Black Elderberry Syrup for Kids is a lower dose version of Sambucol Black Elderberry Original Syrup specially made for children between 2 and 12 years of age that is sold in 4oz or 7.8oz bottles or a pack of two 15.6oz bottles.

   d.  Sambucol Black Elderberry Infant Drops are a low dose, low viscosity elderberry syrup formulated specifically for children between 6 months and 2 years of age. It is sold in 0.68oz bottles.

   e.  Sambucol Black Elderberry Advanced Immune Syrup is a version of Sambucol Black Elderberry Original Syrup containing additional vitamin C and zinc that is sold in 4oz bottles.

---

[60] Second Amended Complaint, ¶ 2.

[61] Smith, T., Resetar, H., and Morton, C., "US Sales of Herbal Supplements Increase by 9.7% in 2021," American Botanical Council, Volume 19, Issue 11, November (https://www.herbalgram.org/resources/herbalegram/volumes/volume-19/issue-11-november/news-and-features-1/2021-herb-market-report/).

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

    f.   Sambucol Black Elderberry Advanced Immune Capsules are a pill form of Sambucol Black Elderberry Advanced Immune Syrup that are sold in 30 capsule packs.

    g.   Sambucol Black Elderberry Gummies are chewable elderberry gummies containing vitamin C and zinc that are sold in 10, 30, 60, or 90 gummy bags or packs.

    h.   Sambucol Black Elderberry Gummies for Kids are a version of Sambucol Black Elderberry Gummies made for children at least three years of age. They are sold in 30 gummy bottles.

    i.   Sambucol Black Elderberry Chewable Tablets are a chewable tablet containing elderberry and vitamin C, with no added sugar. They are sold in 30 or 60 tablet bottles.

    j.   Sambucol Black Elderberry Pastilles are an elderberry throat lozenge containing honey as well as vitamin C and zinc. They are sold in 20 lozenge packs.

    k.   Sambucol Black Elderberry Daily Immune Drink Powder is an elderberry and vitamin C powder intended to be dissolved in water and drank. They are sold in 16 or 30 packet boxes.

    l.   Sambucol Black Elderberry Effervescent Tablets are tablets containing elderberry, as well as vitamin C and zinc that dissolve in water to create a carbonated beverage. They are sold in 15 tablet packs.

43.    Additional details relating to the Challenged Products are provided throughout my declaration.

## VIII.  OVERVIEW OF CHALLENGED REPRESENTATIONS

44.    In the Second Amended Complaint, Named Plaintiffs (i.e., Mr. Corbett and Mr. Dobbs) allege a number of Challenged Representations.

45.    Mr. Corbett alleges that he relied upon some of the Challenged Representations, including "representations that ... its elderberry ingredient (a) was developed by a virologist; (b) supports immunity, (c) supports the immune system (d) is scientifically tested, (e) has been used in clinical studies, (f) has high antioxidant levels, (g) helps you and your family stay

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

healthy throughout the year, and (h) arms you with the best protection nature has to offer."[62]

46.    Mr. Dobbs also alleges that he relied upon some of the Challenged Representations, including:  "claims that its elderberry ingredient (a) was developed by a world renowned virologist, (b) supports immunity and supports the immune system, (c) has been scientifically tested, (d) has been used in clinical studies, (e) has high antioxidant levels, (f) helps you and your family stay healthy throughout the year, and (g) arms you with the best protection nature has to offer."[63]

47.    As discussed above, Dr. Dennis and Mr. Weir appear to have considered some but not all of the Challenged Representations, including some but not all of the representations upon which Named Plaintiffs allege they have relied.

IX.    **DETERMINATION OF CLAIMED ECONOMIC INJURY AND DAMAGES AS A RESULT OF THE CHALLENGED REPRESENTATIONS REQUIRES INDIVIDUAL INQUIRY**

48.    Whether and to what extent any individual Class member may have experienced economic harm attributable to the Challenged Representations depends upon (among other things):

a.    the form of the Challenged Product purchased;

b.    the package size of the Challenged Product purchased;

c.    the retailer from whom the Challenged Product is purchased;

d.    the price paid (including whether a discount was received); and

e.    the alleged misrepresentation.

---

[62] Second Amended Complaint, ¶ 81.

[63] Second Amended Complaint, ¶ 97.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

49.    Analysis of public pricing data from various retailers, including CVS online, Walgreens online, and Amazon, indicates that there is not a single (i.e., uniform) Challenged Product and associated price that can be used to evaluate claimed damages on a Class-wide basis using a common proof approach.   Rather, on-line Challenged Product pricing data demonstrates that there are wide variations in purchase prices associated with the Challenged Products across their (a) forms, (b) package sizes, and (c) retailers. Compounding this complexity is that the Challenged Representations are not the same across Challenged products.

50.    With respect to the Challenged Products, there are multiple forms, multiple package sizes, no meaningful price metric that can be used to evaluate a claimed common price premium, and no "single" set of at-issue representations that the Plaintiffs can use as a basis to evaluate Class-wide claimed damages.   In light of the aforementioned variations, determining whether and to what extent putative Class members experienced claimed economic harm requires individualized inquiry. The Named Plaintiffs' assertion of economic injury is not amenable to Class-wide (common) proof.

51.    The information presented in the remainder of this section provides the bases and support for my conclusion.

   **A.   <u>Challenged Products: Summary Of Forms And Size Packages</u>**

52.    **Table 2** below lists the Challenged Products sold at CVS online, Walgreens online, and Amazon, grouped by form and package size.[64]   As demonstrated by the information

_____

[64] *See* **Exhibits 6-8** for lists of Sambucol Black Elderberry products and prices thereof as advertised at CVS online, Walgreens online, and Amazon, respectively. *See also* **Exhibits 9-11** for screenshots of those individual products per retailer.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

contained in **Table 2**, there are 8 different forms and 27 different package sizes across the

Challenged Products.

a.  Forms include capsules, powder, chewable tablets, effervescent tablets, gummies, liquid, syrup, and pastilles.

b.  Capsules, chewable tablets, gummies, and pastilles come in the following package sizes (that vary by form): 10 count, 15 count, 20 count, 20 count (2 pack), 20 count (3 pack), 30 count, 30 count (2 pack), 30 count (4 pack), 60 count, 90 count.

c.  Power packages include 0.1 ounce (16 pack) and 0.1 ounce (30 pack) packages.

d.  Effervescent tables come in the following package sizes: 15 count, 15 tablets (2 pack), and 15 tablets (3 pack).

e.  The liquid form comes in 0.68 fluid ounces.

f.  The syrup form comes in 4.0 fluid ounces, 4.0 fluid ounces (2 pack), 4.0 fluid ounces (4 pack), 4.0 fluid ounces (5 pack), 4.0 fluid ounces (8 pack), 7.8 fluid ounces, 7.8 fluid ounces (2 pack), 7.8 fluid ounces (3 pack), 7.8 fluid ounces (multi-pack), and 16.9 fluid ounces.

