# EXHIBIT L

000075

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MONTIQUENO CORBETT and ROB   *
DOBBS, individually and on   *
behalf of all others         *
similarly situated,          *
      Plaintiffs,           *
                                        * Civil Action No.
VS.                          * 3:21-cv-00137-JES-AHG
                                        *
PHARMACARE U.S., INC.,       *
      Defendant.            *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE DEPOSITION OF
KEITH R. UGONE, Ph.D.,
AUGUST 18, 2023

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        DEPOSITION of KEITH R. UGONE, Ph.D., produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 18th day of August, 2023, from 9:06 a.m. to 12:32 p.m., before Christy R. Sievert, CSR, RPR, in and for the State of Texas, reported remotely by machine shorthand, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



```
 1      Q.    Okay.  Anything else?
 2      A.    Bear with me.  I'm a little slow with this.
 3            If you go to page 5, third entry down --
 4   and this is all trial testimony.  It doesn't include
 5   all cases or deposition testimony.  But there's a
 6   Laura Lewis.  Do you want me to keep going?
 7      Q.    Well, we can try to skip to it.  In any
 8   of your -- go ahead.
 9      A.    I'm sorry, I missed your response to my
10   question.
11      Q.    I don't -- I don't want to spend all of our
12   time in this deposition today with you going through
13   all 46 pages.  I was hoping you would be able to
14   answer the question up front like you have in the
15   past with some of my colleagues.
16            Did you prepare -- in your professional or
17   personal experience, including all of the cases that
18   you have listed on your resumé and also here in
19   Exhibit 5, did you prepare conjoint surveys in
20   connection with any of this work?
21      A.    So I have not prepared conjoint surveys
22   but --
23      Q.    The question was just with respect whether
24   you prepared them.  We'll get to the rest.
25      A.    Okay.  I'm an -- I'm an economist and
```



1   damage quantifier, and I evaluate them from that
2   perspective but I don't actually do conjoint
3   surveys.  That's the complete answer.
4        Q.   So the answer is in all the work that you
5   have done that you have listed in your resumé and
6   your trial testimony that we have been discussing
7   here, you have not prepared or designed a conjoint
8   survey in connection with any of this work, correct?
9        A.   Well, my complete answer is the one I gave,
10  but I have not prepared a conjoint survey because
11  I'm -- I don't consider myself a survey expert.  But
12  I am an expert at economics and I can evaluate the
13  economic aspects of those surveys, but I do not
14  prepare those surveys or conduct those surveys, to
15  answer your question directly.
16       Q.   And on a high level -- I'm not asking you
17  for every single case you have been involved in --
18  in the cases that you have worked on, have you
19  addressed conjoint surveys in connection with this
20  work?
21       A.   Yes, absolutely. Probably in -- actually,
22  I'm sorry, I may need to understand your question
23  again.  I was going to give, I think, too broad of
24  a -- I think your question was in the cases I have
25  worked on, not every case has a conjoint survey.  So



```
                                          Page 40
 1   that's why I need you to -- so if the question is,
 2   in the cases that had conjoint surveys have I done
 3   economic analyses relating to those, the answer is
 4   yes.
 5        Q.   In any of those cases have you found that a
 6   conjoint analyses was performed properly?
 7        A.   Well, I want to be careful.  The -- I'm
 8   evaluating the economic either inputs, outputs,
 9   implications as opposed to how it was conducted.  I
10   make a distinction between the two.  So I'm not here
11   to say whether, you know, the sample size was right
12   or if, you know -- if, you know, the instruments
13   used should have been something different or if --
14   you know, those sort of things.  So I'm not here to
15   talk about the survey side of it.  I'm here to talk
16   about the economic side of it.
17             And, generally, I would say that in this
18   type of environment, when you try to take the
19   results of a conjoint survey, either because of the
20   inputs or the outputs, that generally I find that
21   there's deficiencies when you try to translate
22   results into what I'll call a damages figure.
23             I don't go into the analysis with that
24   preconceived notion or bias, but I usually find
25   indicators that there are issues with just taking
```



