UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MONTIQUENO CORBETT and ROB DOBBS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PHARMACARE U.S., INC.,

Defendant.

Case No.: 21cv137-JES (AHG)

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION;**

**(2) DENYING MOTION TO EXCLUDE TESTIMONY OF J. MICHAEL DENNIS AND COLIN WEIR; and**

**(3) DENYING MOTION TO EXCLUDE TESTIMONY OF MARK KEEGAN AND KEITH UGONE**

**[ECF Nos. 147, 174, 176, 193]**

Before the Court are several motions filed by the parties: (1) Plaintiffs' motion for class certification (ECF No. 147); (2) Defendant's motion to exclude the testimony of Plaintiffs' experts J. Michael Dennis and Colin Weir (ECF No. 176); and (3) Plaintiffs' motion to exclude the testimony of Defendant's experts Mark Keegan and Keith Ugone (ECF No. 193). Given the various related and overlapping issues raised in these motions,

1

the Court granted the parties' request for consolidated briefing. ECF No. 185. Per the consolidated schedule, the parties filed respective oppositions and replies to these motions. ECF Nos. 174, 175, 189, 192, 196, and 197. On October 24, 2023, the Court held a hearing on all three motions and took them under submission. ECF No. 204. After due consideration, and for the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion for class certification, and **DENIES** the parties' respective motions to exclude.

## I.     BACKGROUND

On January 25, 2021, Plaintiffs filed this putative class action against Defendant PharmaCare U.S., Inc. ("PharmaCare"), asserting consumer protection and breach of warranty claims based on its Sambucol product, a dietary supplement that is alleged to contain a proprietary extract of black elderberry. ECF No. 1. The parties engaged in two rounds of motions to dismiss, making the current operative complaint the Second Amended Complaint ("SAC").[1] ECF No. 45. The current claims that remain in the SAC are as follows: (1) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.; (2) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.; (3) California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; (4) Missouri's Merchandising Practices Act ("MPPA"), Mo. Ann. Stat. § 407.010 et seq.; (5) Breach of Express Warranties; and (6) Breach of Implied Warranty of Merchantability.[2] *Id.*

### A.     The Products

Black elderberry is a flowering plant that produces clusters of black berries. ECF No. 144 at 14. Elderberry has become a popular dietary supplement in recent years,

---

[1] Plaintiffs moved the Court for leave to file a third amended complaint but this motion was denied. ECF Nos. 133, 164.

[2] The original SAC included a third named plaintiff, Damarais Luciano, a resident of Massachusetts, and included an additional claim under Massachusetts state law, but Plaintiff Luciano was subsequently dismissed per Plaintiffs' request. ECF Nos. 59, 84, 120.

partially due to increased popularity of "natural remedies" in the marketplace. SAC ¶¶ 2-3. A method of producing elderberry extract is described in U.S. Patent No. 4,742,046, filed by Madeline Bliah, also known as Madeline Mumcuoglu ("Mumcuoglu"). ECF No. 147-3 at ¶¶ 2-3, Exs. A, B. Dr. Mumcuoglu started an Israeli company to market her elderberry extract product and trademarked the name "Sambucol" for use with her company. ECF No. 147-3, Ex. F at ¶ 4. The Sambucol trademark eventually became owned by Defendant's parent company. ECF No. 147-3, Exs. D, E; I at 99:12-102:23.

Each of Defendant's products that are at issue in this case contain black elderberry extract. Specifically, the following twelve products are at issue:

1.   Original Syrup (4oz and 7.8oz)

2.   Kids Syrup (4oz and 7.8oz)

3.   Chewable Tablets

4.   Advance Immune Syrup (4oz)

5.   Gummies[3]

6.   Kid Gummies[4]

7.   Advance Immune Capsules

8.   Effervescent Tablets

9.   Throat Lozenges

10.   Daily Immune Drink Powder

11.   Infant Drops

12.   Sugar Free Syrup (4oz)

(collectively, the "Products"). ECF No. 144 at 15-16. Defendant uses two different methods to produce the elderberry extract used in these products, depending on whether the product is liquid or non-liquid. *Id.* at 16.

---

[3] These Gummies are not included in the Disease Claim theory as described further down in this order because they do not contain the alleged misrepresentations that are at issue under this theory. However, they are part of the NDI Claim theory.

[4] *See infra* n.3.

Plaintiffs' claims arise from allegations regarding statements made on the labels on Defendant's products, which they allege to be false and misleading. The labels on the Products vary, but include some combination of the following statements:

- "Supports Immunity"

- "Scientifically Tested"

- "Supports the immune system"

- "Virologist Developed"

- "Sambucol®, the original Black Elderberry Extract, provides strong immune system support to help you and your family stay healthy throughout the year. Sambucol® Black Elderberry extract conveniently arms you with some of the best protection nature has to offer."

- "Developed by a [world renowned] virologist, Sambucol® is the unique black elderberry extract that has been used in scientific studies. By using a proprietary method of extraction, only Sambucol® can guarantee consistent, immune supporting properties in every serving."

- "Developed by a world renowned virologist, Sambucol®'s unique manufacturing process preserves and maximizes the naturally occurring health benefits of the Black Elderberry."

- "Sambucol® is the unique Black Elderberry that has been used in published scientific studies. No other elderberry brand can make the same claim."

- "Developed by a world renowned virologist, Sambucol® has been trusted by millions worldwide. Sambucol can be taken every day for continuous immune support."

(collectively, "Challenged Misrepresentations"). These statements are made on the labels on the product boxes at differing locations. *See* ECF No. 144 at 18-20; ECF No. 147-10 to 147-12, Exs. V-KKK.

### B.     The Theories

Plaintiffs rely on two underlying theories in their complaint. First, Plaintiffs allege that the Products contain a new unreported dietary ingredient and therefore, were illegal to sell as dietary supplements (the "NDI claim"). SAC ¶¶ 22-37. Dietary supplements are

defined in the Federal Food, Drug, and Cosmetic Act ("FDCA") as a "product (other than tobacco) intended to supplement the diet" that contains one or more of the following: (1) vitamins; (2) minerals; (3) herbs or other botanicals; (4) an amino acid; (5) a supplement meant to increase total dietary intake; or (6) a concentrate, metabolite, constituent, extract, or combination of any of the listed ingredients." 21 U.S.C. § 321(ff)(1). Under the Dietary Supplement Health and Education Act (the "DSHEA"), dietary ingredients that were marketed in the United States before 1994 could be labeled and sold as dietary supplements without first notifying the FDA. 21 U.S.C. § 350b. Otherwise, generally, a "new" dietary ingredient must be submitted to the FDA prior to sale.[5] *Id.* Plaintiffs alleged that the blackberry extract in Defendant's products are a "new" dietary ingredient for which it had to provide notice to the FDA before sale, and Defendant failed to do so. SAC at ¶ 33. Thus, Plaintiffs allege that the sale of the Products was illegal. *Id.* at ¶¶ 36-37.

Second, Plaintiffs allege that the Products are labeled and marketed in a way that claims that they mitigate or prevent disease (the "Disease claim"). ECF No. 144 at 23. Specifically, Plaintiffs point to statements made on the packaging of the Products—the Challenged Misrepresentations as discussed above—and also to statements made on Defendant's website. SAC at ¶¶ 40-55.

## C.   Named Plaintiffs and Proposed Classes

There are two named Plaintiffs in the class. Plaintiff Corbett was a resident and citizen of San Diego, California at the time the Complaint was filed, claimed so in his declaration filed with the class certification motion, but now appears to reside in Washington. SAC at ¶ 14; ECF No. 147-13 at ¶ 1; ECF No. 174-3 at 10:17-25. He claims to have purchased the capsules, Original syrup, and gummies products from April 2018

---

[5] An exception to the notice requirement does apply for new dietary ingredients that have been "present in the food supply as an article used for food in the same chemical form that you plan to use in your dietary supplement." 21 U.S.C. § 350b(a)(1).

to April 2020 on Amazon and at CVS pharmacies in San Diego. ECF No. 147-13 at ¶¶ 3-4. He alleged that he saw and relied on the misrepresentations on the packaging and also believed that the Products were legally sold dietary supplements. SAC at ¶¶ 81-82; ECF No. 147-13 at ¶ 5. He claimed that had he known the truth about the alleged misrepresentations and that the products were not legally sold dietary supplements, he would not have purchased them. SAC at ¶ 85.

Plaintiff Dobbs was a resident of Florissant, Missouri, at the time the Complaint was filed, but now claims to be a resident of California. SAC at ¶ 16; ECF No. 147-14 at ¶ 1. He claims to only have purchased gummies from August 2019 to April 2020 through Amazon. *Id.* at ¶ 3. He makes similar allegations as to seeing labels on the product and believing it was a legally sold dietary supplement, and that he would not have made the purchases had he known the truth. SAC at ¶¶ 97-100; ECF No. 147-14 at ¶ 3.

Plaintiffs seek to certify the following five classes:

(1)     a Nationwide Class for the NDI Claim

(2)     a California Subclass for the NDI Claim

(3)     a Missouri Subclass for the NDI claim

(4)     a Nationwide class for the Disease Claim; and

(5)     a California Subclass for the Disease Claim.

ECF No. 144 at 13.

## II.     MOTION TO EXCLUDE EXPERTS

Concurrent with the pending motion for class certification, both parties filed competing motions to exclude experts that each party relies upon in their class certification arguments. Since resolution on these motions effects the evidence that the Court will rely upon in deciding the motion for class certification, the Court addresses these motions first, as a threshold matter.

### A.     Legal Standard

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand

the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). An expert witness may provide opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

Generally, district courts have a duty to "act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). However, the duty is to evaluate "not the correctness of the expert's opinions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ). Moreover, the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (citing *Daubert*, 509 U.S. at 594, 596).

The Ninth Circuit has stated that district courts should apply *Daubert* and Rule 702 standards at the class certification stage. *See, e.g.*, *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020). However, at this stage, there is no jury to gatekeep and the judge is the sole arbiter, so "admissibility must not be dispositive." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). "Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.* Thus, many district courts in this circuit view expert admissibility issues raised by parties during class certification as a determination of weight rather than admissibility. *See, e.g.*, *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, No. 2:17-CV-07223-JWH-AS, 2023 WL 4190553, at *2 (C.D. Cal. May 22, 2023) (*Daubert* to be used as a "guide to determine the weight that evidence receives at the class certification stage"); *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2021 WL 1320773, at *4 (N.D. Cal. Mar. 23,

2021) (a "lower *Daubert* standard should be employed at the class certification stage of the proceedings," denying motion to strike, and considering arguments as to reliability of expert testimony to "assist in evaluating the weight of the evidence as it relates to class certification"); *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 297 (N.D. Cal. 2020) ("*Sali* forecloses this interpretation by explicitly instructing that a *Daubert* analysis alone, while relevant, should not prevent a court from considering expert testimony at the class certification stage.").

## B.     Discussion

The first motion is Defendant's motion to exclude Plaintiffs' experts, Dr. J. Michael Dennis ("Dr. Dennis") and Mr. Colin Weir ("Mr. Weir"). ECF No. 176-1. Dr. Dennis performed a consumer perception survey, a materiality survey, and opined on damages. ECF No. 176-1 at 6. Mr. Weir helped to design and support Dr. Dennis's methodology on damages. *Id.* Defendant raises several grounds for why these experts' opinions should be excluded. First, Defendant argues that Dr. Dennis's consumer perception survey is unreliable, biased, and misleading because the questions he posed to survey participants (*i.e.*, whether the accused products "help" protect or prevent disease) did not match Plaintiffs' theory of liability, he used close-ended questions rather than open-ended questions, and he did not show survey participants actual images of the product but rather a manufactured design. *Id.* at 8-13. Second, Defendant argues that Dr. Dennis's materiality survey is similarly unreliable because the design shown to the survey participants was again manufactured for the survey and not an image of the actual product or packaging. *Id.* at 13-15. Third, Defendant argues that Dr. Dennis's full refund damages model is irrelevant to Plaintiffs' theory of liability because none of their theories suggest the product has no value. *Id.* at 14-15. Finally, Defendant argues that Dr. Dennis's price premium model, and therefore Mr. Weir's reliance on it for damage calculations, are irrelevant because materiality was not shown and even if it was, the price premium model design proposed by Dr. Dennis is not sufficiently defined as to how he will perform his conjoint survey, is based on a "willingness-to-pay" benchmark rather

than measuring an actual price premium, and does not present credible marketplace conditions. *Id.* at 16-21.