**Table 2**
**Challenged Products, Form, and Unit Sizes**

| Challenged Products | Form | Unit Count |
|---|---|---|
| Sambucol Black Elderberry Advanced Immune Capsules | Capsules | 30 Count |
| Sambucol Black Elderberry Daily Immune Drink Powder | Powder | 0.1 Oz, 16 Pack |
| | | 0.1 Oz, 30 Pack |
| Sambucol Black Elderberry Chewable Tablets | Tablets (Chewable) | 30 Count |
| | | 30 Count, 2 Pack |
| | | 30 Count, 4 Pack |
| | | 60 Count |
| Sambucol Black Elderberry Effervescent Tablets | Tablets (Effervescent) | 15 Count |
| | | 15 Tablets, 2 Pack |
| | | 15 Tablets, 3 Pack |
| Sambucol Black Elderberry Gummies | Gummies | 10 Count |
| | | 30 Count |
| | | 30 Count, 2 Pack |
| | | 30 Count, 3 Pack |
| | | 60 Count |
| | | 90 Count |
| Sambucol Black Elderberry Gummies for Kids | Gummies | 30 Count |
| Sambucol Black Elderberry Infant Drops | Liquid | 0.68 Fl oz |

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

| | | 4 Fl Oz |
|---|---|---|
| Sambucol Black Elderberry Original Syrup | Syrup | 4 Fl Oz, 2 Pack |
| | | 4 Fl Oz, 4 Pack |
| | | 4 Fl Oz, 5 Pack |
| | | 4 Fl Oz, 8 Pack |
| Sambucol Black Elderberry Original Syrup | Syrup | 7.8 Fl Oz |
| | | 7.8 Fl Oz, 2 Pack |
| | | 7.8 Fl Oz, 3 Pack |
| | | 7.8 Fl Oz, Multi-Pack |
| | | 16.9 Fl Oz |
| Sambucol Black Elderberry Sugar Free Syrup | Syrup | 4 Fl Oz |
| Sambucol Black Elderberry Advanced Immune Syrup | Syrup | 4 Fl Oz |
| Sambucol Black Elderberry Syrup for Kids | Syrup | 4 Fl Oz |
| | | 4 Fl Oz, 2 Pack |
| | | 4 Fl Oz, Multi-Pack |
| | | 7.8 Fl Oz |
| Sambucol Black Elderberry Pastilles (Throat Lozenges) | Pastilles | 20 Count |
| | | 20 Count, 2 Pack |
| | | 20 Count, 3 Pack |

## B. **Challenged Products: Package Sizes And Prices**

53.     The prices of the Challenged Products vary depending upon the package size. For example, as shown in **Table 3** and **Table 4**, the prices of Sambucol Black Elderberry Gummies and Original Syrup, two of the twelve Challenged Products sold at Walgreens online, vary by package size. Prices range from $4.99 (10 count) to $25.99 (60 count) for Sambucol Black Elderberry Gummies and from $15.99 (4.0 fluid ounces) to $29.99 (7.8 fluid ounces) for Sambucol Black Elderberry Original Syrup. In addition, these prices are not proportional to the package size.[65] The presence of different package sizes and prices (aggregate and

---

[65] For Black Elderberry Gummies, the price per one gummy for the 10-, 30-, and 60-count products is respectively $4.99 / 10 count = $0.499, $14.99 / 30 count = $0.500, and $25.99 / 60 count = $0.433, respectively. Similarly, for Black Elderberry Original Syrup, the price per fluid ounce is $15.99 / 4 Fl Oz = $4.000 and $29.99 / 7.8 Fl Oz = $3.845, respectively.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

___

per unit) indicate that there are different demands and cost considerations present for each

of the package sizes offered of the Challenged Products.

**Table 3**
**Prices of Sambucol Black Elderberry Gummies by Package Size**

| Unit Count | Price | Price Per Count (Rounded) |
|---|---|---|
| 10 Count | $    4.99 | $    0.50 |
| 30 Count | $    14.99 | $    0.50 |
| 60 Count | $    25.99 | $    0.45 |

**Table 4**
**Prices of Sambucol Black Elderberry Original Syrup by Package Size**

| Unit Count | Price | Price Per Fluid Ounce (Rounded) |
|---|---|---|
| 4 Fl Oz | $    15.99 | $    4.00 |
| 7.8 Fl Oz | $    29.99 | $    3.84 |

## C. Challenged Products: Forms And Prices

54.     The prices of the Challenged Products vary depending upon the form. **Table 5** lists eight

different forms that the Challenged Products represent. The Challenged Products can be

largely divided into two categories: solid and non-solid. Among the solid Challenged

Products, for example, there are specific forms: capsules, gummies, pastilles, powder, and

chewable tablets. And even among the solid forms, customers may prefer one form to

another. That is, it is reasonable to consider that a consumer would have preferences for

the form purchased to the extent that they purchase (for example) chewable tablets over

Gummies and given the different prices across forms.[66]

___

[66] Similar approach applies to liquid forms, e.g., liquid and syrup.

CONFIDENTIAL – FOR COUNSEL ONLY
- 24 -

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

**Table 5**
**List of the Challenged Products by Form**

| Form | Challenged Products |
|------|---------------------|
| Capsules | Sambucol Black Elderberry Advanced Immune Capsules |
| Gummies | Sambucol Black Elderberry Gummies |
| | Sambucol Black Elderberry Gummies for Kids |
| Tablets (Chewable) | Sambucol Black Elderberry Chewable Tablets |
| Tablets (Effervescent) | Sambucol Black Elderberry Effervescent Tablets |
| Pastilles | Sambucol Black Elderberry Pastilles (Throat Lozenges) |
| Powder | Sambucol Black Elderberry Daily Immune Drink Powder |
| Syrup | Sambucol Black Elderberry Advanced Immune Syrup |
| | Sambucol Black Elderberry Original Syrup |
| | Sambucol Black Elderberry Sugar Free Syrup |
| | Sambucol Black Elderberry Syrup for Kids |
| Liquid | Sambucol Black Elderberry Infant Drops |

55.     As an additional consideration, **Table 6** lists two different prices of Sambucol Black Elderberry products sold in the same unit count (but different forms) at Walgreens online. A pack of the 30 count Sambucol Black Elderberry Advanced Immune Capsules are sold at $18.49 and a pack of the 30 count Sambucol Black Elderberry Gummies are sold at $14.99.

**Table 6**
**Prices of 30-Count Challenged Products by Form**

| Form | Challenged Products | Price |
|------|---------------------|-------|
| Capsules | Sambucol Black Elderberry Advanced Immune Capsules | $ 18.49 |
| Gummies | Sambucol Black Elderberry Gummies | $ 14.99 |

CONFIDENTIAL – FOR COUNSEL ONLY
EX PAGE - 0831

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

56.   As can be discerned from the above information, the presence of different forms and prices
      indicate that there are different demands and cost considerations present for each of the
      forms offered of the Challenged Products.

      **D.  Challenged Products: Prices By Retailer**

57.   The prices of the Challenged Products vary depending upon the retailer. Based upon
      Plaintiffs' allegations and during the Relevant Period, the Named Plaintiffs assert they
      bought the Challenged Products at two retailers: Amazon and CVS.  These retailers do not
      sell at the same price.

58.   **Exhibit 12** depicts a pairwise comparison of the Challenged Products at three retailers,
      Amazon, CVS, and Walgreens. As summarized in **Exhibit 12**, the following observations
      can be made: (1) some products may not be available at all three retailers and (2) the
      products that are sold in only two retailers may be sold at the same price.[67] However,
      amongst the products that are sold across all three retail stores, no price is identical for the
      same Challenged Product. For example, as of April 12 and 13, 2023, a 4 Fl Oz product of
      Sambucol Black Elderberry Advanced Immune Syrup was sold at $17.49, $17.99, and
      $11.99 at CVS, Walgreens, and Amazon, respectively. Similarly, on the same dates, a 30-
      count product of Sambucol Black Elderberry Advanced Immune Capsules was sold at
      $19.49, $18.49, and $12.88 in the three retailers, respectively.