1  the results and applying it broadly in the case such
2  as this one.
3      Q.   Have you -- so with those conditions and
4  understanding how you just described it, in any of
5  the cases where you have been asked to opine about a
6  conjoint analysis, have you found that any of them
7  were performed properly --
8      A.   Yeah, I think --
9      Q.   -- to allow you to conduct your economic
10 analysis?
11     A.   You know, I think the answer is yes,
12 because it's not just in consumer class action
13 cases.  I have seen and worked on cases where there
14 were conjoint surveys done, for example, in patent
15 infringement cases and times when I've adopted the
16 analysis, you know, performed by somebody else.  So
17 it's not 100 percent of the time that I say that the
18 results are unreliable.
19     Q.   In a case where an individual is suing a
20 corporation, like the plaintiffs in this case where
21 they purchased a product sold by Defendant, have you
22 ever found that a conjoint survey was conducted
23 properly?
24     A.   So in shorthand nomenclature, I might kind
25 of just call that consumer class action cases just



1  to make it easy.
2          And so in cases similarly situated to this
3  one -- and -- and I don't mean anything by this, but
4  you -- you're still using that word "implemented,"
5  but I've kind of described how I'm interpreting
6  that.  I'm not talking about survey design or the
7  survey company that, you know, does the actual
8  survey.  But from an economic perspective, I have
9  generally found deficiencies in the application of
10 the conjoint analysis to the evaluation of
11 class-wide damages using common proof.
12      Q.  Generally or always?  They're two different
13 things.
14      A.  I would say, especially because of what the
15 results of the conjoint analysis give you, that in
16 each of the cases where I've issued a report, I
17 would say, yes, that I found deficiencies within the
18 area that I'm opining to.
19      Q.  Every single time?
20      A.  Yes.
21      Q.  Do you have any experience marketing
22 consumer products?
23              MR. ORZANO:  Vague and ambiguous.
24      A.  Now, when you -- when you say "marketing,"
25 you know, I mentioned before that I'm a



1  bear with me a second.  Okay.  I was just trying to
2  get back the video so I could see who I was talking
3  to.
4         The -- I don't -- I don't go about naming
5  products.  That might be the simple way to do it.
6     Q.   Do you have any experience with labeling
7  consumer products, putting words on the label of a
8  consumer product that is being sold?
9     A.   Yeah, if we define it that way, I would
10 say, no, that's not -- that's not what I do.  With
11 the same caveats I was giving previously, that
12 there's certain economic aspects I look at, but I
13 don't actually develop the labeling.
14    Q.   Have you ever designed a survey that has
15 yielded a dollar figure for damages or lack thereof
16 for a consumer product?
17    A.   I don't -- I'm not a -- I'm not a survey
18 expert.
19    Q.   Have you ever designed a survey for the
20 purpose of determining whether consumers overpaid
21 for a product as a result of a misrepresentation or
22 omission?
23    A.   Again, I don't actually develop or conduct
24 surveys.  I'll look at the economic inputs, the
25 economic outputs, do they make sense, but do not



```
 1   design the survey.
 2        Q.   Is that a "no"?
 3        A.   I don't -- I'm not a survey expert.  I do
 4   not work in that area that you're asking about.  So
 5   I'll freely admit that I'm an economist and proud of
 6   it.
 7        Q.   Have you ever designed a survey for the
 8   purpose of determining how much a consumer would pay
 9   for a product in terms of a dollar figure as a
10   result of certain product attribute?
11        A.   Yeah, it's not -- my role is not to design
12   surveys.
13        Q.   Have you ever designed a survey for the
14   purpose of setting the price of a product in terms
15   of a dollar figure?  This is a --
16        A.   I'm not --
17        Q.   -- design question.
18        A.   I'm sorry?
19        Q.   It's a design question.
20             Have you ever designed a survey for the
21   purpose of setting a price of a product in terms of
22   a dollar figure?
23        A.   No.  I've actually assisted companies
24   coming up with prices, but I haven't designed a
25   survey to do that.
```



000083

```
 1      Q.   You know what choice-based conjoint
 2   analysis is, correct?
 3             THE STENOGRAPHER:  Could you repeat
 4   that?
 5      A.   I'm sorry, I didn't hear.
 6             THE STENOGRAPHER:  You're cutting out
 7   a little bit, and you're very soft-spoken.
 8   BY MS. SOFFIN:
 9      Q.   You know what choice-based conjoint
10   analysis is, correct?
11      A.   Yes.
12      Q.   How would you define this in your own
13   words?
14      A.   It's a survey technique where participants
15   are provided choice sets, and based on the
16   development of the technique, the choice sets, the
17   products, the attribute levels, the attributes, the
18   levels within the attributes and pricing, the
19   attempt is to tease out certain values that a
20   consumer may place on certain attributes or levels
21   within the attributes of products.  So it's a survey
22   technique.
23      Q.   Have you ever designed a conjoint survey?
24      A.   No.  Again, I'm not a survey expert.
25      Q.   So if someone called and asked you to be
```



A. I don't believe that that would be a requirement subject to my prior answer.

Q. Would you agree that the number of class products purchased in this case is a historical number and is therefore fixed?