Plaintiffs present their own challenges to Defendant's experts, Dr. Mark Keegan ("Dr. Keegan") and Dr. Keith Ugone ("Dr. Ugone"), who opposed Dr. Dennis's and Mr. Weir's opinions. ECF No. 193-1. First, Plaintiffs argue that Dr. Keegan's competing consumer perception survey fails to accurately portray their theory of the case because Dr. Keegan himself did not read the Court's previous orders or understand the theory, and that Dr. Keegan lacks expertise in conjoint surveys for damages . *Id.* at 7-15. Second, Plaintiffs argue that Dr. Ugone's critiques of Dr. Dennis's survey should be excluded because he does not have sufficient expertise in surveys, particularly with respect to conjoint analysis. *Id.* at 15-19.

After reviewing the parties arguments and briefing on these issues, this Court agrees with the many district courts in this circuit that concluded that the more appropriate place to consider these arguments is on how much *weight* to give to the competing expert testimony, rather than their *admissibility*. *Sali*, 909 F.3d at 1006; *Painters*, 2023 WL 4190553, at *2; *Aberin*, 2021 WL 1320773, at *4; *Bally*, 335 F.R.D. at 297. This is particularly appropriate where, as here, much of the arguments for exclusion of the testimony is not on whether the types of surveys are acceptable, but whether certain criteria used in the respective surveys pass muster. However, the Ninth Circuit has stated that as a general matter, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997); *see also Microsoft Corp. v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1120 (W.D. Wash. 2012) (Criticisms "go to issues of methodology, survey design, reliability . . . [and] critique of conclusions, and therefore go to the weight of the survey rather than its admissibility.") (internal quotation marks omitted).

Accordingly, the Court **DENIES** the motions to exclude expert testimony under *Daubert*. However, the Court will consider both parties' arguments as to the reliability of

the proffered expert testimony to assist in evaluating the weight of the evidence as it relates to class certification issues below.

### III.  MOTION FOR CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs class actions. Under Rule 23(a), plaintiffs must establish numerosity, commonality, typicality, and adequacy. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Once Rule 23(a) is satisfied, then plaintiffs must meet one of the limitations under Rule 23(b). Here, Plaintiffs rely on Rule 23(b)(3), requiring them to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotations omitted). However, proof to establish that Rule 23 requirements have been met often "overlap with the merits of plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. A weighing of competing evidence, however, is inappropriate at this stage of the litigation. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

### Rule 23(a) Requirements

#### A.    Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Staton*, 327 F.3d at 953. The plaintiff need not state the exact number of potential class members; nor is a specific minimum number required. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal.

1  1994). Rather, whether joinder is impracticable depends on the facts and circumstances of
2  each case. *Id.*

3      Here, Plaintiffs state that more than 37 million packages of the Products were sold
4  nationally. The Court may infer that this suffices to establish numerosity. *See Clay v.*
5  *CytoSport, Inc.*, No. 3:15-CV-00165-L-AGS, 2018 WL 4283032, at *3 (S.D. Cal. Sept. 7,
6  2018) (numerosity satisfied based on "several million" of products sold in California); *In*
7  *re Hitachi Television Optical Block Cases*, No. 08CV1746 DMS NLS, 2011 WL 9403, at
8  *3 (S.D. Cal. Jan. 3, 2011) (sales of more than 100,000 products satisfy numerosity).

9      Defendant makes a related argument that the class cannot be overbroad and
10  unascertainable. ECF No. 174 at 54. Specifically, Defendant argues that because the
11  proposed class definitions include members that may not have suffered economic
12  damages (*i.e.*, they may have obtained refunds or were simply satisfied customers), the
13  class definitions are overbroad. In support of its position, however, Defendant only cites
14  to legal authority from other circuits. On this issue, the Ninth Circuit has squarely held
15  that any questions as to ascertainability or administrative feasibility is not a separate
16  inquiry or bar to class certification. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124
17  n.4 (9th Cir. 2017); *Clay*, 2018 WL 4283032, at *3 ("At class certification stage, it is
18  sufficient that the class be defined by an objective criterion, *i.e.*, whether the class
19  members purchased the relevant products"). Issues with regards to whether all members
20  of a class were injured is addressed in other aspects of the Rule 23 inquiry, such as
21  23(b)(3) predominance. *Briseno*, 844 F.3d at 1124 n.4 (citing *Torres v. Mercer Canyons*
22  *Inc.*, 835 F.3d 1125, 1136-39 (9th Cir. 2016)). Thus, the Court rejects this argument.

23      Accordingly, the Court finds that Plaintiffs have satisfied their burden to establish
24  numerosity.

25      **B.    Commonality**

26      Rule 23(a)(2) requires the existence of "questions of law or fact common to the
27  class." Fed. R. Civ. P. 23(a)(2). This requirement can be met with just a single common
28  question. *Wal-Mart*, 564 U.S. at 359.

This requirement overlaps with a part of Rule 23(b)(3)'s requirement that the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members." The Supreme Court has held that the commonality requirement is "subsumed, or superseded by, the more stringent Rule 23(b)(3) [predominance] requirement." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 610-612 (1997). Thus, for the sake of efficiency, courts often analyze these two requirements together, focusing on the predominance question because it is the more demanding inquiry. *See, e.g.*, *Johnson v. R&L Carriers Shared Servs., LLC*, No. 222CV01619MCSJPR, 2023 WL 3299709, at *3 (C.D. Cal. Apr. 10, 2023).

Accordingly, the Court will defer ruling on this Rule 23(a)(2) requirement and merge its discussion with the Rule 23(b)(3) requirement below.

### C.   Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties to be typical to those of the rest of the class. Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Like commonality above, typicality is a "permissive standard." *Id.*

Plaintiffs contend that their claims and defenses are typical of the class because members of the class suffer the same injury, resulting from a substantially similar theory of liability. ECF No. 144 at 28-29. In support, Plaintiffs cite various cases that have held that typicality is routinely met in consumer protection cases that arise from alleged misrepresentations on product labels. *Id.*

Defendant argue that both Plaintiff Corbett and Plaintiff Dobbs are not typical representatives for different reasons. First, as to Plaintiff Corbett, Defendant argues that he did not rely on the statement on the Products that it was a "Dietary Supplement" and did not know they were illegal. ECF No. 174 at 55. Further, Defendant argues that Corbett was a repeat purchaser and admitted to not reading the labels again after the first purchase. *Id.* at 56. Defendant also argues that Corbett admitted during his deposition that

he relied on the labels "Supports immunity" and "scientifically tested," which he testified he did not really understand the meaning of. *Id.*

The Court does not find these arguments as to Corbett to defeat a typicality finding. First, the Court agrees with Plaintiffs that Defendant selected certain portions of Corbett's testimony to highlight and his deposition does not read as clearly on the factual issues. *See, e.g.*, ECF No. 174-3 at 114:25-4 (Corbett stating that he knew Sambucol is labeled as a dietary supplement); ECF No. 147-13 at ¶ 5 (Corbett stating that he believed that the products were approved for sale as dietary supplements); ECF No. 189-11 at 151:12-152:3 (Corbett stating that he believed it would have been illegal to sell the product if the statement on the bottle was false). Second, to defeat typicality, Defendant needs to show that it has a defense against the particular representative that it does not have against other plaintiffs. *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 974 (C.D. Cal. 2015) ("To be typical, a class representative need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails. Instead, she must establish that she is not subject to a defense that is not 'typical of the defenses which may be raised against other members of the proposed class.'"). Here, the Court finds that Defendant's arguments raised as to Corbett are not necessarily atypical of arguments they may raise against any other member of the class.

Second, as to Plaintiff Dobbs, Defendant argues that he only purchased the Gummies products so cannot be a representative of the classes on the Disease Claims because the Gummies were not labeled with the alleged misrepresentations at the core of that claim and are thus, not part of this theory. ECF No. 174 at 20. Further, Defendant argues that Dobbs testified that he did not remember seeing the label at all at said "Dietary Supplement," making him atypical for the NDI claims as well. *Id.*

As to these arguments, the Court finds that they hold more weight. First, Plaintiffs do not dispute that the Gummies are not part of the Disease claims. So, if Dobbs *only* purchased the Gummies, he cannot be a named representative of a class under such a theory because he is not even a member of that class. *See, e.g., In re Capacitors Antitrust*

13

*Litig.*, 154 F. Supp. 3d 918, 928 (N.D. Cal. 2015) (in order to have standing to be a named plaintiff bringing a consumer protection claim, "a named plaintiff must have purchased the [] product in the state under whose law he or she seeks to bring a claim"). While there is a difference in the courts' treatment of situations where there are many products at issue and a named plaintiff has not brought *every* product that is at issue, here, Dobbs did not buy *any* product that was at issue in the Disease claims. *See Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 570 (N.D. Cal. 2013). Thus, the Court finds that he does not meet the typicality requirement to be part of any classes based on the Disease Claim, and cannot be named representative on any of those classes.

Turning to the NDI claim for Dobbs, the Court agrees with Defendant that Dobbs gave testimony that he did not read the Dietary Supplement label:

Q.· The bottle for the gummies that you purchased says that they're a dietary supplement, right?

A.· I can't remember if it stated those words.

ECF No. 174-4 at 52:18-22. In their reply brief, Plaintiffs provide no citations to any testimony that shows that Dobbs *did* read the Dietary Supplement label. However, Plaintiffs argue that what matters is if the named plaintiffs thought the products were legal and would not have purchased them if they had known they were illegal. ECF No. 191 at 54. In other words, Plaintiffs argue that their NDI theory does not rest solely on the consumer seeing the term "Dietary Supplement" on the label, and interpreting it in some way. Instead, Plaintiffs argue that Defendant marketed "Dietary Supplement" products that contain an illegal NDI, which render its products illegal for sale. This theory, Plaintiffs argue, does not turn on what a consumer would interpret the label "Dietary Supplement" to mean. *See* SAC at ¶¶ 22-37. Here, Dobbs—like Corbett—does state in his declaration that he believed that the Sambucol Products were approved for sale as dietary supplements and that he purchased the products based on these beliefs. ECF No. 147-14 at ¶ 3. Given the permissive nature of this inquiry, the Court finds that Dobbs has met the typicality requirement for the NDI claim.

Accordingly, the Court finds that Plaintiffs have satisfied their burden to establish typicality for Plaintiff Corbett, for Plaintiff Dobbs for the NDI Claims, but have failed to establish typicality for Plaintiff Dobbs for the Disease Claims.

### D.   Adequacy of Representation

The last Rule 23(a) factor looks to make sure the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P 23(a)(4). The root concern this factor seeks to address is a constitutional due process concern to make sure absent class members are afforded adequate representation in the action before there is an entry of a judgment that would bind them. *Hanlon*, 150 F.3d at 1020. Thus, this factor focuses on two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978)).

Plaintiffs state in their motion that the named class representatives share common interests with the other class members and there is no conflict that would cause them to not adequately represent their interests. ECF No. 144 at 29. Similarly, Plaintiffs argue that they—along with their counsel—have shown the requisite vigor in prosecuting the case to date and will continue to do so. *Id.* at 30. Further, Plaintiffs' counsel provide information regarding their experience with such class action cases in the past, and a description of the work they have done so far in the case. *Id.* at 30-31.

Other than the arguments as to Plaintiffs Corbett and Dobbs that the Court addressed above in typicality, the only other argument that Defendant raises related to this factor is with regards to a conflict of interest with Plaintiffs' counsel. ECF No. 174 at 57. Specifically, Defendant argues that there is a conflict of interest in acting as counsel in this case and in another case before the Court, *Sunderland v. Pharmacare*, Case No. 23cv1318-JES (BGS). *Id.* In that case, the plaintiffs present a related theory of liability that the blackberry extract is simply elderberry juice and not "unique or proprietary." *Id.* Plaintiffs counter that pursuing an alternative theory of liability in a separate action does

not necessarily create a conflict of interest. ECF No. 191 at 54-55. Rather, counsel maintains that its representation in both cases seek to make sure class members' interests are furthered by vigorously pursuing these alternative theories. *Id.*

The Court agrees with Plaintiffs and does not find that this representation presents an actual conflict that bars their representation here. While the theories in the two cases are different, there is nothing to suggest that counsel cannot vigorously pursue both theories, as counsel often must do even in the same case presenting alternative theories. Thus, the Court does not find that this would make class counsel inadequate.

Accordingly, the Court finds that Plaintiffs have satisfied their burden to establish adequate representation of both the class representatives and class counsel.

### Rule 23(b)(3) Requirements

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is more stringent than commonality and requires that "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.2d at 1022.

Defendant raises several issues for why predominance and superiority cannot be maintained for the different proposed classes. The Court will address them below, addressing threshold issues first and then reaching the actual Rule 23(b)(3) inquiry.