59.   The presence of different locations (and prices) where putative Class members can
      purchase the Challenged Products indicates that there are unique circumstances and
      demands driving where putative Class members purchase the Challenged Products.

_____

[67] An example includes a 10-count product of Sambucol Black Elderberry Gummies that is sold at both CVS and
Walgreens, but not Amazon. As of April 12, 2023, the product in the two retailers was sold at the same price of $4.99.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

### E.  Challenged Products: Discounted And Expedited Prices

60.    In addition, Amazon offers a discounted price and an expedited price. Amazon customers

could purchase a Challenged Product (a) at a 10% discount via a regular subscription option

called "Subscribe & Save" or (b) with a premium for expedited shipping with the "Get it

Faster" option. For example, Amazon customers could have purchased Sambucol Black

Elderberry Advanced Immune Capsules at the original price of $12.88 or opted to subscribe

to a regular (e.g., monthly) purchase and paid $11.59, saving about 10.02% of the original

price.[68] As another example, Amazon customers could have purchased Sambucol Black

Elderberry Daily Immune Drink Powder at the original price or $17.99 or opted for faster

shipping and purchased the same product for $18.92, paying a premium of around 5.20%.[69]

61.    The presence of some putative Class members willing to purchase the Challenged Products

at a regular price, or at a lower automatic refill price, or at an expedited shipping price

indicate that there are different demands present in the marketplace for the Challenged

Products.

### F.  Challenged Products And Challenged Representations

62.    Analysis of Sambucol's pricing data presented above demonstrates that there are wide

variations in the prices of the Challenged Products depending upon at least the form,

package size, retailer, and add-on services (i.e., automatic refills and expedited delivery).

In addition, consideration must be given to the different Challenged Representations.

63.    As stated earlier in my declaration, while there appears to be a variety of Challenged

Representations, Dr. Dennis and Mr. Weir appear to consider the following statements:

_____

[68] The prices are as of April 13, 2023.

[69] The prices are as of April 13, 2023.

CONFIDENTIAL – FOR COUNSEL ONLY
- 27 -

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

___

a.  scientifically tested;

b.  virologist developed;

c.  developed by a world-renowned virologist;

d.  support[s] immunity;

e.  supports immune system;

f.  provides strong immune system support; and

g.  dietary supplement.

64.    However, as shown in **Exhibit 13**, not all of the Considered Representations appear on the

packaging of each of the Challenged Products.

a.  the packaging of Sambucol Black Elderberry Syrup for Kids contains <u>seven</u> of the Challenged Representations;

b.  the packaging of Sambucol Black Elderberry Pastilles contains <u>five</u> of the Challenged Representations;

c.  the packaging of Sambucol Black Elderberry Gummies contains <u>three</u> of the Challenged Representations; and

d.  the packaging of Sambucol Black Elderberry Advanced Immune Capsules contains <u>four</u> of the Challenged Representations.

In addition, all of the aforementioned Challenged Products contain the disclaimer "[t]hese

statements have not been evaluated by the [FDA]. This product is not intended to diagnose,

treat, cure or prevent any disease."

### G.  <u>Conclusion: Individual Inquiry (Not Common Proof) Is Required To Evaluate Claimed Damages</u>

65.    In light of the aforementioned variations, determining whether and to what extent putative

Class members experienced claimed economic harm requires individualized inquiry. The

Named Plaintiffs' assertion of economic injury is not amenable to Class-wide common

proof.  With respect to the Challenged Products, there are multiple forms, multiple package

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

sizes, no meaningful price metric that can be used to evaluate a claimed price premium, and no "single" set of at-issue representations that the Plaintiffs can use as a basis to evaluate Class-wide claimed damages such that one claimed price premium is applicable to each set of circumstances described in this section of my declaration. In addition, a common claimed percentage price premium applied under these circumstances will extract value as claimed damages when such value is unrelated to the Challenged Representations and is instead related to form, package size, or retailer.

## X.     THE CLAIMED PRICE PREMIUM MEASURES MR. WEIR WILL OBTAIN FROM DR. DENNIS WILL NOT REPRESENT A PRICE PREMIUM

66.     Dr. Dennis proposes to combine the results of his conjoint survey with a "market-simulation" analyses to "estimate reliably what the prices of the C[considered] Products would have been "but-for" the harmful act (that is, without Defendant's use of the C[considered] Representations) and then comparing those "but-for" prices to the actual prices paid by class members."[70] Dr. Dennis proposes to do this employing Sawtooth Software using Hierarchical Bayesian models. [71] Dr. Dennis claims that "[m]arket simulation will provide a statistically robust estimate of the price premium that reasonable consumers paid, if any, as a result of each of the [Considered] Representations as well as the Challenged representation and/or Omission relating to Defendant unlawfully labeling and selling the [Considered] Products as 'Dietary Supplements'."[72] Dr. Dennis proposes

_____

[70] Dennis Report, ¶ 28.

[71] Dennis Report, ¶ 123.

[72] Dennis Report, ¶ 123.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

to provide the results of the conjoint and market-simulation analyses to Mr. Weir for use in his proposed damages calculations.[73]

67.    Mr. Weir and Dr. Dennis characterized the results of Dr. Dennis' conjoint analysis and market simulations as yielding a price premium associated with the Considered Representations.  As explained in detail below, however, Dr. Dennis' proposed approach provides only a measure of survey respondents' "willingness-to-pay" associated with the [Considered] Representations, not a difference in equilibrium market values, or market prices.  This is an important distinction as "value" is measured by market prices (not measured by willingness-to-pay) and changes in value are measured by changes in market prices (not measured by changes in willingness-to-pay).

A.  **Dr. Dennis' Analysis Will Yield A Measure Of Consumer Willingness-To-Pay Rather Than A Difference In Market Prices**

68.    According to basic economic theory, market price is determined by the interaction of supply and demand factors.  Hence, in order to determine the market prices that putative Class members would have paid absent the Challenged Representations, a damages methodology must evaluate not only demand-side considerations absent the alleged Challenged Representation, but also supply-side considerations.  Dr. Dennis' conjoint survey and market simulation provide only information from the demand side of consumer behavior and hence yield measures known as willingness-to-pay rather than market prices (or market price differences).

_____

[73] Dennis Report, ¶ 22 (*Italics* added):

I understand that my price premium survey, *if conducted*, will be a source of data for Mr. Colin Weir, Plaintiffs' expert in economics, who I understand will be responsible for calculating economic damages.  Mr. Weir would calculate the amount of any economic damages suffered by class members that is specifically attributable to the [Considered] Representations.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

### 1.  <u>Willingness-To-Pay Measures Are Not Differences In Market Prices</u>

69.    Willingness-to-pay is a measure of the maximum price for which a given consumer would
be willing to purchase a product.[74]  In the context of attempting to measure the value of a
product feature or attribute (such as the Challenged Representations), willingness-to-pay
may be thought of as the largest additional amount for which a given consumer would be
willing to buy a product with the attribute as compared to a product without the attribute.
However, this measure provides limited information regarding the actual market price for
a product (or actual differences in price attributable to a product attribute) because market
prices are determined by the interaction of supply and demand factors.  Willingness-to-
pay is a demand side only consideration.