A. Yeah, we're not going back -- we're not going back and changing that. I mean, I know where this question is coming from. Mr. Weir puts forth this strawman argument where he tries to say that the defense side is trying to change the historical sales. No, that's not going on at all. That's a -- that's a mischaracterization. So, yes, what happened in the past happened in the past, and what was bought was what was bought. That doesn't change the fact that there's different forms, there's different package size and, you know, everything else. So. . .

Q. But would you agree that the number of class products purchased in this case is a historical number and is therefore fixed?

A. I don't disagree with the fact that it is a historical number. Now, whether there could be problems determining what that number is, but what was bought was what was bought.

Q. Is that a "yes"?



Page 80

```
 1     A.    Yeah, what was bought was what was bought.
 2     Q.    Would you agree that if market demand for a
 3  product drops and a supplier does not lower its
 4  price for that product, the supplier will sell fewer
 5  units of that product?
 6     A.    If there's a decrease in demand and in a
 7  competitive market, if a supplier does not respond
 8  to those market dynamics and forces, less product
 9  would be sold, yes.
10     Q.    Do you believe that a product can be
11  produced for a cost of X dollars and have a market
12  value that is less than X dollars?
13     A.    Yes, it's called making a loss.  If I
14  understood your question.
15     Q.    All right.  In my mind, I'm picturing a
16  typical graph of supply and demand -- this is taking
17  you back to my very painful college days.  Okay.  So
18  I'll start again.
19           In my mind, I'm picturing a typical graph
20  of supply and demand, and the graph usually reflects
21  a downward sloping demand curve and an upward supply
22  curve that ends up looking something like an X,
23  correct?
24     A.    Yes.  Yes.  So there's actually huge
25  important interpretations of that X.  But, yes, it's
```



1  a representation of -- a graphical representation of
2  supply and demand.
3     Q.   In the typical economic depiction of supply
4  and demand curves, the Y axis represents the price
5  and the X axis represents the quantity, correct?
6     A.   Correct.
7     Q.   Have you determined the slope of the
8  relevant supply curve at issue in this case?
9     A.   No, I have not looked at -- actually, a
10 more precise question would be the elasticity of
11 supply, which is very different from slope.  But I
12 haven't made that determination.
13    Q.   I'm going to ask them separately, then.
14         Have you determined the slope of the
15 relevant supply curve at issue in this case?
16    A.   No.
17    Q.   If you were asked, how would you do it?
18    A.   You've got to figure out -- well, a
19 traditional approach might be an econometric
20 analysis; in other words, supply -- I don't want to
21 give a long answer, but you asked the question.
22         The supply is a function of the price of
23 the good in question.  It's a function of the price
24 of labor.  It's a function of the price of capital.
25 It's a function of the price of raw materials.  It's



1    Q.   Do you believe that Dr. Dennis has the
2  knowledge, skill, education and experience necessary
3  to design a reliable conjoint survey?
4    A.   Yeah, I'm not -- I want to make it clear,
5  I'm not criticizing his qualifications or experience
6  at all.  I rarely do that.  I'm not going to
7  question his, you know, experience.  I always look
8  at what goes on in a particular case, and from an
9  economic and damage quantification perspective is
10  there an issue with the work done on a particular
11  case as opposed to a general statement about his
12  qualifications.  I did not make that criticism.
13    Q.   So do you believe that Dr. Dennis has the
14  knowledge, skill, education and experience necessary
15  to design a reliable conjoint survey?
16    A.   Yeah, I mean, I want to be a little
17  careful.  I mean, it -- it seems like he's been
18  doing this and he's been consulting doing this.  So
19  my point is I'm not going to -- you know, I can't
20  speak to the quality of all of that, but I'm not
21  criticizing it.  I mean, it's just a nonissue for
22  me.  It's not something I'm even evaluating or
23  anything along those lines.
24    Q.   You don't have any criticisms of his
25  competence to design a reliable conjoint survey; is