### A.    Nationwide Classes

Plaintiffs seek to certify two nationwide classes: (1) a Nationwide Class for the NDI Claim; and (4) a Nationwide class for the Disease Claim. Defendant argues that material differences exist between state laws that preclude certification of classes on a nationwide basis.

In the case *Mazza v. American Honda Motor Co.*, the Ninth Circuit set out a framework for determining whether California laws could be applied to a nationwide

class. 666 F.3d 581 (9th Cir. 2012). "A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law. *Zinser v. Accufix Rsch. Inst., Inc.,* 253 F.3d 1180, 1187 (9th Cir. 2001). For class actions, California's choice of law rules places on the party seeking certification the "initial burden to show that California has significant contact or significant aggregation of contacts to the claims of each class member." *Mazza*, 666 F.3d at 589 (citing *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 921 (Cal. 2001)) (internal quotation marks omitted). This is a constitutional requirement that must be met before applying California law. *Id.* at 590. If the party seeking certification makes this showing, then "the burden shifts to the other side to demonstrate that foreign law, rather than California law, should apply to class claims." *Id.* (internal quotation marks omitted).

As to their initial burden, Plaintiffs argues that they have satisfied this burden because Defendant is based in California and decisions based on labeling of the Products were made in California. ECF No. 191 at 52. The Court agrees that such connections are sufficient to meet the constitutional requirement that California has significant contacts to the claims of the class member. *See Mazza*, 666 F.3d at 590 (finding constitutionally sufficient contacts where Defendant's corporate headquarters was in California, advertising agency that produced the alleged false representations was in California, and a fifth of the class members were in California); *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV152171FMOFFMX, 2016 WL 11770360, at *5 (C.D. Cal. Mar. 8, 2016) (constitutional requirement met where Defendant was incorporated and headquartered in California); *Clay*, 2018 WL 4283032, at *14 (constitutional requirement met where Defendant was incorporated and headquartered in California, final decisions regarding labels were made in the state, and many of the products were made in state).

Thus, under the *Mazza* framework, the burden now shifts to Defendant. California law may only apply to a nationwide class if "the interests of other states are not found to outweigh California's interest in having its law applied." *Mazza*, 666 F.3d at 590. Courts determine this with a three-step governmental interest test:

First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Id.* (citing *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81-82 (Cal. App. 2010)).

### i.    Conflict of Laws

The first step in this test is to determine if there is a true conflict in the laws between California and the other states. A conflict does not arise simply where more than one state's laws are implicated, but a "problem only arises if differences in state law are material, that is, if they make a difference in this litigation." *Id.*

In support of this argument, Defendant submits several charts detailing differences between the laws of the different states that it claims are material. *See* ECF No. 174-19 (chart for express warranty claim); 174-20 (chart for implied warranty claim); 174-21 (chart for consumer protection laws). The charts each consider the law of the 50 states and purports to highlight differences between the jurisdictions.

For the causes of action arising under state consumer protection statutes, Defendant's chart alleges differences in whether the individual states require causation, materiality, reliance, or have additional requirements. ECF No. 174-21. The chart also includes footnote citations for each state, providing legal citations for the information in the chart. *Id.* In *Mazza*, the Ninth Circuit considered a similar chart detailing differences under various state consumer protection statutes. *Mazza*, 666 F.3d at 591. The court found that the charts sufficiently demonstrated material and nontrivial differences,

including that some states require scienter, reliance, and provided for different remedies. *Id.* Many district courts have followed suit, finding that this step is met where a party submits charts and briefing explaining the differences between other states' consumer protection laws as compared to California. *See Clay*, 2018 WL 4283032, at *15 (finding sufficient material difference regarding reliance, causation, statute of limitations and other differences); *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 615 (S.D. Cal. 2015) (finding sufficient material difference in this step based on scienter, reliance, statute of limitations differences); *Warner*, 2016 WL 11770360, at *6 (similarly finding that comparison of consumer protection statutes pass first step of *Mazza* test); *In re Hitachi Television Optical Block Cases*, 2011 WL 9403, at *6 (collecting cases finding differences in state consumer protection laws).

   For the express warranty claims, Defendant's chart alleges differences in whether the individual states require reliance, pre-litigation notice, or privity to establish such a claim. ECF No. 174-19. The chart similarly includes footnote citations for each state, providing legal citations for the information in the chart. *Id.* Differences in reliance requirements and privity have been held to be material differences. *See In re Hitachi*, 2011 WL 9403, at *6 (finding material differences between California's express warranty law and those of the other forty-nine states based on reliance and privity and citing cases in support). Similarly, for the implied warranty claims, Defendant's chart also alleges differences between how the states treat reliance, prelitigation notice, and privity. ECF No. 174-20. Such differences in the implied warranty context have also been held to be material. *See Czuchaj v. Conair Corp.*, No. 13cv1901-BEN (RBB), 2016 WL 1240391, at * 2-3 (Mar. 30, 2016) (finding material differences based on privity and statute of limitations for implied warranty claims).

   Accordingly, the Court finds that Defendant has sufficiently established that there are at least some material differences between California and the other states for the relevant causes of action for the first step of the *Mazza* analysis.

   //

### ii.     Interest of Foreign Jurisdictions

If there is a material difference found, the Court proceeds to the next step of the analysis to determine the interests of the various jurisdictions. In *Mazza*, the court analyzed this step in the context of consumer protection statutes. The court noted that each state generally has an interest in having its own laws applied to its residents and to conduct that took place within its borders. *Mazza*, 666 F.3d at 591-92. In addition, the court also noted that states also have an interest in creating a favorable business climate within its borders and as such, has a "valid interest in shielding out-of-state businesses from what the start may consider to be excessive litigation." *Id.* at 592. Balancing these valid, competing interests is a policy decision that should be left to the purview of the individual states and their legislatures. *Id.* Thus, the *Mazza* court concluded that "[e]ach of our states has an interest in balancing the range of products and prices offered to consumers with the legal protections afforded to them" and "an interest in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future." *Id.*

The Court sees no reason here to depart from these interests identified in *Mazza*. *See Clay*, 2018 WL 4283032, at *16 ("[W]here a plaintiff seeks to apply California consumer protection law to a California corporation on behalf of foreign citizens who purchased defendant's products outside California, a true conflict arises where California law affords either greater or lesser consumer protection because other states may choose to offer lesser consumer protection and a more business-friendly climate than California, while others may offer more consumer protection and a less business-friendly environment.); *Czuchaj*, 2016 WL 1240391, at *4 (finding that the same interests identified in *Mazza* are equally implicated in breach of warranty claims).

Accordingly, the Court finds that this step of the test has been met as well.

//

//

### iii.    Which State's Interest is Most Impaired

In this last step, the Court must determine which state's interest would be more impaired. *Mazza*, 666 F.3d at 593. However, the *Mazza* court emphasized that this test is "designed to accommodate conflicting state policies, as a problem of allocating domains of law-making power in multi-state contexts" and is "not intended to weigh the conflicting governmental interests in the sense of determining which conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue." *Id.*

In *Mazza*, the court stated that California law recognizes that "the place of the wrong has the predominant interest." *Id.* at 593. Further, California considers the "place of the wrong" to be "the state where the last event necessary to make the actor liable occurred." *Id.* In a consumer protection situation that involved false advertising, the court concluded that the last event necessary for liability was "communication of the advertisements to the claimants and their reliance thereon in purchasing" and that this happened in the various foreign states, not California. *Id.* at 594. Thus, the court concluded that "[t]hese foreign states have a strong interest in the application of their laws to transactions between their citizens and corporations doing business with their state." *Id.* In contrast, it found California's interest in applying its laws to foreign citizens "attenuated." *Id.* Thus, the court dismissed the premise that "one state's law must be chosen to apply to all [] jurisdictions" and held that "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Id.*; *see also Guzman*, 305 F.R.D. at 618 (denying class certification on nationwide class because consumer protection and misrepresentation claims should be governed by individual state laws from where loss was sustained—where consumers were domiciled).

Plaintiffs cite to the case *Clay v. CytoSport, Inc.* to support their position that California law should be applied. In that case, this court reviewed *Mazza* and differentiated its conclusion on this issue. 2018 WL 4283032, at *16-17 (S.D. Cal. Sept. 7, 2018). The court focused on the case that *Mazza* relied upon to find that the "last

event" was viewing the advertisement, and found that the facts of that case were such that the entire wrongful conduct occurred in another state. *Id.* (citing *McCann*, 48 Cal. 4th at 90). Applying that view of the holding of *McCann* to its facts, the *Clay* court found that all the events underlying the misconduct happened in California: "All allegedly false representations were made on Defendant's product labels, and all products were sold with labels. All final decisions regarding the labels were made and approvals were given in California, where Defendant is incorporated and maintains its principal place of business." *Id.* Thus, the court concluded that "[t]he fact that some products were purchased in one state rather than another should be immaterial to the choice of law under the facts of the present case, because the alleged misconduct occurred entirely in California." *Id.*

However, subsequent cases have rejected *Clay*'s attempt to differentiate *Mazza*. In *Kaupelis v. Harbor Freight Tools USA, Inc.*, the district court disagreed with *Clay*; even though in that case, labeling decisions were made in California, the court nevertheless held that the "location of the purchase is the place where the wrong occurred." No. SACV191203JVSDFMX, 2020 WL 5901116, at *13 (C.D. Cal. Sept. 23, 2020). The court concluded that *Clay* was in contravention of the "clear rule from *Mazza*." *Id.* Subsequently, another district court followed suit in *Cimoli v. Alacer Corp.*, 587 F. Supp. 3d 978, 994 (N.D. Cal. 2022). The court there found that *Clay* misconstrued the holding in *Mazza*, emphasizing that *Mazza* was clear that the "the state where transactions occurred has the predominant interest for purposes of the choice of law analysis." *Id.*

The Court agrees with Defendant and finds that the weight of the authority, including Ninth Circuit authority from *Mazza*, balances in favor of finding here that the foreign class member's claims should be governed by the laws of the individual states because the place of the wrong is where each individual viewed the statements on the product labels and that it is not appropriate to apply California's laws to the nationwide class.

Accordingly, the Court **DENIES** certification of the proposed nationwide classes.

**B.    Statewide Classes**

Next, the Court turns to the proposed statewide classes. Plaintiff proposes two classes for the NDI Claim: a California Class and a Missouri Class. Plaintiff also proposes a California class for the Disease claim.

Plaintiffs argue that the requirements for Rule 23(b)(3) are met. ECF No. 144 at 31-52. Defendant, in turn, raises several issues that they argue preclude certification. For the NDI claim, as a threshold matter, Defendant argues that the claim is preempted by federal law. Defendant also raises several issues, arguing that neither the NDI or Disease claims satisfy Rule 23(b)(3) because Plaintiffs have not shown they can be sustained by class-wide evidence without individualized inquiries. ECF No. 174 at 24-27; 33-54. The Court will address these issues in turn below.

**i.    Preemption of the NDI Claim**

As a preliminary matter, the Court will address Defendant's argument that the NDI claims are preempted by the FDCA, and therefore, classes cannot be certified under this theory. ECF No. 174 at 24. Defendant argues that this issue is appropriate for adjudication at class certification because if no claim can be maintained under this theory, as a matter of judicial efficiency, no class should be certified. *Id.* (citing *Yumul v. Smart Balance, Inc.*, No. CV 10-00927 MMM, 2011 WL 1045555, at *5 (C.D. Cal. Mar. 14, 2011)).

In *Buckman Co. v. Plaintiffs' Legal Committee*, the Supreme Court addressed whether a state law tort claim based on fraudulent misrepresentations to the FDA was preempted. 531 U.S. 341 (2001). The case involved bone screws that injured the plaintiffs when it was installed into their spines, but the company only received approval from the FDA for use of the screws in the arms and legs. *Id.* at 343-44. The court found such "fraud-on-the-agency" claims "exist solely by virtue of the FDCA disclosure requirements" and "the existence of these federal enactments is a critical element in their case." *Id.* at 352-53. Thus, these claims were preempted because permitting the plaintiffs

to maintain the claims would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 350.

The *Buckman* court left open the possibility of maintaining some state claims where they "parallel federal safety requirements." *Id.* at 353 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (no preemption for state law claims that are "equal to, or substantially identical to, requirements imposed under federal law")). Subsequently, interpreting *Buckman*, the Ninth Circuit has stated that the non-preempted claims must fit in a "narrow gap" where "[t]he plaintiff must be suing for conduct that violates the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing because the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman* )." *Perez v. Nidek Co.*, 711 F.3d 1109, 1120 (9th Cir. 2013) (citation omitted).