70.    The differences between consumers' willingness-to-pay and market prices can be
demonstrated by considering an example of consumer preferences regarding disposable
plastic water bottles.  A convenience store may sell a bottle of water for $1.00 per bottle,
which might be the price throughout the year.  On an ordinary day, a consumer may be
willing to pay $1.00 for a bottle of water, whereas on a particularly hot day, the same
consumer may be willing to pay $5.00 for a bottle.  In this example, a method that treats
willingness-to-pay as a measure of market prices would yield a claimed price difference
of $4.00 associated with sales on a hot day (i.e., $5.00 per bottle on a hot day minus $1.00
per bottle on a regular day).  However, as described above, the convenience store actually
charges $1.00 per bottle regardless of the weather, and the consumer does not actually pay

_____

[74] "Willingness-to-pay – definition and meaning," Market Business News (https:// marketbusinessnews.com/financial-glossary/willingness-pay-definition-meaning/).

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

a higher price even when the consumer would have been willing to pay a higher amount
on a hot day.

71.    This example illustrates the difference between willingness-to-pay measures and
differences in market prices.  Moreover, this example demonstrates that a measure of
willingness-to-pay can overstate (and sometimes significantly overstates) a market price
difference (if any) because it does not account for supply-side factors.  Hence, a claimed
damages model predicated on measures of willingness-to-pay associated with the
Challenged Representations cannot reliably measure (and overstates or identifies where
none exists) economic harm that Named Plaintiffs have alleged that putative Class
members have suffered.

### 2. Documentary Support That A Conjoint Analysis/Market Simulation Experiment Does Not Yield A Measure Of A Change In Market Price

72.    Dr. Dennis and Mr. Weir insist that their proposed methodologies account for supply side
considerations and, hence, yield estimates of changes in market prices when the
Considered Representations are removed in a conjoint analysis/market simulation
environment.  However, publications by Sawtooth Software (i.e., the company that
provides the software Dr. Dennis proposes to use for his analysis) or affiliated individuals
clarify that Dr. Dennis' conjoint survey and market simulations yield only measures of
survey respondents' willingness-to-pay.  I rely upon the my economic training and the
following passages in support of this observation.

a.    2001 Article From Sawtooth Software Research Paper Series.  A 2001 article from the
Sawtooth Software Research Paper Series advocates the use of market simulation to
perform willingness-to-pay analyses.  The article's description of market simulation
supports that the result of such a simulation is not an actual difference in market prices

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

but rather is a measure of "what new price can be charged while maintaining the same share of preference."[75]

b. <u>2010 Book By Bryan Orme, President Of Sawtooth Software</u>.  Sawtooth Software promotes and offers for sale on its website a book entitled "Getting Started with Conjoint Analysis" by Bryan Orme.[76]  In this work, Mr. Orme described conjoint analysis and market simulations as yielding consumer demand measures or measures of willingness-to-pay.

i. In Chapter 9 of his book ("Interpreting the Results of Conjoint Analysis"), Mr. Orme stated that "[t]he results of conjoint analysis may be used to assess the price elasticity [of demand] of products and services.  It also may be used to assess buyer price sensitivity and willingness-to-pay."[77]

ii. In Chapter 10 of his book ("Market Simulators for Conjoint Analysis"), Mr. Orme described market simulators as allowing for the estimation of demand curves and consumer price elasticities.[78]  The chapter states that "[t]he market simulator focuses on the demand side of the marketing equation; but it is also important to pay attention to the supply side and take the costs of producing different products/services into consideration."[79]  Also in this chapter, Mr. Orme states regarding "share of preference" predictions that they "usually should not be interpreted as market shares, but as relative indications of preference," further demonstrating that conjoint surveys and market simulators do not identify market outcomes but rather consumer preference measures.[80]

c. <u>2017 Book Published By Sawtooth Software</u>.  A 2017 book by Bryan Orme and Keith Chrzan and published by Sawtooth Software describes the market simulation procedure to be used by Dr. Dennis as yielding measures of willingness-to-pay ("WTP").

> Finally, one can use conjoint simulations to find WTP.  To do this, we simulate a set of competing products A and B.  Product A possesses the

---

[75] Orme, Bryan K. (2001) "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions."  Sawtooth Software Research Paper Series, p. 4, available at https://www.sawtoothsoftware.com/download/techpap/monetary.pdf.

[76] "Getting Started with Conjoint Analysis – Strategies for Product Design and Pricing Research."  Sawtooth Software (https://www.sawtoothsoftware.com/products/conjoint-choice-analysis/getting-started-with-conjoint-analysis).

[77] Orme, Bryan K. (2010) "Interpreting the Results of Conjoint Analysis," Chapter 9 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research,* Second Edition, Research Publishers LLC, p. 84.

[78] Orme, Bryan K. (2010) "Market Simulators for Conjoint Analysis," Chapter 10 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research,* Second Edition, Research Publishers LLC, pp. 95 - 97.

[79] Orme, Bryan K. (2010) "Market Simulators for Conjoint Analysis," Chapter 10 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research,* Second Edition, Research Publishers LLC, p. 96.

[80] Orme, Bryan K. (2010) "Market Simulators for Conjoint Analysis," Chapter 10 in *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research,* Second Edition, Research Publishers LLC, p. 108.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

___

feature and has the current price. Product B lacks the feature and we set its price so that A and B each have 50 percent share. The difference in price that equalizes the shares is an estimate of WTP.[81]

### B. Measures Of Willingness-to-pay, Such As Those To Be Calculated By Dr. Dennis, Overstate Differences In Market Prices or Identify Differences Where None May Exist

73.     Measures of willingness-to-pay, such as those to be calculated by Dr. Dennis generally overstate differences in market prices or identify differences where none may exist. An article included in the proceedings of a 2013 Sawtooth Software conference explicitly states that WTP measures do not represent (and overstate) differences in equilibrium market prices.

> The problem with both the WTP [Willingness-to-pay] and WTB [Willingness to Buy] measures is that they are not equilibrium outcomes. WTP measures only a shift in the demand curve and not what the change in equilibrium price will be as the feature is added or enhanced….
>
> In general, the WTP measure will overstate the change in equilibrium price and profits….[82]

### C. The Claimed Use Of Real-World Prices Does Not Transform Willingness-To-Pay Measures Into Differences In Market Prices

74.     In light of these limitations of conjoint analysis, market simulations, and willingness-to-pay measures, a conjoint analysis and market simulation performed according to standard procedures (as identified in the Sawtooth Software literature and as described by Dr. Dennis) would not yield a difference in market prices. In order to derive a claimed difference in market price from a conjoint survey and market simulation analysis (such as

___

[81] Orme, Bryan K. and Keith Chrzan (2017) "Willingness-to-pay," Chapter 13 in *Becoming An Expert In Conjoint Analysis – Choice Modeling for Pros,* Sawtooth Software, Inc., p. 194.

[82] Allenby, Greg et al., "Using Conjoint Analysis to Determine the Market Value of Product Features." Proceedings of Sawtooth Software Conference, October 2013, p. 342 (https://www.sawtoothsoftware.com/download/techpap/2013Proceedings.pdf).

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

that proposed to presented by Dr. Dennis), additional steps must be performed or additional information must be incorporated.

75.     Despite the documentation outlined above, Mr. Weir has asserted that a conjoint analysis can be used to measure the market price of an attribute of a product.[83]  The documentation and economic discussion provided above demonstrate that willingness-to-pay measures generally overstate differences (if any) in market prices and show that the willingness-to-pay measures obtained by Dr. Dennis overstate the claimed reduction in market prices, if any, between the Considered Products with the Considered Representations and those without the Considered Representations.