1    that correct?
2         A.   No.  No.  Nor would I offer such
3    criticisms.  Others might, but I'm not going to do
4    that.
5         Q.   In reading your reports, it also appears
6    that you have a few criticisms of Mr. Weir's
7    analysis.  Is that correct?
8         A.   Yes.
9         Q.   Do you believe that Mr. Weir has the
10   knowledge, skill, education and experience to
11   ascertain whether it would be possible to determine
12   damages on a class-wide basis using common evidence?
13        A.   Give me the whole question again.
14        Q.   Do you believe that Mr. Weir has the
15   knowledge, skill, education and experience to
16   ascertain whether it would be possible to determine
17   damages on a class-wide basis using common evidence?
18        A.   Yeah, I think -- I'll just parenthetically
19   note that I think he and I have different
20   backgrounds.  But, again, that's not a criticism
21   that I'm making.  I never have -- I mean, Mr. Weir
22   and I -- and Dr. Dennis and I have opposed each
23   other in other cases, and I never have called into
24   question their -- you know, their education or their
25   knowledge or their skills.  I always look at what



1  might say, okay, that's really something for a
2  colleague of mine to do, or I might say, well,
3  here's an economic way of looking at it.  But I have
4  not thought through any of that.  So I really can't
5  answer that question.
6      Q.   Well, you're not a consumer survey expert,
7  right?
8      A.   Well, I've agreed to that from the very
9  beginning, that I'm not a --
10     Q.   Have you --
11     A.   -- consumer survey expert.
12     Q.   Are you an expert in determining how
13 consumers perceive words on product labels?
14     A.   Boy, that can go in a lot of different
15 directions.  I'm not a linguist, I guess, if that's
16 even the right way to describe it.  But there might
17 be -- there could always be economic ways to do
18 tests to see how people are reacting to phrases.
19 That's why I'm not ruling out it.  I mean, the
20 likelihood is that I would probably pass it on to a
21 colleague, but I'm not going to 100 percent rule it
22 out because there may be economic ways to look at
23 the issue.
24     Q.   What do you mean "economic ways"?
25     A.   Well, to just see -- well, for example, to



```
 1  I'm a little unclear in your question about whether
 2  you're talking about a CVS saying it or whether
 3  you're talking about Pharmacare saying it.  But --
 4  and there's different situations of whether we would
 5  ever see such a statement.  But trying to be --
 6  trying to answer your question, I haven't -- trying
 7  to answer the spirit of your question, I haven't
 8  seen that.
 9  BY MS. SOFFIN:
10      Q.   Have you done any kind of analysis or
11  evaluation of whether consumer preferences would
12  change if they learned that the products could not
13  be lawfully sold?
14      A.   Ask the question again.
15      Q.   Have you done any kind of analysis of
16  whether consumer preferences would change if
17  consumers learned that the products could not be
18  lawfully sold?
19      A.   I have not done that analysis.
20      Q.   Have you done any kind of analysis or
21  evaluation of whether consumer preferences would
22  change if consumers learned that the products were
23  not developed by a virologist?  And when I say
24  "products" in these questions, I mean the challenged
25  products at issue.
```



```
 1                MR. ORZANO:  Assumes facts, vague and
 2    ambiguous.
 3    BY MS. SOFFIN:
 4        Q.   Well, the consumers would not have -- if a
 5    product is determined to be illegal before it makes
 6    it to the shelf, the consumers would never have the
 7    opportunity to purchase that product, correct?
 8        A.   Yeah, that's --
 9        Q.   I'm talking about at a retailer.
10                MR. ORZANO:  Same objections.
11        A.   I think this is trying to help me
12    understand the question, but I will say that's
13    tautological.  If it's illegal to sell and it
14    wouldn't be on the shelf, then, yeah, consumers
15    could not legally buy the product.  I'm not going to
16    disagree with that.
17    BY MS. SOFFIN:
18        Q.   And then --
19        A.   But that's -- but that's a tautology.
20                MS. SOFFIN:  Let's take a break.
21                THE WITNESS:  Yeah.  And, in fact,
22    I'll leave it up to you, and I don't know where you
23    are located, but our office manager has told me my
24    lunch is here.
25                MS. SOFFIN:  Well, we're pretty close
```



000092