District courts applying these cases in the context of whether state law claims can still be maintained under the UCL, FAL, and CLRA have come to different conclusions. The first line of cases hold that such claims are not preempted. For example, in *Brown v. Van's International Foods. Inc.*, No. 22-cv-0001-WHO, 2022 WL 1471454 (N.D. Cal. May 10, 2022). the court faced an implied preemption issue for a UCL claim based on a violation of California's Sherman law's incorporation of FDCA labeling requirements. The court started its analysis by emphasizing that the FDCA expressly preempted state law claims inconsistent with its requirements but "specifically anticipated states enacting their own identical laws" because state laws are "only preempted if they are not equal to, or substantially identical to, requirements imposed by or under the FDCA." *Id.* at *7. Thus, the *Brown* court read *Buckman* to not apply because where a plaintiff asserts a UCL claim based on California's Sherman law, reliance on the FDA rules only "provides a predicate basis" for the state law claim because the plaintiff is "suing because the [] statements at issue are allegedly misleading under California law, not because the [] statements allegedly violate FDA regulations." *Id.* Other district court have followed suit. *See Brown v. Food for Life Baking Co.*, No. 21-CV-10054-TLT, 2023 WL 2637407, at

*4 (N.D. Cal. Feb. 28, 2023); *Roffman v. Perfect Bar, LLC*, No. 22-CV-02479-JSC, 2022 WL 4021714, at *5 (N.D. Cal. Sept. 2, 2022); *Roffman v. Rebbl, Inc.*, 653 F. Supp. 3d 723, 730 (N.D. Cal. 2023).

A second line of cases hold that such state law claims are preempted. *See Telebrands Corp. v. Luminas Int'l LLC*, No. 322CV00891RSHWVG, 2023 WL 6370902, at *4 (S.D. Cal. July 12, 2023) (finding UCL claim that the defendants engaged in unlawful business practices by selling the patches that did not comply with FDCA requirements or California's Sherman law preempted by the FDCA); *ImprimisRx, LLC v. OSRX, Inc.*, No. 21-CV-01305-BAS-DDL, 2023 WL 2919318, at *4 (S.D. Cal. Apr. 12, 2023) (holding that "to the extent that Plaintiff's UCL claim relies on violations of the FDCA, it is preempted" but that other unlawful UCL theories predicated on other theories could move forward); *Wilson v. ColourPop Cosms., LLC*, No. 22-CV-05198-TLT, 2023 WL 6787986, at *7 (N.D. Cal. Sept. 7, 2023) (finding state claim preempted where "Plaintiff's claims, in substance, nevertheless seek to enforce the FDCA by holding Defendant liable for its alleged use of Harmful Ingredients—which are not approved by the FDA for use in the eye area").

In yet another lines of cases, addressing preemption at the motion to dismiss stage, courts have permitted such claims to move forward from this early stage. *See, e.g.*, *Scheibe v. Perfect Keto Group LLC*, Case No. 23cv839-L (JLB), ECF No. 12 at 9 (permitting a UCL claim to survive a motion to dismiss because it was not predicated solely on a violation of the Sherman Law, but also on the FAL and CLRA); *See Lozano v. Pruvit Ventures, Inc.*, Case No. 23cv4394-GW (SKx), ECF No. 20 at 19-20 (adopting the court's tentative ruling that "Plaintiff has sufficiently alleged a claim under the FAL and CLRA to undergird her UCL unlawful claim and declined to reach the question of implied preemption of the Sherman Law").

In addition, previously on a motion to dismiss, the Court rejected a preemption argument on these same claims. ECF No. 44 at 22-24. Specifically, the Court found that *Buckman* and *Perez* were not directly on point because they did not deal with labeling

issues and found that in that motion, Defendant failed to cite to authority that show preemption should apply. *Id.*

Plaintiffs' theory on the NDI claim does appear to rest on FDCA requirements, as well as California's Sherman Law. SAC at ¶¶ 35-37 ("The introduction of adulterated and misbranded food into interstate commerce is prohibited under the FDCA and the parallel state statutes cited in this Class Action Complaint."). Under its UCL claim, however, Plaintiffs also include that the conduct is "unlawful" because its also violates the FAL and CLRA. *Id.* at ¶ 118.

After consideration of all the above, the Court declines to find that preemption under the FDA is a bar to class certification on this theory. First, Plaintiffs have pled alternative theories upon which the UCL claim may rest, including the FAL and CLRA. Second, while the Court must "probe behind the pleadings" and perform a "rigorous analysis" at the class certification stage, the issue related to preemption is not squarely at issue in the Rule 23 considerations. *Wal-Mart*, 564 U.S. at 351.

Thus, at this time, the Court does not find that preemption is not a bar to class certification and will continue onto the Rule 23 requirements.[6]

### ii.    Rule 23(b)(3) for the Statewide Classes

As stated above, Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is more stringent than commonality and requires that "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.2d at 1022.

//

---

[6] This conclusion is without prejudice to Defendant raising preemption in the future where the issue may be more appropriately decided on the actual merits.

### a.      Causes of Action

In order to address whether common issues, predominate, the inquiry begins "with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The causes of action Plaintiffs allege are as follows.

Plaintiffs allege violation of the UCL, FAL, and CLRA based on the statements made on Defendant's packaging. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL prohibits untrue or misleading advertising. Cal. Bus. & Prof. Code § 17500. "To state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009); *see Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011). This inquiry is "focus[ed] on the defendant's conduct, rather than the plaintiff's damages." *In re Tobacco II*, 46 Cal. 4th at 312. Thus, this standard is based on whether a "reasonable consumer" is likely to be deceived. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) ("[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer.") (citation omitted).

Similar to the UCL and FAL, the MMPA prohibits methods, acts, or practices that are unlawful, including those based on "deception; fraud; false pretense; false promise; misrepresentation; unfair practice; or the concealment, suppression, or omission of any material fact." Mo. Rev. Stat §§ 407.025.1, 407.020.1. "Whether the conduct alleged is deceptive under the MMPA is to be analyzed under the 'reasonable consumer' standard" and "does not require plaintiffs to show individualized reliance upon the alleged fraud or misrepresentations." *Webb v. Dr Pepper Snapple Grp., Inc.*, No. 4:17-00624-CV-RK, 2018 WL 1955422, at *3 (W.D. Mo. Apr. 25, 2018).

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770(a). Unlike the UCL and FAL, the CLRA permits a plaintiff to obtain damages, equitable relief, and other forms of remedies. In order to

establish a claim for the CLRA, plaintiffs must "show not only that a defendant's conduct was deceptive but that the deception caused them harm." *Stearns*, 655 F.3d at 1022. In other words, it must be shown that each class member suffered "an actual injury caused by the unlawful practice." *Id.* However, the requisite injury may be shown on a class-wide basis if materiality is established." *Id.* ("If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class."). "A misrepresentation is judged to be 'material' if a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 549 (N.D. Cal. 2021) (citation omitted).

Next, Plaintiffs assert a claim for breach of express warranty. Plaintiffs assert that the state laws in both California and Missouri are similar. Each requires that a plaintiff prove "(1) the seller's statements constitute an 'affirmation of fact or promise' or a 'description of the goods'; (2) the statement was 'part of the basis of the bargain'; and (3) the warranty was breached." *Weinstat v. Dentsply Internat., Inc.*, 180 Cal. App. 4th 1213, 1227 (2010); *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. 2010) ("The elements for a breach of express warranty claim are: (1) the defendant sold goods to the plaintiff; (2) the seller made a statement of fact about the kind or quality of those goods; (3) the statement of fact was a material factor inducing the buyer to purchase the goods; (4) the goods did not conform to that statement of fact; (5) the nonconformity injured the buyer; and (6) the buyer notified the seller of the nonconformity in a timely fashion."). Reliance is not required to be shown as part of this cause of action. *Weinstat*, 180 Cal. App. 4th at 1227.

Plaintiffs also assert a claim for breach of implied warranty. This claim requires a plaintiff to prove "(1) that the plaintiff bought the product from the defendant; (2) at the time of purchase, defendant was in the business of selling these goods or held itself out as having special knowledge or skill regarding these goods; (3) the product was not of the same quality as those generally acceptable in the trade, was not fit for the ordinary

purposes for which such goods are used, or did not conform to the quality established by the parties' prior dealing or by usage of trade." *Deitsch Plastics Co., Inc. v. Gredale LLC*, 602 F. Supp. 3d 1331, 1337 (C.D. Cal. 2022); *Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 360 (Mo. App. 1989) ("[A] plaintiff must show: (1) that a merchant sold goods, (2) which were not 'merchantable' at the time of the sale, (3) injury and damages to the plaintiff or his property (4) which were caused proximately or in fact by the defective nature of the goods, and (5) notice to the seller of the injury" where "merchantable" means that the "goods must be at least 'fit for the ordinary purposes for which such goods are used.'").

### b. Predominance for NDI Claims

Defendant argues that both the consumer protection claims and the warranty claims under a NDI theory cannot be substantiated using class-wide evidence. The Court addresses each of these arguments below.

### 1. Consumer Protection Claims under the UCL, CLRA, and MMPA

Defendant summarizes these claims for the NDI theory as follows: by labeling products a "Dietary Supplement," Plaintiffs suggest that Defendant implicitly represents that it could so label the product with FDA approval; however, this is false because Defendant failed to submit a New Dietary Ingredient premarket notification to the FDA for the elderberry extract. ECF No. 174 at 25. Defendant's primary argument is that Plaintiffs have failed to present any evidence that this theory aligns with the perceptions of reasonable consumer—there is no consumer survey evidence, and there is no evidence that a reasonable consumer attached any importance to the statement of identity on Defendant's products. *Id.*

Plaintiffs counter that Defendant does not accurately describe its NDI theory. ECF No. 191 at 34. Instead, Plaintiff posits that Defendant marketed "Dietary Supplement" products that contain an illegal NDI, which render its products illegal for sale. This theory, Plaintiffs argue, does not turn on what a consumer would interpret the label

"Dietary Supplement" to mean. *Id.* Even if it did, Plaintiffs argue that the consumer protection statutes all depend on whether a "reasonable consumer" would have been deceived, and even under the CLRA, which requires an additional showing of harm, that could be shown class-wide by materiality. *Id.* at 34-35. Under these standards, Plaintiffs argue that cases do not necessarily require them to put forth additional evidence other than what the named representatives believed and does not require survey evidence at the class certification stage. *Id.* at 35-36. Finally, Plaintiffs argue that Defendant cannot "seriously contest" that the illegal nature of the Product would not be material to a reasonable consumer. *Id.* at 36-37.

The Court agrees with Plaintiffs that their theory under the UCL, CLRA, and MMPA is not so limited to a false labeling claim based on the term "Dietary Supplement" on the product labels. *See* SAC at ¶¶ 22-37. Plaintiffs' unfair or deceptive business practice NDI claim may rest upon a theory that even putting the products for sale on the marketplace is an implicit representation that they are being legally sold and comply with the FDA. Further, Plaintiffs' cases do support their contention that finding that common issues predominate at the class certification stage can be made based on evidence such as the perception of the named representatives and does not require survey evidence. *See Dickey v. Advanced Micro Devices, Inc.*, No. 15-CV-04922-HSG, 2019 WL 251488, at *3 (N.D. Cal. Jan. 17, 2019) (finding predominance met where only evidence that supported what the term "core" meant was how the named representatives understood the term and finding that what mattered at class certification was whether a reasonable consumer would have been deceived by the term "core" as used in Defendant's advertising—which could be shown by common proof). Defendant does not cite to any cases suggesting that lack of consumer survey evidence is necessarily fatal to the predominance inquiry.

Accordingly, and particularly in light of Plaintiffs' theory of liability here that does not rest solely on interpretation of the label "Dietary Supplement" on the products, the Court finds that predominance is met for these claims.

## 2.      Express and Implied Warranty Claims

Defendant argues that both of these claims fail as a matter of law, and therefore cannot be certified. ECF No. 174 at 26-27. Specifically, Defendant argues that any *implied* representation that a consumer may derive from the "Dietary Supplement" label on the product cannot be the basis of an express warranty claim because it is not an explicit affirmation of fact or promise. *Id.* Defendant argues that the implied warranty claim must fail as well because the underlying theory is the same, so the implied warranty claim rises and falls with the express warranty claim. *Id.*

Plaintiffs first argue that this argument as to express warranties has been rejected by this Court's earlier order on Defendant's motion to dismiss the express warranty claim. ECF No. 191 at 37-38. On this point, the Court agreed with Plaintiffs. The Court previously stated:

> The Court disagrees with Defendant's argument that there is no label claiming that the Products are legal to sell and concludes that Plaintiffs have sufficiently alleged an express promise describing the Products as "dietary supplements", when in fact, they are not because Defendant allegedly failed to provide the FDCA with the required NDI notification. (Id. ¶¶ 30-34.) Advertising a product as a "dietary supplement" creates a reasonable impression to the consumer that it has been designated or has features of a supplement based on some criteria set by the FDA.