76.     However, Mr. Weir has asserted that because Dr. Dennis' conjoint survey will use market-based price points for the Considered Products, the approach incorporates relevant supply factors that exist in the marketplace.[84]  Given that Sawtooth Software characterizes the output of conjoint analyses and market simulations as measures of willingness-to-pay (not market price differences), Dr. Dennis would have to perform his analysis in a way that differed from standard conjoint analyses and market simulations in order to calculate a claimed difference in market prices (rather than a willingness-to-pay).  However, using real-world prices (as Dr. Dennis states he will do) for the price levels presented in the survey (i.e., as inputs) is a standard and routine procedure when performing conjoint analyses and market simulations (which still yield measures of willingness-to-pay as outputs).  For example, a Sawtooth Software research paper states that "[a]ttribute levels should cover the full range of possibilities for existing products as well as products that

_____

[83] Weir Declaration, ¶¶ 37-38

[84] Weir Declaration, ¶ 47.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

may not yet exist, but that you want to investigate."[85]  Regarding selections of prices for use in conjoint analysis, this statement indicates that prices should be selected to reflect the prices of the products in the market.  In other words, the use of observed market prices is standard practice for conjoint analyses.[86]

77.    Given that the use of real-world prices (as inputs) is a routine part of standard conjoint analyses and market simulations, Mr. Weir's assertion that their usage causes Dr. Dennis' analysis to account for supply factors insufficient to transform the output of Dr. Dennis' analysis into a claimed difference in market prices.

## XI.    MR. WEIR'S PROPOSED APPLICATION OF A CLASS-WIDE CLAIMED PRICE PREMIUM PERCENTAGE IGNORES INDIVIDUALIZED FACTORS

78.    Mr. Weir proposed two models to calculate claimed Class-wide damages, a price premium damages model and a full compensatory damages model. In the price premium damages model, Weir proposed to multiply (a) the claimed "*Price Premium %*" based upon a conjoint and market simulation analyses proposed by Dr. Dennis[87] by (b) the total dollar sales associated with the Challenged Products.[88] However, from an economic and claimed damages perspective, Mr. Weir's proposed damages calculation would not yield a reliable or relevant common proof measure of the claimed harm experienced by putative Class members (i.e., a loss caused by the Considered Representations).

---

[85] Orme, Bryan K. (2002) "Formulating Attributes and Levels in Conjoint Analysis," Sawtooth Software Research Paper Series, p. 2 (https://www.sawtoothsoftware.com/download/techpap/formatt.pdf).

[86] From an economic perspective, the use of observed market prices (as inputs) is appropriate in order to improve the likelihood that survey participants' responses provide guidance as to <u>consumer behavior</u> (though not price premiums) around those prices.  A conjoint analysis attempting to measure consumers' willingness-to-pay for a products' features or attributes would not provide such guidance if it was performed at a range of prices that do not reflect the prices respondents see in the marketplace.

[87] Weir Declaration, ¶ 63.

[88] Weir Declaration, ¶ 63.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

79.   Deficiencies in Mr. Weir's analysis include (among others presented throughout my

declaration):

    a.   a failure to recognize (and acknowledge) the importance of individual inquiry when
        evaluating the existence and amount of claimed harm to putative Class members in this
        matter;

    b.   a reliance upon Dr. Dennis' analysis for the claimed "*Price Premium %*" and, hence,
        Mr. Weir's analysis is subject to the same deficiencies as Dr. Dennis' analysis; and

    c.   no analysis or economic proof that all putative Class members paid the same claimed
        "Price Premium" (if any).

These points are especially true in light of the large variety of choices among the

Challenged Products (i.e., across forms, package sizes, retailers, and prices).[89]

80.   Mr. Weir's proposed application of a claimed price premium on a Class-wide basis (i.e., a

constant percentage amount) assumes that (a) all purchasers of the Challenged Products

experienced harm attributable to the Considered Representations and (b) all putative Class

members paid the same percentage price premium on their purchases because of the

Considered Representations (i.e., that claimed harm is proportional to product value given

_____

[89] Mr. Weir also has not appropriately considered or investigated data availability issues.  (See Weir Declaration, ¶¶
58-59.)  With respect to "total sales of products", Mr. Weir states:

    I understand that Counsel for Plaintiffs has issued a subpoena to obtain relevant third party retail
    sales data from Information Resources, Inc. ("IRI"), and individually retailers. This data will include
    dollar and unit sales measures for each of the Class Products, By Class State for the Class Period.
    This data will reflect historic, market based prices that consumers actually paid during the class
    period.

    I have also been provided with Defendants' total and net sales records (dollars and units), to both
    wholesale customers, and directly to a limited number of retail customers that purchased product
    through the Defendants' website, for the years 2015-2022.

Mr. Weir testified in his deposition that if IRI data was not available, he would be able to use the data produced by
PharmaCare as one input into his calculations.  (Weir Deposition, pp. 91:25 – 93:10.)  However, such data generally
represents wholesale data on the national level.  Retail sales data is not provided.  Sales data is not provided by state.
Mr. Weir suggests in his deposition testimony (but not his declaration) that such data could still be used.  However,
Mr. Weir has not provided any methodology or suggested adjustments to apply to the PharmaCare-produced data to
match the calculations he states he will perform to calculate claimed Class-wide damages.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

that different forms, package sizes, retailers, and prices exist). However, these two assumptions are inappropriate.[90]

### A.  Different Demands Exist For The Challenged Products

81.   As explained earlier in my declaration, whether and to what extent any individual Class member experienced economic harm (if any) attributable to the Challenged Representations depends upon (among other things):

   a.  the form of the Challenged Product purchased;

   b.  the package size of the Challenged Product purchased;

   c.  the retailer from whom the Challenged Product is purchased;

   d.  the price paid (including whether a discount was received or expedited delivery was included in the price); and

   e.  the alleged misrepresentation.

82.   Analysis of public pricing data from various retailers, including CVS online, Walgreens online, and Amazon, indicates that there is not a single (i.e., uniform) Challenged Product and associated price that can be used to evaluate claimed damages on a Class-wide basis using a common proof approach.   Rather, on-line Challenged Product pricing data demonstrates that there are wide variations in purchase prices associated with the Challenged Products across their (a) forms, (b) package sizes, and (c) retailers.   Moreover, these variations are based on a review of current pricing information.   There is further

_____

[90] The application of claimed percentage price premiums based upon Considered Representations additionally is inappropriate given the changing product mix of Challenged Products over time.  PharmaCare has provided wholesale and direct-to-customer sales data for 27 different stock keeping units (i.e., SKUs) over the FY2015 to FY2022 time period, as shown in **Exhibit 14**.  These SKUs covered different forms, different package sizes, age groups (i.e., infants, kids, and adults), strength (e.g., advanced immune), and sugar content (e.g., sugar free).   There also are different prices associated with these SKUs (indicating different values associated with the attributes of the products represented by the SKUs).  Dr. Dennis and Mr. Weir have not undertaken any analyses to demonstrate that a claimed price premium associated with any single Considered Representation or combination of Considered Representations would be applicable across these cross sections of Challenged Products - - rendering such an application unreliable.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

complexity due to historical pricing variations that likely occurred during the alleged Class
period, which I understand Named Plaintiffs' claim dates back at least six years (or,
according to Named Plaintiffs, the fullest period allowed by law).[91]  Compounding this
complexity is that the Challenged Representations are not the same across Challenged
Products.