ECF No. 44 at 31. Because the Court finds that this argument as to express warranties fail, and Defendant's argument as to the implied warranty claim is that it rises or falls with the express warranty claim, this argument fails too.

Furthermore, the Court agrees that these arguments go to the merits of the claim, which are premature for consideration on class certification. Defendant provides no argument for why the warranty claims cannot be substantiated by common evidence, and in fact, Plaintiffs cite to cases suggesting that they can be. *See Zakaria v. Gerber Prod. Co.*, No. LACV1500200JAKEX, 2016 WL 6662723, at *13 (C.D. Cal. Mar. 23, 2016) (stating that "[d]eterminations of whether Defendant misrepresented its products and, as a result, whether warranties were breached, are common issues appropriate for class

1   treatment" for express warranty claims and '[a]n implied warranty claim requires an
2   objective standard, and is 'therefore susceptible of common proof'" for implied warranty
3   claims).

4        Accordingly, the Court finds that predominance is met for the warranty claims as
5   well.

### c.        Predominance for the Disease Claims

7        Defendant puts forth several arguments as to why the Disease Claims do not meet
8   Rule 23(b)(3)'s predominance requirement. The Court will address them in turn below.

### 1.        Uniform Exposure to Labels

10       The first argument that Defendant makes as to why class certification cannot be
11   granted is that Plaintiffs fail to establish that the class members were uniformly exposed
12   to all the challenged statements. ECF No. 174 at 35-36. Specifically, Defendant argues
13   that the packaging differs between products and while the majority of packaging contains
14   the statements "support immunity" and "scientifically tested" on the front of the package,
15   the statement "virologist developed" varies in its location, including on other sides of the
16   package and in varying font sizes. *Id.*

17       "[C]lass certification of UCL claims is available only to those class members who
18   were actually exposed to the business practices at issue." *Berger v. Home Depot USA,*
19   *Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft*
20   *Corp. v. Baker*, 582 U.S. 23 (2017). In the context of product labeling claims, "class-wide
21   exposure has been inferred because the alleged misrepresentation is on the packaging of
22   the item being sold" because of the "inherently high likelihood that in the process of
23   buying the product, the consumer would have seen the misleading statement on the
24   product." *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015).

25       The allegedly misleading statements must be on the products that were purchased
26   by the class members. *See Zakaria*, 2016 WL 6662723, at *8 (class overbroad where
27   different versions of products were sold during relevant time period and some packages
28   did not include the seal with the statement at issue). However, where the statements are

on the packaging, courts do not appear to require that they be uniform as long as they make sufficiently similar representations. *See Allen v. Hyland's Inc.*, 300 F.R.D. 643, 652 (C.D. Cal. 2014) (finding sufficient exposure to class where 12 products were at issue and some packaging stated that product was "100% natural" and others stated that product was "All Natural" or "Natural" as long as packaging was "similar"). Rather, the court will consider if those differences are materially different. *See Hahn v. Massage Envy Franchising, LLC*, No. 12CV153 DMS BGS, 2014 WL 5099373, at *10 (S.D. Cal. Apr. 15, 2014) ("precise wording . . . is not critical" if iterations did not "differ materially"). Even where a statement is on a product's packaging consistently, courts will also consider factors that may affect a consumer is likely to have seen it, including where on the package it appears, the front, and whether it is buried in the middle of other text. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1100 (N.D. Cal. 2018) (differentiating between a statement that was on the front of the product, even if in small font, with another statement that appeared on the back panel, in small font, and in the middle of a block of text).

With this legal framework in mind, the Court turns to the labels at issue here. There is no dispute that the phrases "scientifically tested" and "supports immunity" appear on the front of the packaging of all products and in largely the same format and prominence, as shown in the illustrative example below. ECF No. 147-10-147-12, Exs. V-KKK.



As for the statement "virologist developed," Defendant is correct that is appears in different locations on the packaging, with changes in wording. Thus, the Court must determine whether the differences would render to variations "materially" different such as to preclude class certification. First, as to the locations, the phrase does not appear on

the front in any iteration, and instead appears on the back, side, and top panels. Whereas it might matter if a representation appeared on the front panel compared to another panel, the Court does not find a material difference on positioning between the back, side, or top panels alone. Second, the text does differ. In a majority of the labels, "virologist developed" appears as follows on either the side or back panel of the packaging. ECF No. 147-10-147-12, Exs. V-XX.



In other iterations, specifically for the pastilles, drink powder, and effervescent tablets, the statement is in a paragraph on the package. *Id.*, Exs. YY-KKK.



The statement as it appears for the packaging for the pastille (shown in the top image above) is more prominent as compared to for the drink powder and effervescent tablets, where the statement is incorporated into a longer paragraph. However, even for the last two products, the text is not in a smaller or finer print; rather it is the same font and size as the rest of the text on the panel of the package. In totality, the Court finds that this difference in how this one phrase appears on packaging is not "materially" different to preclude class certification, particularly in light of the other statements that do appear consistently amongst all the packaging for the products. *See Allen*, 300 F.R.D. at 652.

Accordingly, the Court finds that this argument does not preclude class certification on the Disease claim.

### 2.    Disclaimer

Next, Defendants argue that disclaimers that were included on the Products' packaging preclude an actionable implied disease claim. ECF No. 174 at 36-37. Specifically, the product packaging includes the following statement that "[t]his product is not intended to diagnose, treat, cure or prevent any disease." This statement is present on the various packaging at either the bottom of the side of the product packaging or the back of the packaging, but not on the front. ECF No. 147-10-147-12, Exs. V-KKK. For example, the disclaimer shows as follows on some packaging where it appears on the side of the box:



Whether disclaimers can defeat a claim under the UCL, FAL, or CLRA is typically a question of fact that goes to whether a reasonable consumer would be deceived. *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014). In *Williams v. Gerber*, the Ninth Circuit rejected an argument that images and descriptions on the front of the packaging of "Fruit Juice Snack" products could not be misleading where information on the back of the packaging listed the actual ingredients of the products. 552 F.3d 934, 939-40 (9th Cir. 2008) ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging."). On the other hand, certain courts have held, on motions to dismiss and summary judgment, that the disclaimer language at issue could so strongly diffuse any potential of misleading a reasonable consumer. *See, e.g.*, *Gudgel v. Clorox Co.*, 514 F. Supp. 3d 1177, 1186 (N.D. Cal. 2021) (reasonable consumers could not be lead to believe Clorox products was capable of sanitizing or disinfection where the product contained disclaimer "not for sanitization or disinfection" and the other words and images did not conflict with this disclaimer language); *Stanley v. Bayer Healthcare LLC*, No. 11CV862-IEG BLM, 2012 WL 1132920, at *8 (S.D. Cal. Apr. 3, 2012) (finding that statement "helps defend against occasional diarrhea" along with disclaimer language "[t]his product is not intended to diagnose, treat, cure, or prevent any disease" did not support that a reasonable consumer would be lead to believe it relieves diarrhea).

Given the factual nature of this inquiry and the products labels at issue, the Court agrees with Plaintiffs that this is an issue that goes to the merits of the case and is not appropriate for addressing at class certification. Thus, the Court rejects Defendant's argument that the presence of the disclaimer language on the product packaging necessitates denial of class certification.

//

### 3.  Likelihood of Deception

As stated above, the consumer protection statutes under both California law and the MMPA require a showing that a "reasonable consumer" is likely to be deceived. *Freeman*, 68 F.3d at 289; *Webb*, 2018 WL 1955422, at *3. In turn, "likely to deceive" means "more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

In order to show that likelihood of deception can be proved on a class-wide basis without individualized inquiries, as discussed above with the *Daubert* motions, Plaintiffs engaged an expert, Dr. Dennis, to perform a consumer perception survey. Defendant attacks this survey on several grounds, and put forth their own expert, Dr. Keegan, who performed his own consumer perception survey. Where, as here, there is conflicting evidence presented for and against a requirement for class certification, under Ninth Circuit law, the Court must "judg[e] the persuasiveness of the evidence presented" and "resolve any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011); *see also Grodzitsky*, 957 F.3d at 986 (district court must perform "rigorous analysis" of commonality rather than find it met just because evidence was admissible). Thus, while the Court declined to strike any of the expert testimony under *Daubert* above, it will now consider the persuasiveness of the competing expert testimony.

### a.  Dr. Dennis's Survey and Critiques

Dr. Dennis designed the consumer perception survey with a control group and test group. ECF No. 147-15 at ¶ 51. The control group was shown products without the Challenged Representations, whereas the test group were shown identical products with the Challenged Representations. *Id.* Thus, Dr. Dennis concludes that he limited the

difference between the groups to the absence/presence of representations at issue. *Id.* at ¶ 52. For the product, Dr. Dennis chose to show the Original Syrup product, modified to be "brand neutral." *Id.* at ¶ 53. Specifically, he removed all mentions of Pharmacare and Sambucol, botanical imagery, and modified the background color so that participants could not use that to determine the brand. *Id.* at ¶ 54. He did retain the "Black Elderberry" because he felt this did not identify the product. *Id.* Participants were shown all four sides of the packaging. *Id.* at ¶ 56. For each side, for the control group, Dr. Dennis removed all mentions of the challenged statements, such as "Scientifically Tested," Supports Immunity," etc. *Id.* The product packaging with statements removed are as follows:



*Id.* at 16-19. Dr. Dennis then asked the following questions:

| Tested Statements in the Consumer Perception Survey |
| --- |
| The product will help protect you from disease. |
| The product will help prevent a cold or virus from happening. |
| The product will help prevent the flu or a virus from happening. |
| The product will help lessen the severity of symptoms from a cold or virus. |
| The product will help lessen the severity of symptoms from flu or virus. |
| There are scientific publications that show the Black Elderberry in the product is effective in protecting you from disease, colds, flu, or virus. |
| The product will taste good.* |

*Distractor statement.

*Id.* at ¶ 61. For each of these questions, Dr. Dennis asked the participant if the package side shown communicated the meaning of the statement:



*Id.* at ¶ 62.

Dr. Dennis's results on the surveyed showed that test group respondents who were shown the Challenged Representations were 2.2 more times likely than the control group respondents to perceive the product to have health benefits stated in his questions above. *Id.* at ¶¶ 65-67. Specifically, on average, 24.2% of the control group respondents perceived the packaging *without* the representations to have the health benefits, whereas

51.9% of the test group respondents perceived the packaging *with* the representations to have the health benefits—an increase of 27.7 percentage points based on the representations.

Defendants engaged Dr. Keegan to critique Dr. Dennis's survey. ECF No. 180-1. Dr. Keegan critiques the survey on several grounds. First, Dr. Keegan argues that the universe of participants for Dr. Dennis's survey includes nearly half who had not purchased any of the products at issue in the past—and the correct focus for a consumer perception survey should be representative of the actual proposed class members. *Id.* at ¶¶ 10-15. Second, Dr. Keegan takes issue with survey stimuli, in that Dr. Dennis did not test the individual representations individually. *Id.* at ¶¶ 16-18. Third, Dr. Keegan argues that Dr. Dennis should have used open-ended questions rather than the leading, close-ended questions he did use. *Id.* at ¶¶ 19-21. Fourth, Dr. Keegan argues that the packaging imagery Dr. Dennis showed to the respondents, as shown above, was heavily modified from the packaging as it appears in the actual marketplace and is not representative of a believable product, making the survey results unreliable. *Id.* at ¶¶ 22-29. Fifth, Dr. Keegan argues that the statements that Dr. Dennis tested does not match Plaintiffs' theory of liability. *Id.* at ¶¶ 32-35.

### b.    Dr. Keegan's Survey and Critiques

In addition to his critiques, Dr. Keegan conducted his own consumer perception survey. ECF No. 180. First, Dr. Keegan gave participants a set of screener questions to make sure that they fit the criteria he determined for the survey—namely targeting likely potential purchasers of the products, which he distilled down to respondents that shopped at supermarkets and drugstores (likely places the products would have been purchased) and who has made a recent purchase in the product category of nutritional supplements/vitamins. *Id.* at ¶ 21; ¶¶ 42-52. If the answers to these questions qualified the individual, s/he moved into the next set of questions.