83.    As explained earlier in my declaration, with respect to the Challenged Products, there are
multiple forms, multiple package sizes, no meaningful price metric that can be used to
evaluate a claimed common price premium, and no "single" set of at-issue representations
that the Plaintiffs can use as a basis to evaluate Class-wide claimed damages.  In light of
the aforementioned variations, determining whether and to what extent putative Class
members experienced claimed economic harm requires individualized inquiry. The Named
Plaintiffs' assertion of economic injury is not amenable to Class-wide (common) proof.

84.    The aforementioned observations are not considered by Mr. Weir in his proposed common
proof price premium approach to evaluating Class-wide damages.  Specifically, Mr. Weir
does not acknowledge or analyze the following considerations in his declaration (which
were described earlier in my declaration):

a.   The presence of different package sizes and prices (aggregate and per unit) indicate
     that there are different demands and cost considerations present for each of the package
     sizes offered of the Challenged Products.

b.   The presence of different forms and prices indicate that there are different demands and
     cost considerations present for each of the forms offered of the Challenged Products.

c.   The presence of different locations (and prices) where putative Class members can
     purchase the Challenged Products indicates that there are unique circumstances and
     demands driving where putative Class members purchase the Challenged Products (and
     their associated willingness-to-pay.

_____
[91] Second Amended Complaint, ¶ 103.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

---

85.    There is no basis for Mr. Weir's reliance upon Dr. Dennis' statement that "[m]y price premium statistics will be accurately generalizable to the Defendant's Products sold during the proposed class period for the Proposed Classes."[92]  Indeed, as discussed above, Dr. Dennis does not appear to have considered all of the Challenged Products and Challenged Representations in his analysis.

**B.  Some Putative Class Members Purchased The Challenged Products And Were Satisfied With The Products' Performances**

86.    Mr. Weir's proposed damages calculation includes as an input the total sales of the products during the putative Class period.[93] Use of "$Units Sold" as an input in Mr. Weir's damages calculations represents an assumption that (a) all putative Class members experienced harm associated with the Considered Representations and (b) all putative Class members experienced the same amount of harm associated with the Considered Representations. There are numerous reasons why these assumptions are not appropriate.

a.    Different Purchases Of Challenged Products. As explained earlier in my declaration, not all Challenged Products have the same Considered Representations.  Dr. Dennis appears to have claimed that we will provide a price premium figure for every possible combination of Considered Representations (that he considers).  However, Mr. Weir did not discuss the application of different price premium figures to different forms of Challenged Products.  Mr. Weir has not analyzed which Challenged Products have which Challenged Representations.   After providing his formula for calculating claimed total price premium damages[94], Mr. Weir states in his report:

> This calculation can be performed on a class-wide basis, across different geographies, and for any defined time period, including the proposed Class Period(s) in this litigation.[95]

---

[92] Dennis Report, ¶ 127.

[93] Weir Declaration, ¶ 63.

[94] Weir Declaration, ¶ 63.

[95] Weir Declaration, ¶ 64.

CONFIDENTIAL – FOR COUNSEL ONLY

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

          Mr. Weir does not state that this calculation can (or will be) performed for any groupings of Challenged Products.[96]

b.    <u>Satisfied Customers</u>. Putative Class members who purchased the Challenged Products and were satisfied with the performance of the Challenged Products have experienced no economic harm associated with the Challenged Representations (or less economic harm than consumers who purchased because of the Challenged Representations). Such consumers would have received the product – or at least some benefits from the product – for which they paid. The existence of consumers who were satisfied with the performance of the Challenged Products is demonstrated by positive online product reviews. For instance, as of April 21, 2023, the surveyed product of Dr. Dennis's report, Sambucol Black Elderberry Original Syrup product (7.8 fl. oz.), received 10,630 five-star ratings on Amazon[97], 446 five-star ratings on Sambucolusa.com[98] and 209 five-star ratings on CVS.com[99]. A significant portion of customers, comprising 94%, 97%, and 99%[100] of total reviews on these online retailers, respectively, gave the product a four or five-star rating. Mr. Weir's approach would provide damages to essentially 100% of the putative Class members when over 90+% of the putative Class members were satisfied with their purchases of the Challenged Products. Mr. Weir has not analyzed the consumer ratings associated with the Challenged Products or the repeat purchase rate of customers for the Challenged Products (i.e., another indicator of customer satisfaction).

---

[96] Dr. Dennis has provided a table in the Dennis Report (paragraph 127) entitled "Template for Presenting any Price Premium Solely Attributable to the Challenged Representations on the Products". The implication of this table is that Dr. Dennis will be providing 15 different claimed price premium percentages (i.e., one for each possible combination of Considered Representations considered by Dr. Dennis). Dr. Dennis then states: "My price premium statistics will be accurately generalizable to the Defendant's Products sold during the proposed class period for the Proposed Classes." (Dennis Report, ¶ 127.) It should be noted that the table presented by Dr. Dennis contemplates four alleged misrepresentations. Mr. Weir contemplates seven alleged misrepresentations. (Weir Declaration, footnote 2, p. 2.) Five alleged misrepresentations would require 24 different price premium percentages. Six alleged misrepresentations would require 35 different price premium percentages. Seven alleged misrepresentations would require 48 different price premium percentages.

[97] Amazon, "Sambucol Black Elderberry Syrup" (https://www.amazon.com/Sambucol-Elderberry-Original-Formula-Antioxidant/dp/B001ESA36I/ref=cm_cr_arp_d_bdcrb_top?ie=UTF8&th=1), viewed on April 21, 2023 Amazon, "Sambucol Black Elderberry Syrup" (https://www.amazon.com/Sambucol-Elderberry-Original-Formula-Antioxidant/dp/B001ESA36I/ref=cm_cr_arp_d_bdcrb_top?ie=UTF8&th=1), viewed on April 21, 2023.

[98] Sambucol, "Black Elderberry Syrup Large - 7.8 oz" (https://sambucolusa.com/products/black-elderberry-syrup-large-7-8-oz), viewed on April 21, 2023 Sambucol, "Black Elderberry Syrup Large - 7.8 oz" (https://sambucolusa.com/products/black-elderberry-syrup-large-7-8-oz), viewed on April 21, 2023.

[99] CVS, "Sambucol Black Elderberry Syrup 7.8 OZ" (https://www.cvs.com/shop/sambucol-black-elderberry-syrup-7-8-oz-prodid-8478300), viewed on April 21, 2023.

[100] CVS, "Sambucol Black Elderberry Syrup 7.8 OZ" (https://www.cvs.com/shop/sambucol-black-elderberry-syrup-7-8-oz-prodid-8478300), viewed on April 21, 2023.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

### C. **Some Putative Class Members Purchased The Challenged Products For Reasons Unrelated To The Challenged Representations**

87.    The extent to which putative Class members may have experienced harm related to the alleged wrongful conduct would vary based upon their reasons for purchasing the Challenged Products. For example, if a putative Class member purchased a bottle of Black Elderberry Gummies for the flavor of Black Elderberry or the gummy form, the putative Class member would not have experienced the claimed economic harm as a putative Class member who purchased it because of the alleged Challenged Representations. Mr. Weir has not performed any analysis to ascertain whether consumers who purchased the Challenged Products did so because they were allegedly misled by the Challenged Representations or because of other features offered by the Challenged Products.[101] Moreover, the materiality survey by Dr. Dennis indicates that 8.1% of the respondents preferred the surveyed product without Challenged Representations.[102] To the extent Dr. Dennis' materiality survey can be relied on as he contends, it would further demonstrate some class members would purchase the Challenged Products for reasons unrelated to the Challenged Representations.