For the main questionnaire, Dr. Keegan shows the respondents the following product:

1
2
3
4
5
6
7
8
9
10
11
12
13



14  *Id.* at ¶ 55. After being shown this image, respondents were asked open-ended questions,

15  including 1) "please list all the reasons that you would or would not purchase this

16  product;" and 2) "if you were to purchase [the product], would you have any expectations

17  about specific benefits it would provide" and if answered yes, asked to explain their

18  beliefs. *Id.* at ¶¶ 58-63. Respondents were also asked a close-ended question on how

19  likely it was that the product would deliver these specific benefits, being able to choose

20  between "very likely," "somewhat likely," "neither likely nor unlikely," "somewhat

21  unlikely," "very unlikely," and "don't know/no opinion." *Id.* at 64.

22          Next, Dr. Keegan's survey focused on the statements on the product packaging.

23  Respondents were shown the actual labels from the packages.

24
25
26
27
28

   

*Id.* at 68. Respondents were then shown a question to select any of 24 options of statements on the packaging that appealed to them, which included the Challenged Representations at issue along with others. *Id.* If a respondent chose one of these statements, then a follow-up question was asked about if they agreed or disagreed with the following:

*Table 1. Contested Claims with corresponding agree/disagree statements*

| Claim | Agree/Disagree Statement |
|---|---|
| Scientifically tested | The claim "Scientifically tested" means that scientific research has conclusively established the effectiveness[15] of PRODUCT A. |
| Supports immunity | The claim "Supports immunity" means that PRODUCT A can provide immunity to disease, including colds and the flu.[16] |
| High antioxidant levels | The claim "High antioxidant levels" means that PRODUCT A has been tested and confirmed to contain levels of antioxidants in compliance with U.S. food labeling laws.[17] |
| Dietary supplement | The claim "Dietary supplement" means that PRODUCT A meets the definition of a dietary supplement in accordance with U.S. food labeling laws.[18] |
| Strong immune system support to help you and your family stay healthy throughout the year | The claim "Strong immune system support to help you and your family stay healthy throughout the year" means that PRODUCT A will provide immunity protection through the cold and flu season.[19] |

43

| | |
|---|---|
| Best protection nature has to offer | The claim "Best protection nature has to offer" means that PRODUCT A has been proven to be effective in providing immunity protection.[20] |
| Immune supporting properties | The claim "Immune supporting properties" means that PRODUCT A will protect you and your children from diseases such as viruses.[21] |
| PharmaCare Laboratories | The claim "PharmaCare Laboratories" means that PRODUCT A is made by a pharmaceutical company.[22] |
| Supports your immune system | The claim "Supports your immune system" means that PRODUCT A can provide immunity to disease, including colds and the flu.[23] |
| Developed by a world renowned virologist | The claim "Developed by a world renowned virologist" means that PRODUCT A has the ability to mitigate, treat, cure, or prevent a disease or diseases, specifically viruses.[24] |
| Used in published scientific studies | The claim "Used in published scientific studies" means that PRODUCT A has been extensively tested, researched, and studied by scientists throughout the world.[25] |
| Used in clinical studies | The claim "Used in clinical studies" means that PRODUCT A has been tested, researched, and studied in a clinical setting.[26] |

*Id.* at ¶ 70.

Dr. Keegan summarized the results of his survey as follows. As for answers on reasons for purchase, only 39.8% of respondents identified health-related reasons for why they would purchase the product, and only 21.2% identified immunity support. *Id.* at ¶ 80. Rather, the open-ended questions resulted in respondents providing many other reasons for why they would purchase the product. *Id.* at 78-79. As for expectation of benefits, 71.2% of respondents answered that they would expect the product to provide benefits. *Id.* at 81. As for what these benefits are, 49.2% reported some health-related benefit, with 33.9% identifying immune support/boost immune system. *Id.* Dr. Keegan's survey further tested attributes that consumers found appealing, including the following:

| Attribute/Claim | Indicated "Appealing" % |
|---|---|
| Supports your immune system | 62.7 |
| Supports immunity | 59.0 |
| High antioxidant levels | 54.2 |
| Strong immune system support to help you and your family stay healthy throughout the year | 48.9 |
| Immune supporting properties | 48.9 |
| Great tasting syrup | 41.5 |
| Scientifically tested | 41.0 |
| No artificial flavors or colors | 37.0 |
| Naturally flavored with the goodness of Elderberry | 33.3 |
| Natural honey helps soothe the throat | 29.1 |
| Satisfaction Guaranteed | 29.1 |
| Sealed for your protection | 28.0 |
| Dietary supplement | 26.6 |
| Best protection nature has to offer | 24.6 |
| Developed by a world renowned virologist | 24.0 |
| Gluten free | 23.7 |
| Used in clinical studies | 23.7 |
| If desired, mix syrup in water, fruit juice, smoothies, yogurt, or most anything | 23.2 |
| Used in published scientific studies | 20.6 |
| Suitable for vegetarians | 16.4 |
| PharmaCare Laboratories | 10.7 |
| Kosher | 10.5 |

*Id.* at ¶ 87. When asked further about what respondent thought these statements meant, they stated the following:

Table 6. Percentage agreeing with plaintiffs' interpretation of contested claims - Top 2

| Plaintiff's interpretation of claim | "Strongly Agree" or "Somewhat Agree" % Respondents (n=354) |
|---|---|
| The claim "Supports your immune system" means that PRODUCT A can provide immunity to disease, including colds and the flu. | 50.0 |
| The claim "Supports immunity" means that PRODUCT A can provide immunity to disease, including colds and the flu. | 49.7 |
| The claim "High antioxidant levels" means that PRODUCT A has been tested and confirmed to contain levels of antioxidants in compliance with U.S. food labeling laws. | 48.6 |
| The claim "Strong immune system support to help you and your family stay healthy throughout the year" means that PRODUCT A will provide immunity protection through the cold and flu season. | 44.4 |
| The claim "Immune supporting properties" means that PRODUCT A will protect you and your children from diseases such as viruses. | 38.4 |
| The claim "Scientifically tested" means that scientific research has conclusively established the effectiveness of PRODUCT A. | 35.3 |
| The claim "Dietary supplement" means that PRODUCT A meets the definition of a dietary supplement in accordance with U.S. food labeling laws. | 22.6 |
| The claim "Best protection nature has to offer" means that PRODUCT A has been proven to be effective in providing immunity protection. | 22.6 |
| The claim "Used in clinical studies" means that PRODUCT A has been tested, researched, and studied in a clinical setting. | 18.9 |
| The claim "Used in published scientific studies" means that PRODUCT A has been extensively tested, researched, and studied by scientists throughout the world. | 17.5 |
| The claim "Developed by a world renowned virologist" means that PRODUCT A has the ability to mitigate, treat, cure, or prevent a disease or diseases, specifically viruses. | 14.7 |
| The claim "PharmaCare Laboratories" means that PRODUCT A is made by a pharmaceutical company. | 9.6 |

45

*Id.* at ¶ 88. Based on the survey results, Dr. Keegan concludes that consumers provide a wide range of reasons for purchasing the products, without a unified or predominant reason driving their decision, that they had wide expectations of the benefits the product would provide, that there was wide variation in what consumers found appealing based on the statements on the packaging, and that consumers did not uniformly understand the statements to mean what Plaintiffs assert they mean. *Id.* at ¶¶ 91-96.

Dr. Dennis submitted a rebuttal expert report where he put forth several critiques of Dr. Keegan's survey. ECF No. 147-16. He points out issues with Dr. Keegan's scope of survey, including regarding his sampling. *Id.* at ¶¶ 13-17. As for the survey decision, most of his criticism centers around Dr. Keegan's use of open-ended questions for much of the survey and his use of a close-end question with a large number of response options. *Id.* at ¶ 19. As for open-ended questions, Dr. Dennis argues that using such questions in a self-administered online survey tends to underestimate phenomena, and that survey experts believe that close-ended questions are "more appropriate for scientifically rigorous, quantitative survey research." *Id.* at ¶¶ 22-30. Dr. Dennis also argues that Dr. Keegan's survey encourages respondents to answer "I don't know" to his open ended questions. *Id.* at ¶ 32. As to his closed ended question where he provided users with 24 options, Dr. Dennis argues it is inappropriate because its format encourages "under selection" of options. *Id.* at ¶ 39. Moreover, Dr. Dennis argues that even with this format, the responses actually support Plaintiffs: "5 of the 7 most "appealing" claims were related to the Plaintiffs' challenged claims: 'Supports your immune system' (62.7 % of respondents); 'Supports immunity' (59.0%); 'Strong immune system support to help you and your family stay healthy throughout the year' (48.9%); 'Immune supporting properties' (48.9%); and 'Scientifically tested' (41.0%)." *Id.* at ¶ 40. Dr. Dennis also highlighted other conclusions he drew from Dr. Keegan's survey data that he actually argues support's Plaintiffs' positions. *Id.* at ¶ 44.

//

//

### c.     Analysis

Upon consideration of the competing expert testimony above and the respective critiques of each other's expert testimony, the Court concludes that the dispute is not sufficient to defeat class certification on predominance. Even where "criticisms are serious and could be persuasive to a finder of fact," at class certification, courts do not determine "which expert is correct." *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 328 (S.D. Cal. 2019); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) ("[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue."); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *11 (N.D. Cal. Feb. 8, 2016) (even where there is "compelling evidence" that contradict expert testimony, "[t]he crucial point is that whether the [] theory is right or wrong, it is something that can be decided on a class-wide basis"); *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, 276 F.R.D. 364, 373-74 (C.D. Cal. 2011) (where dispute is not about the "standard way" to show a conclusion and the argument is simply that the expert's analysis is flawed, "Court is not supposed to decide at the certification stage which expert analysis or model is better").

Here, neither party argues that a consumer perception survey is not the right vehicle to test for likelihood of deception to the reasonable consumer. However, the respective experts dispute how the survey should be designed. For example, as outlined above, they dispute the way that the packaging must be shown to the respondents and they disputed whether it was better to use close-ended or open-ended questions. Both cite to authorities regarding on consumer perception surveys that support their position on what methodology is better. Furthermore, the experts also disagree about interpretation of the results. As explained above, Dr. Dennis argues that Dr. Keegan's survey actually supports Plaintiffs' position.

The Court finds that the disputes between the experts at this stage of the litigation does not rise to the level to preclude class certification. Defendant's criticism, whether they will eventually carry the day or not to a fact finder, is not sufficient to convince the Court that evidence of consumer deception from a reasonable consumer standpoint cannot be proved or disproved on a class-wide basis through a well-designed survey.

Accordingly, the Court finds that this argument does not preclude class certification as to likelihood of deception and that it can be shown through class-wide evidence in the form of a consumer survey such as Dr. Dennis's, subject to rebuttal and criticism.

### 4.    Materiality

Defendants also attack Dr. Dennis's materiality survey. Materiality is relevant to the CLRA claim, which requires the additional showing that Defendant's deception caused actual harm. *Stearns*, 655 F.3d at 1022. However, the requisite harm may be shown on a class-wide basis if materiality is established. *Id.*

Plaintiffs engaged Dr. Dennis to also perform a materiality survey. Defendant attacks this survey on several grounds, and put forth their own expert, Dr. Wilcox, who performed his own modified version of Dr. Dennis's survey. As above, the Court will now consider the persuasiveness of the competing expert testimony.

### a.    Dr. Dennis Survey and Critiques

Dr. Dennis based his materiality survey on a referendum question format. ECF No. 147-15 at ¶ 69. Specifically, the referendum questions are designed to test consumers' preference to purchase either the Products (i) without the Challenged Representations or (ii) with the Challenged Representations. *Id.* at ¶ 71. Dr. Dennis used the same images for product packaging that he used in the consumer perception survey, "Product A" without the challenged representations and "Product B" with the challenged representations. *Id.* at 72. Respondents were able to see all four panels of the packaging for both products. *Id.* at 74. Respondents were then asked the referendum question, about which product they would purchase if the two shown were the only available options. *Id.*

1

### Referendum Survey Question



If these were the only two options available to you, which of these **PRODUCTS** would you purchase? You can click on the product packaging to enlarge it.

| | **PRODUCT** A | **PRODUCT** B |
|---|---|---|
| Brand | Same | Same |
| Packaging | BLACK ELDERBERRY<br><br>**BLACK ELDERBERRY**<br><br>GLUTEN FREE<br>Great Tasting Syrup<br>High antioxidant levels<br>Dietary Supplement | BLACK ELDERBERRY<br><br>**BLACK ELDERBERRY**<br><br>GLUTEN FREE<br>Great Tasting Syrup<br>Scientifically Tested<br>Supports Immunity*<br>High antioxidant levels<br>Dietary Supplement |
| Type | Syrup | Syrup |
| Size | 7.8 oz. | 7.8 oz. |
| Price, not including tax | Same | Same |
| Select one you would purchase | ○ | ○ |
| | ○ Don't know | |

Dr. Dennis stated that the results showed the consumers were 11 times more likely to choose Product B when answering the question, with 8.1% choosing Product A and 91.9% choosing Product B. *Id.* at ¶ 76. Thus, Dr. Dennis concluded that the challenged representations were material to consumers. *Id.* at ¶ 77.