88.    Mr. Weir stated that individual inquiry is not required in this case.[103] He stated that the reasons for individual putative Class members' purchases of the Challenged Products are irrelevant because the reasons for purchase do not change the price premium experienced

---

[101] For instance, PharmaCare's sales data indicates that the Gummies form became the highest selling Challenged Product after their introduction. *See* **Exhibit 5**, in which the two SKUs for "SAM GUMMIES 30CT" combine to represent the most Total Net Sales. I understand the labeling and packaging of the Gummies did not include "scientifically tested" or "virologist developed." PharmaCare's Further Responses to Plaintiffs' First Set of Interrogatories, p. 9; *see also* PC001579.

[102] Dennis Report, ¶ 76.

[103] Weir Declaration, § IX.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

by the individual.[104] Even assuming that the results from the CBC analyses proposed by Dr. Dennis can be used to calculate a market price premium (which they cannot), Mr. Weir's argument is flawed. There needs to be an economic causal connection between the alleged wrongful conduct and damages allegedly suffered by putative Class members. Putative Class members who did not make their purchase decisions based on the Challenged Representations did not experience economic harms as claimed by Mr. Weir, because there is a lack of economic causal connection between the Challenged Representations and the alleged price premium calculated by Dr. Dennis. Put differently, these individuals received the benefits from the Challenged Products for which they paid.

89.  In summary, Mr. Weir's proposed damages calculation incorrectly assumes that the Challenged Representations caused economic harm (or the same extent of economic harm) to customers who purchased the Challenged Products for a specific purpose and concluded the products fulfilled that purpose (e.g., preference for the taste of Black Elderberry). Contrary to Mr. Weir's statement that "individual inquiry is not required,"[105] such analyses and/or inquiry in fact would be required to identify such consumers and to determine whether and to what extent they experienced economic harm attributable to the Challenged Representations (if any).

D.  **Individual Inquiry Is Required To Determine The Forms Purchased And The Prices Paid For Challenged Products**

90.  Whether and to what extent any individual Class member may have experienced economic harm attributable to the Challenged Representations depends upon (among other things)

[104] Weir Declaration, ¶ 72.

[105] Weir Declaration, § IX.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

the specific product purchased and the prices paid by that Class member for the Challenged Products. Mr. Weir's proposed damages calculation (i.e., a "*Total Sales of the Products x Price Premium % = Price Premium Damages*" calculation) along with Mr. Weir's statement that "individual inquiry is not required," appears to demonstrate that Mr. Weir intends to apply a single claimed percentage price premium to all putative Class members. (In addition, the Dennis Report upon which Mr. Weir will rely does not indicate a conjoint analysis will be conducted on a product-by-product basis as Dr. Dennis only included the Sambucol Black Elderberry Original Syrup product (7.8 fl. oz.) in his proposed conjoint survey.[106]). However, Mr. Weir has not demonstrated that a single claimed damages measure can account for different market conditions under which individual putative Class members purchased the Challenged Products or can account for likely different price premiums (in absolute and percentage terms), if any. Mr. Weir has not demonstrated that a single claimed damages measure can account for different features and forms that may drive purchase decisions across the different products with average sales prices varying significantly.

91.    Analyses presented earlier in my declaration relating to the Challenged Product pricing data demonstrates that there are wide variations in the prices of the Challenged Products depending upon at least the unit count, form, retailer, and add-on services. In addition, as shown in **Exhibit 13**, not all of the Considered Representations appear on the packaging of each of the Challenged Products. While the packaging of Sambucol Black Elderberry

_____

[106] Dennis Report, ¶ 95. There are eight different forms across 12 different Challenged Products (plus numerous package sizes).  The product proposed to be surveyed by Dr. Dennis (i.e., Sambucol Black Elderberry Original Syrup product (7.8 fl. oz.)) comprises less than 10% of the various forms and varieties of the Challenged Products, as shown in **Exhibit 4** and **Exhibit 5**.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

Syrup for Kids (e.g.) contains every Considered Representation, the packaging of Sambucol Black Elderberry Gummies (e.g.) contains just three of the Considered Representations. In light of these variations, determining whether and to what extent putative Class members experienced claimed economic harm requires individualized inquiry. The Named Plaintiffs' assertion of economic injury is not amenable to Class-wide proof, as there is no "single" average purchase price and no "single" set of at-issue representations that the Plaintiffs can use as a basis to evaluate Class-wide claimed damages (and no "single" price premium percentage that can be applied across all Sambucol's Black Elderberry products).

E. **Mr. Weir's Discussion Of Supply-Side Factors Is Incomplete**

92.     Mr. Weir claimed that "Dr. Dennis has considered and accounted for supply-side factors in the determination of his price premium survey design"[107] and that Mr. Weir "also considered supply-side factors in [his] determination of a framework for damages."[108] Mr. Weir identified a number of supply-side factors either as factors that Mr. Weir considered or that Mr. Weir discussed with Dr. Dennis.[109] However, Mr. Weir's discussion of supply side factors is incomplete.

1.     **Mr. Weir Discussed General Claimed "Supply-Side Factors" That Are Insufficient For Determining Market Prices**

93.     Mr. Weir presented in his declaration various claimed "supply-side factors" that he allegedly considered and discussed with Dr. Dennis.[110] However, none of the factors Mr.

---

[107] Weir Declaration, ¶ 41.

[108] Weir Declaration, ¶ 42.

[109] Weir Declaration, ¶¶ 42-50.

[110] Weir Declaration, ¶¶ 41-50.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

Weir discussed represent supply-side factors that would be sufficient to determine a market price absent the alleged wrongful conduct (as would be required to determine a claimed price premium).

94.    The supply-side factors that are needed to determine the equilibrium, market-clearing price absent the alleged wrongful conduct include factors that determine the amount that PharmaCare would have been willing to supply at any given market price (and generally rely upon cost considerations).[111] Such factors would include both (i) the relationship between the quantity of Sambucol products PharmaCare produced and the costs that they face to produce them and (ii) information on the reactions of PharmaCare's competitors (and how those reactions in turn would affect PharmaCare's incentives).[112] The claimed "supply-side factors" Mr. Weir presented represent general statements about markets that do not include these required supply-side considerations.

**2.    Mr. Weir's Discussion Of Claimed "Supply-Side Factors" With Dr. Dennis Does Not Cause The Results From Dr. Dennis' Proposed Survey To Represent A Change In Market Price**

95.    The price premia Dr. Dennis proposed to calculate and Mr. Weir proposed to use in the Class-wide damages calculation (without adjustment) does not represent the difference between market-clearing, equilibrium prices with and without the alleged wrongful conduct that is required for a value to represent a claimed price premium.

a.    Historical Sales And Prices Do Not Represent The Supply Side Factors That Would Have Been Relevant Absent The Alleged Wrongful Conduct. Mr. Weir claimed that the use of historical sales and prices incorporates relevant supply-side factors.

One of the most important and most frequent topics of discussion between Dr. Dennis and myself was the data on actual sales of the

---

[111] *See,* e.g., Mankiw, N. Gregory (2008), Principles of Microeconomics, Fifth Edition, p. 73.