Defendant engaged Dr. Wilcox to rebut Dr. Dennis's expert testimony. ECF No. 174-14. Dr. Wilcox objected to Dr. Dennis's methodology because the side-by-side comparison used "artificially drew respondents' attention to the only difference between the products (the Considered Representations) and survey respondents had no reason not to choose the superior product (*i.e.*, the product with the Considered Representations)." *Id.* at ¶ 16. In such a situation, Dr. Wilcox surmises that it is "no surprise that over 90%"

of the respondents would choose that product, but that result is not representative of real world consumers. *Id.*; *see also id.* at ¶ 27. Dr. Wilcox also criticizes Dr. Dennis's survey because the product packaging left open space in Product A where the challenged representations were removed—Dr. Wilcox argues that in the real world, that empty space would be filled with other claims to product benefits. *Id.* at ¶ 33.

### b. Dr. Wilcox's Survey

In order to show what he called "inherent bias" in Dr. Dennis's materiality survey, Dr. Wilcox made a modification to the survey where he used a "between-subjects" design. *Id.* at ¶ 25. This methodology uses a control group that is shown only Product A, and a test group that is only shown Product B. *Id.* at ¶ 34. Both groups are then asked to indicate their intent to purchase the product they were shown—"If this product were available for purchase, how likely or unlikely would you be to purchase the product?" *Id.* at ¶ 43. Dr. Wilcox states that using separate groups eliminates the inherent bias in Dr. Dennis's survey that artificially draws attention to the Challenged Representations that are the only difference between Product A and Product B. *Id.* at ¶ 34.

Dr. Wilcox claims to have mostly used Dr. Dennis's packaging images but specified the brand to Sambucol because it was necessary in a between-subjects version where the same respondent was not shown both products. *Id.* at ¶ 43. Also, Dr. Wilcox stated that it was necessary to add a price, so he added a realistic price for the syrup product of $24.99 based on reviewing the prices at major retailers. *Id.* The below shows a sample of what respondents were asked:

If the following product were available for purchase, how <u>likely</u> or <u>unlikely</u> would you be to purchase the product?

You can click on the product packaging to enlarge it.

| Brand | Sambucol |
|---|---|
| Packaging | BLACK ELDERBERRY<br><br>**BLACK ELDERBERRY**<br><br>GLUTEN FREE<br><br>Great Tasting Syrup<br><br>Dietary Supplement |
| Type | Syrup |
| Size | 7.8 oz. |
| Price, not including tax | $24.99 |

I would be...

Please select one.

○ <u>Very likely</u> to purchase the product

○ <u>Somewhat likely</u> to purchase the product

○ <u>Neither likely nor unlikely</u> to purchase the product

○ <u>Somewhat unlikely</u> to purchase the product

○ <u>Very unlikely</u> to purchase the product

○ Don't know / Unsure

*Id.* at ¶ 46.

Dr. Wilcox summarized that the results of his survey showed "no statistically significant difference between respondents' likelihood of purchasing products with and without the Considered Representations." *Id.* at ¶ 49.

### Responses to Modified Dennis Materiality Survey

| Responses to "If the following product were available for purchase, how likely or unlikely would you be to purchase the product?" | Without Considered Representations (Control)[1] | | With Considered Representations (Test)[2] | |
|---|---|---|---|---|
| | Number of Respondents | Percent of Respondents | Number of Respondents | Percent of Respondents |
| Very likely to purchase the product | 110 | 22.0% | 102 | 20.4% |
| Somewhat likely to purchase the product | 147 | 29.4% | 164 | 32.8% |
| Neither likely nor unlikely to purchase the product | 72 | 14.4% | 68 | 13.6% |
| Somewhat unlikely to purchase the product | 103 | 20.6% | 107 | 21.4% |
| Very unlikely to purchase the product | 63 | 12.6% | 53 | 10.6% |
| Don't know / Unsure | 5 | 1.0% | 6 | 1.2% |
| Mean Response[3] | -- | 3.28 | -- | 3.31 |
| Total Respondents | 500 | 100.0% | 500 | 100.0% |

Source: Survey Data

*Id.* at ¶ 52.

### c.   Analysis

For the same reasons as stated above for the consumer perception survey, the Court finds that the disagreement between the experts here is not properly for the Court to determine at the class certification stage. The disagreement amounts to a disagreement on survey methodology, rather than suggestions that a survey could not be designed to test materiality in the first place. In *Vizcarra v. Unilever United States, Inc.*, another district court considered a very similar materiality survey using this referendum format to test two products, one with the challenged representation and one without, with similar results where 88% were found to prefer the product with the challenged representation. 2023 WL 2364736, at *12 (N.D. Cal. Feb. 24, 2023). The court found that the survey "does test and does speak to the effect of the [] Representations on consumers' purchasing decisions, consistent with Vizcarra's theory of liability, and that it does so with a sufficient degree of reliability such that a reasonable factfinder at trial could find, based on Dr. Dennis' opinions, that the [] Representations were material to a reasonable consumer's purchasing decisions." *Id.* Further, the criticisms of his survey "boil down to a disagreement as to Dr. Dennis' survey design choices, but those go to the weight that the factfinder at trial would accord to Dr. Dennis' survey results and opinions derived therefrom." *Id.* The Court finds this reasoning persuasive and applicable to this case.

Accordingly, the Court finds that this argument does not preclude class certification as to materiality and that it can be shown through class-wide evidence in the form of a consumer survey such as Dr. Dennis's, subject to rebuttal and criticism.

### 5.   Damages

In addition to claiming that the merits of the case is subject to common proof, Plaintiffs also argue that damages may be calculated on a class-wide basis. ECF No. 144 at 45-46. A plaintiff seeking certification under Rule 23(b)(3) must show that damages are capable of measurement on a class-wide basis. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The model "must measure only those damages attributable to" the

plaintiff's theory of liability, but the calculations "need not be exact" at the certification stage. *Id.*

Here, Plaintiffs argue that they are seeking compensatory or restitution damages to measure the consumer impact caused by the alleged misrepresentations. ECF No. 144 at 46. This may be calculated, Plaintiffs propose, by considering the difference in the market price paid by consumers with the actual "true" market price which takes into account the misrepresentations. *Id.* Specifically, Plaintiffs put forth two damages model, and Defendant, in turn, criticize those damage models. The Court will address the damages models in turn below.

### a.     Full Refund Model

First, Plaintiffs suggest that a full refund model can be used to measure damages where a plaintiff's theory of liability is that the product is valueless. *Id.* at 46. Plaintiffs argue that this model can be supposed under either the NDI or Disease Claim theories. For the NDI theory, Plaintiffs argue that the FDCA does not permit sales of food or drugs that are misbranded, and here, the Products were misbranded as legal dietary supplements when they actually contained an NDI for which Defendant failed to submit premarket notice for to the FDA. Thus, Plaintiffs argue that a full refund model can be used because illegal products are valueless. Under the Disease theory, Plaintiffs also argue that consumers would not have bought the products if the Challenged Representations had been removed from the packaging.

As to the Disease theory, Defendant argues that this full refund model only applies when a product is shown to have no value to consumers. *See Caldera v. J.M. Smucker Co.*, No. CV 12-4936-GHK (VBKx), 2014 WL 1477400, at *4 (C.D. Cal. Apr. 15, 2014) (stating a full refund is "only [ ] appropriate if not a single class member received any benefit from the products"); *In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at *2-3 & n.2 (C.D. Cal. Mar. 25, 2014) (decertifying class, concluding that a full refund model was inappropriate because it failed to account for other value consumers received from the product). Indeed, many courts in this circuit

have rejected this model because of the difficulty in showing that no consumer received *any* benefit. *See Khasin v. R. C. Bigelow, Inc.*, No. 12-CV-02204-WHO, 2016 WL 1213767, at *3 (N.D. Cal. Mar. 29, 2016) ("The 'full refund' method of calculating restitution has been repeatedly rejected in this district" and collecting cases so holding). In *Khasin*, the court found that it was too "implausible" to accept that the no benefit in the form of enjoyment, nutrition, caffeine intake, or hydration from consuming the teas." *Id.* The Court is persuaded by this line of cases—Plaintiffs have not sufficiently and plausibly shown that, even if the Challenged Representations were misleading, the products at issue did not confer other benefits on the consumers.

As for the NDI theory, this theory may work differently to support a full refund model. In *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, the court noted a difference when a full refund model is applied to class where there is a misadvertised or mispresented product. In such situations, courts "confirm that what consumers may recover, in those circumstances, is the difference between what plaintiff paid and the value of what plaintiff received." 609 F. Supp. 3d 942, 975 (N.D. Cal. 2022). However, the situation may be different as for sales products that are "underage or otherwise allegedly inherently unfair or illegal sales." *Id.* Plaintiffs cite several cases to support giving a product a $0 value if it was illegal to be sold as it was. *Id.* (approving full-refund model use where plaintiff's theory was that because "it was illegal or inherently unfair to market and sell the JUUL product to youth, youth purchasers received no value from it at all"); *In re Morning Song Bird Food Litig.*, 320 F.R.D. 540, 556 (S.D. Cal. 2017) (plaintiffs theory was "the bird food [] was actually bird poison and worthless"); *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (Cal. App. 2 Dist. 2010) (approving of seeking full restitution where product at question contained an illegal substance that was a Schedule III controlled substance in California). The Court agrees with Defendant that these cases can be distinguished from this case in that they highlight a degree of illegality of selling the product that is not present in this case. Any alleged violation of the FDCA here based on labeling is more technical than the more blatantly illegal actions taken by

defendants in the above cited cases. In light of the strong case law suggesting that generally, a product must be shown to be *worthless* to consumers in order to support a full refund, this line of cases focusing on illegal sales reads more as a limited exception to the general rule. The Court concludes that their holdings do not control here.

Accordingly, the Court finds that the full refund model is not supported by Plaintiffs' theories in the case.

### b. Price Premium Model

Second, alternatively, Plaintiffs suggest that damages may be assessed on a class-wide basis through a price premium model. Specifically, Plaintiffs suggest that this be done using a conjoint analysis model, which Dr. Dennis proposes in his expert report. ECF No. 147-15 at ¶¶ 78-128. Dr. Dennis explains that the purpose of choice-based conjoint surveys is to attempt to measure the market price premium that consumers assign to the challenged representations by "generat[ing] a set of thousands of data points that can be utilized by a market simulator that incorporates real-world demand and supply factors based on both the survey data and independent real world historical information regarding the Elderberry product marketplace." *Id.* at ¶ 82. The theory behind conjoint surveys is that consumers are familiar with the task of shopping, by comparing products, evaluating them, and making choices—so the conjoint models asks respondents to express preferences by choosing between alternative products, which is a reflection of what they do in the marketplace. *Id.* at 85-86. Explaining further:

> In a conjoint survey, survey participants are presented with a "choice exercise" in which they are typically shown a set of 3 or 4 hypothetical products and asked to choose which of the products, if any, they would purchase. The hypothetical products in conjoint surveys are typically comprised of 6 to 8 "attributes" that reflect features that consumers consider in making purchasing decisions. For consumer-packaged goods, attributes that consumers typically consider in their purchasing decisions include things like product brand, packaging claims, product size and, of course, price.

*Id.* at ¶ 87.

Dr. Dennis has not performed the conjoint survey, but describes how he could design the survey. Dr. Dennis states that he would review relevant documents and perform real world market research, including visiting physical and online retailers that sell the products, and has considered "supply-side factors and real-world market transaction information from consumer transaction data for the Products and competing products." *Id.* at ¶¶ 91-92. Specifically:

> I have already and will consider further numerous real-world, supply-side factors for the Products at issue, so that my survey or surveys will accurately measure the price premium attributable to the Challenged Representations and the challenged representation and/or Omission relating to Defendant unlawfully labeling and selling the Products as "Dietary Supplements," i.e., the intersection between demand-side factors (willingness to pay) and supply-side factors (willingness to sell), to determine the actual effect of the Challenged Representations on market price. The actual real-world pricing of the Products sold during the class period reflects the actual number of units sold, the costs of manufacturing, the costs for distribution, advertising, and marketing, and margin, among other supply-side factors. I will take into account the fact that these products are sold in a competitive market, through a variety of retail outlets. Further, I will take into account the fact that the quantity supplied of Defendant's and competitors' products is a known fact and is fixed as a matter of history.