[112] Mankiw, N. Gregory (2008), Principles of Microeconomics, Fifth Edition, p. 73.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

Products in the real-world marketplace. These real-world transactions occurred at prices that already reflect the supply-side factors then extant in the marketplace.[113]

While historical transactions occurred at prices that reflected historical supply-side factors facing PharmaCare and retailers, those transactions do not reflect what the prevailing market conditions would have been absent the alleged wrongful conduct (for the simple reason that none of those historical transactions occurred absent the alleged wrongful conduct). Calculation of a claimed price premium requires estimations of market-clearing equilibrium prices absent the alleged wrongful conduct. Reference to historical market prices in isolation is insufficient to demonstrate that the claimed damages measure Dr. Dennis proposed to calculate would represent the difference between such prices and market-clearing, equilibrium prices absent the alleged wrongful conduct.[114]

b.  <u>Variability In Retail Pricing Does Not Demonstrate The Existence Of A Claimed Price Premium (Nor Is The Proposed Measure A Claimed Price Premium).</u> Mr. Weir stated that "the market for the Products is an 'ordinary' market, subject to competitive pressures" and noted various statements from retailers demonstrating a willingness to change prices.[115] However, variability in pricing neither demonstrates the existence of a claimed price premium nor that the damages measure Dr. Dennis proposed to calculate from the results of his proposed survey would represent a claimed price premium.

96.  Willingness to change prices in response to changing market conditions and consumer preferences does not in isolation establish the existence of a claimed price premium. Instead, demonstration that market conditions and consumer preferences actually would have changed in the absence of the alleged wrongful conduct – i.e., demonstration that demand for the Challenged Products would have been different absent the alleged wrongful conduct – also is required. Such a change in demand would then need to be interacted with existing supply considerations. Such interactions would allow for a determination of a price

_____

[113] Weir Declaration, ¶ 47.

[114] In addition, as discussed previously, Mr. Dennis' proposed metric would not represent such a price difference and therefore is not a claimed price premium.

[115] Weir Declaration, ¶¶ 50-54.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

premium (if any) associated with the Challenged Representations. As discussed above, Mr.

Weir has provided no such evidence.

### F. **Additional Deficiencies In Mr. Weir's Proposed Analysis: Full Compensatory Model**

97.     In the full compensatory damages model, Mr. Weir proposed calculating damages by

multiplying (a) the "Units Sold" by (b) the "Average Retail Price." From an economic and

claimed damages perspective, these proposed damages calculations would include putative

Class members who did not experience economic harm or significantly overstate the harm

experienced by the putative Class members.

a.  Problem with applying "Average Retail Price".

    i.  First, an average retail price fails to account for the variations in prices that Class members paid for their products. As demonstrated in **Table 3**, **Table 4**, and **Table 6**, the prices of Challenged products vary based on numerous factors, including forms, unit count, retailers, and add-on services. For example, it is evidently improper to assume that Class members who purchased the multi-pack of 7.8oz bottles of Sambucol Black Elderberry Original Syrup from Amazon (priced at $210) experienced the same harm, and thus should receive the same compensation, as Class members who purchased the 10 pack of Sambucol Black Elderberry Gummies from CVS (priced at $4.99).

    ii.  Second, by proposing compensation based on the full retail price amount, Mr. Weir implicitly assumes that all Class members received absolutely no benefit from the products they purchased. This assumption is a clear overstatement of the alleged harm experienced by the Class members and is not supported by the overwhelming positive online review data discussed in earlier in this section.

b.  Problem with applying "Units Sold". Mr. Weir's proposed application of "Units Sold" on a Class-wide basis again assumes that all purchasers of the Challenged Products experienced harm attributable to the Considered Representations. This assumption is subject to the aforementioned individualized factors in determining whether, and to what extent, putative Class members experienced economic injury attributable to the Challenged Representations:

    i.  Putative Class members who were satisfied with the products' performance were not harmed (i.e., they received the value for which they paid); and

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

_____

      ii.   Putative Class members who did not base their purchase decision on the Challenged Representations and, therefore, had no expectations of experiencing an improvement in health.

### G.  Mr. Weir Will Use Dr. Dennis' Current Survey Results For Past Years

98.  From an economic and damages quantification perspective, survey techniques such as conjoint analysis generally measure the value of product attributes at the point in time of the survey and cannot easily determine the value of attributes in the past.  Hence, the values that Dr. Dennis proposes to calculate from a conjoint survey and market simulation and the values Mr. Weir proposes to use in his claimed damages calculations are based upon tastes and preferences that will exist when his survey will be performed.  However, there are no assurances that values based upon current survey responses would be representative of (or correlated with) putative Class Members' preferences associated with Challenged Representations and Challenged Products from approximately six years prior to Dr. Dennis' proposed survey.  If respondents' preferences have changed from the beginning of the putative Class period until the time of the survey, then Dr. Dennis' survey results (which Mr. Weir states he will rely upon) would provide no measure of what their preferences were over the entire putative Class period.  This especially is true when no supporting work has been performed to validate an assumption that the survey results obtained today can be reliably applied to earlier time period.

99.  A lack of reliable support for the assumption that a survey value obtained in a current survey is applicable to several years prior is exacerbated by the global pandemic that started to affect consumers' behaviors beginning in March 2020.  In this social and market environment, and from an economic and damages quantification perspective, the survey proposed by Dr. Dennis likely will reflect consumers' current preferences and willingness-

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

___

to-pay.  It will not be an accurate reflection of consumers' preferences and willingness-to-pay prior to the onset of the COVID-19 pandemic, let alone six years before.  Mr. Weir and Dr. Dennis have not acknowledged or discussed this changing environment and what the implications may be for Dr. Dennis' results or Mr. Weir's calculations.

100.    In summary, consumers' preferences are influenced by the contemporaneous market environment and their socio-economic conditions.  A survey yet to be conducted in a different market environment, especially in the current COVID-affected environment, cannot guarantee a result regarding a willingness-to-pay that is applicable to a different (i.e., earlier) time period.

## XII.    CLAIMED INJURY AND/OR CLAIMED DAMAGES IN THIS MATTER CANNOT BE RELIABLY EVALUATED ON A CLASS-WIDE BASIS USING COMMON PROOF

101.    Mr. Weir stated that class-wide damages can be calculated either from the bottom up as the sum of individual damages, or can be calculated from the top down by finding the price premium for the Considered Representations.[116] In this case, the top down approach proposed by Mr. Weir is replete with flaws, as discussed throughout my declaration, which makes the Class-wide damages using his proposed calculations (i.e., total Challenged Products dollar sale multiplied by a price premium percentage) unreliable. The proposed top-down approach is further made unreliable by the flaws in Dr. Dennis' proposed conjoint and market simulation analyses in arriving at a price premium, also as discussed throughout my report.

___

[116] Weir Declaration, ¶ 70.

Declaration of Keith R. Ugone, Ph.D.
April 24, 2023

102.   Based upon the analysis presented throughout my declaration, individual inquiry is required to evaluate and quantify the claimed injury and/or alleged damages experienced by putative Class members, if any, attributable to the alleged messages communicated by the Challenged Representations.

103.   For the reasons presented throughout my declaration, evaluation of claimed damages is not amenable to a simple mathematical calculation of actual dollar sales times a claimed price premium percentage. Such a simple formulaic approach using common proof will not yield a reliable measure of Class-wide claimed damages because there is not a common proof measure of percentage change in price nor a common proof measure of dollar sales (or units) associated with consumers who experienced economic harm.

* * * * * *

104.   My analyses, observations, and opinions contained in this declaration are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the Parties to this dispute and to supplement my opinions based upon that review.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Grand Saline, Texas on April 24, 2023.

_____
Keith R. Ugone, Ph.D.
April 24, 2023

EX PAGE - 0857