*Id.* at ¶ 93. While he has not designed the survey, he claims that he has "prepared the structure and overall design of the conjoint survey" and the design work that remains is the "selection of levels of the attributes." *Id.* at ¶ 94. Dr. Dennis stated that: 1) he would limit it to actual and likely purchasers; 2) he would use appropriate language and set the appropriate context for the survey; 3) he would use 3 product profiles to reduce the cognitive burden on the respondents; 4) he would use 12 choice tasks for each respondent which would reduce their fatigue in answering questions and lead to more reliable results; 5) he would use fewer than 8 attributes to consider, again to reduce cognitive burden on respondents, currently planning for as follows:

| ATTRIBUTE | DISPLAYED PER PRODUCT PROFILE |
|---|---|
| Brand | 1 brand logo selected from at least 5 Brands (Sambucol Black Elderberry + 4 or more competitors) |
| Label Claims | 3 to 5 claim derived the Challenged Representation label claim + 8 or more other Label Claims knows as "distractors," on which, more below, for a total of at least 12 potential label claims |
| Price | 1 price from 4 to 6 price points |

6) he would use the 7.8oz syrup as a representative product as he did in his other surveys. *Id.* at ¶ 95. Further, he will select four or more competitors, currently stating that he may include Nature's Way, Nature Made, Nature's Bounty, and Zarbee's Naturals. *Id.* at ¶ 98. He will also use 8 or more "distractor" claims to prevent respondents from guessing the research purpose of the study to ensure more unbiased results. *Id.* at ¶ 101. His current plan is for collecting at least 900 convey surview interviews. *Id.*

Plaintiffs also present the expert report of Mr. Weir, who will use Dr. Dennis's conjoint survey results to then calculate an actual price premium. ECF No. 147-18. He also opines that conjoint surveys are widely accepted in the industry to value attributes of products. *Id.* at ¶¶ 19-31. He opines that he has reviewed Dr. Dennis's report and that his design will properly measure the price premium. *Id.* at ¶¶ 32-39. He states that he understands that Dr. Dennis has taken into consideration supply-side factors and that he also has taken such considerations. *Id.* at ¶¶ 41-57. The calculation would be based on actual sales data produced in discovery. *Id.* at ¶¶ 58-60. He will calculate the price premium with the following formula:

$$\%Price\ Premium\ Factor: Claim \times \$Units\ Sold\ = Damages$$

*Id.* at ¶ 63. Using the calculated price premium, then the damages can be calculated as:

$$\sum_{t=1}^{p} \$Sales\ of\ the\ Products_t$$

for each product

$$Units\ Sold\ x\ Average\ Retail\ Price\ =\ Full\ Compensatory\ Damages$$

57

1   *Id.* at ¶¶ 63-64. He opines that this can be determined on a class-wide basis without

2   individualized inquiries. *Id.* at ¶¶ 64, 69-74.

3       Defendant challenges both experts on several grounds. First, Defendant argues Dr.

4   Dennis's conjoint survey design does not provide sufficient details. ECF No. 174 at 47-

5   50. For example, Defendant points out that Dr. Dennis has not provided the exact

6   competitor brands he proposes to use, the distractor claims, the prices points, or whether

7   he will have to do multiple surveys. *Id.* at 48-49. Defendant also argues that Dr. Dennis

8   makes various assumptions and failed to do the work to validate that they are correct. *Id.*

9   at 49. Second, Defendant's expert Dr. Ugone reviewed Dr. Dennis's survey and opines

10  that damages actually require a number of individualized inquires. He opines that there

11  are many challenged products of different forms, sizes, and a wide variety of prices, and

12  different demands and cost considerations are present across the products. *Id.* at ¶¶ 42-56.

13  He opines that prices also vary across different retailers where class members purchased

14  the products, and can vary further depending on subscriptions and discounts. *Id.* at ¶¶ 57-

15  61. He also opines that the Challenged Representations do not apply uniformly on the

16  same places or even at all across all the products. *Id.* at 64. Thus, he opines that

17  individualized inquiries will be required to calculate damages. Third, Dr. Ugone argues

18  that the survey that Dr. Dennis designed will not actually measure a price premium but

19  rather a "willingness-to-pay" figure. *Id.* at ¶ 67. This is important, Dr. Ugone opines,

20  because "value" should be measured by market prices and changes in value should be

21  measured by changes in market prices—not willingness-to-pay changes. *Id.* at ¶ 67.

22  Specifically, Dr. Ugone argues that "a damages methodology must evaluate not only

23  demand-side considerations absent the alleged Challenged Representation, but also

24  supply-side considerations" and Dr. Dennis's survey "provide[s] only information from

25  the demand side of consumer behavior and hence yield measures known as willingness-

26  to-pay rather than market prices (or market price differences)." *Id.* at ¶¶ 68-72. Dr. Ugone

27  opines that willingness-to-pay will overstate differences in market prices. *Id.* at ¶ 73. Dr.

28  Ugone states that simply using real world prices do not sufficiently account for this. *Id.* at

¶¶ 75-77. Further, Dr. Ugone also identifies issues with Mr. Weir's proposed formulas for calculating damages. *Id.* at ¶¶ 78-80. Some criticisms are similar—that different demands exist for different products, that the calculation assume that all class members were unsatisfied with the product, that some might have purchased the product for reasons not related to the Challenged Representations. *Id.* at ¶¶ 81-89. Thus, he concludes that individualized inquiry is required to calculate damages. *Id.* at ¶¶ 90-91.

At the outset, the Court notes that choice-based conjoint surveys have routinely been found by courts to be accepted methodology to measure the difference in price that may arise from alleged misrepresentations made about products. *See e.g.*, *Vizcarra.*, 339 F.R.D. at 553 (citing cases); *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17cv2335-GPC (MDD), 2019 WL 3006465, at *3 (S.D. Cal. July 10, 2019) (collecting cases); *McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-JLB, 2021 WL 859137, at *7 (S.D. Cal. Mar. 8, 2021); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 616 (N.D. Cal. 2018).

With regard to Defendant's argument regarding the level of detail in Dr. Dennis's survey, Defendant does concede that Dr. Dennis need not have conducted the conjoint survey at this class certification stage. ECF No. 174 at 47. Rather, Defendant argues that the proposed survey design is lacking in detail, and cites primarily to the case *Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015). In that case, plaintiff also presented a damages model using a contingent valuation approach, proposing to use consumer surveys to measure the relative value consumers placed on product attributes. *Id.* at *21. However, there plaintiff suggested two models, either a Contingent Valuation Method or Choice-Based Conjoint analysis. *Id.* The court found that Dr. Dennis's opinion there lacked sufficient detail—specifically, reviewing the expert report and finding that the "few concrete details" that he provided to be "too vague." *Id.* at *21-22. While the Court agrees with the legal framework set out in this case, it finds that it must evaluate the details given by Dr. Dennis in this specific case, rather than compare with the details in *Miller*. Here, upon review of Dr. Dennis' expert

report, as well as his rebuttal report which flushes out even more details (*see* ECF No. 147-17), the Court finds that Dr. Dennis has sufficiently considered and provided details regarding his proposed conjoint survey, as recited above.

With regards to Defendant's argument that Dr. Dennis's survey only measures willingness-to-pay, the Court agrees that a survey that only calculates willingness to pay does not satisfy the *Comcast* requirement. *Hilsley*, 2019 WL 3006465, at *3; *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("[C]ourts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay."). Rather, the price must reflect not only market demand (through willingness to pay) but also market supply. *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119-20 (C.D. Cal. 2015). Thus, courts have found that the requisite supply side considerations are met if "prices in the surveys reflect the actual market prices during the class period and the quantities used reflect the actual quantities of products sold." *Hilsley*, 2019 WL 3006465, at *3.

Based on these guidelines, the Court finds that Dr. Dennis' survey design does account for supply-side considerations. Dr. Dennis repeatedly stated in his expert report that he would take into account the supply-side factors:

> ¶ 92: I also considered and will further consider supply-side factors and real-world market transaction information from consumer transaction data for Products and competing products.

> ¶ 93: I will design the conjoint survey . . . consider[ing] real-world, supply-side factors for the products at issue . . . *i.e.* the intersection between demand-side factors (willingness to pay) and supply-side factors (willingness to sell), to determine the actual effect of the Challenged Representations on market price. The actual real-world pricing of the Products sold during the class period reflects the actual number of units sold, the costs of manufacturing, the costs for distribution, advertising, and marketing, and margin, among other supply-side factors. I will take into account the fact that these products are sold in a competitive market, through a variety of retail outlets. Further, I will take into account the fact that the quantity supplied of Defendant's and competitors' products is a known fact and is fixed as a matter of history.

¶ 124: In calculating the price premium statistics, I will select price points for the market simulations that correspond to the actual prices paid by consumers for the Defendant's Products during the class period using sales data obtained during the discovery process. By using the actual prices paid by consumers, I will incorporate into my market simulation both demand- and supply-side factors that determine actual, real-world transaction prices. I will use the actual prices paid by class members for the Defendant's Products.

ECF No. 147-15. Furthermore, Mr. Weir also provided opinions on the supply-side factors in his expert report. ECF No. 147-18 at ¶¶ 41-57. Defendant and Dr. Ugone may dispute if these opinions and if the considerations of supply-side factors is *sufficient*, but the Court finds that these disagreements go to the merit of the issue and the weight of the competing expert opinions. However, given the statements from Plaintiffs' experts that they have taken supply-side factors into account—including using real-world market prices as well as actual historical sales data—the Court cannot conclude that Plaintiffs have failed to wholesale take into account supply-side considerations. *See Vizcarra*, 2023 WL 2364736, at *17 ("Further, Dr. Dennis represents that he intends to use actual, historical pricing data for the . . . product at issue in calculating the price premium . . . Dr. Dennis' proposed use of actual pricing data serves to incorporate supply-side factors into the price premium analysis, so that his price premium calculations do not reflect only demand-side factors.); *Fitzhenry-Rusell*, 326 F.R.D. at 606.

As for the remainder of Defendant's arguments, the Court finds that they amount to challenges to the experts' testimony that goes to the weight of the evidence, which is more appropriately challenged at trial and does not preclude a finding here that the price premium damage model satisfies the *Comcast* requirements. *See Hilsey*, 2019 WL 3006465, at *6 (finding that using real-world pricing data satisfies *Comcast* and remaining disputes regarding methodology "go to the weight not its admissibility" of the model); *Vizcarra*, 2023 WL 2364736, at *17 ("Unilever's criticisms of Dr. Dennis' revised price premium model go to the weight that a jury would accord to Dr. Dennis'

opinions as to a price premium calculated pursuant to his proposed model, but they do not preclude a finding that the proposed model satisfies *Comcast*'s requirements.").

Accordingly, the Court concludes here that Plaintiffs have sufficiently shown that Rule 23(b)(3)'s predominance requirement has been met for both the Disease Claim state classes and NDI Disease state classes. Since predominance is met, the lower threshold issue of commonality under Rule 23(a)(2) is also met.

### d.   Superiority

Beyond predominance, the second requirement of Rule 23(b)(3) is that the class action must be "superior" to other available methods to fairly and efficiently adjudicate the controversy. Fed. R. Civ. P 23(b)(3). Factors to consider include "A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Plaintiffs argue that these factors weigh for finding the class action vehicle to be superior because the amounts to be recovered are modest for individuals and so they are individually unlikely to bring suit. ECF No. 144 at 41. Plaintiffs assert that they are not aware of any other litigation involving the product. *Id.* Plaintiffs also assert that this District is the appropriate forum given its substantial ties to Defendant and a large number of class members. *Id.* Defendant challenges superiority because it argues that where full refunds are offered to dissatisfied customers, a class action is not superior. ECF No. 174 at 54. Further, rehashing its preemption claim, Defendant argues that a private class action is not a superior way to regulate Defendant's compliance with FDA regulations. *Id.*

The Court concludes that Plaintiffs have met their burden to show that a class action is the superior method to adjudicate the class member's claims.

//

# IV.   CONCLUSION

After due consideration and for the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** the motion for class certification and **DENIES** the respective *Daubert* motions. Only the following classes are certified:

(1)    A California Subclass for the NDI Claim;

(2)    A Missouri Subclass for the NDI Claim; and

(3)    A California Subclass for the Disease Claim.

Certification of the proposed nationwide classes are **DENIED** for the reasons stated in this Order under the *Mazza* analysis.

**IT IS SO ORDERED.**

Dated:  March 29, 2024

Honorable James E. Simmons Jr.
United States District Judge